# NO. 20-1681

### IN THE
### UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

Neal Bissonnette, Individually and on behalf of all others similarly situated,
Tyler Wojnarowski, Individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

v.

LePage Bakeries Park St., LLC,
C.K. Sales Co., LLC,
Flowers Foods, Inc.,

*Defendants-Appellees*.

On appeal from an order and judgment of the
United States District Court for the District of Connecticut,
Civil Action No. 3:19-cv-00965 (KAD)

### PLAINTIFFS-APPELLANTS' JOINT APPENDIX
### VOLUME I OF 2: (PGS. JA0000-JA0189)

Harold L. Lichten, Esq.
Matthew Thomson, Esq.
Zachary L. Rubin, Esq.
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
hlichten@llrlaw.com
mthomson@llrlaw.com
zrubin@llrlaw.com
Attorneys for *Plaintiffs-Appellants*

# TABLE OF CONTENTS

## VOLUME I of II (189 pages)

| Document/Description | Docket No. | Page No. |
|---|---|---|
| Original Complaint | 1 | JA0001 |
| Amended Class and Collective Action Complaint | 24 | JA0012 |
| Answer of Defendants to Plaintiffs' Amended Class and Collective Action Complaint | 28 | JA024 |
| Defendants' Motion to Dismiss or, in the Alternative, To Compel Arbitration | 31 | JA0045 |
| Memorandum In Support of Defendants' Motion to Dismiss, or in the Alternative, to Compel Arbitration | 31-1 | JA0048 |
| Exhibit 1 to Defendants' Motion to Dismiss or, in the Alternative, To Compel Arbitration – Declaration of Jake Linthicum | 31-2 | JA0077 |
| Plaintiffs' Opposition to Defendants' Motion to Dismiss or, in the Alternative, To Compel Arbitration | 32 | JA0160 |

| | | |
|---|---|---|
| Defendants' Reply in Support of Their Motion to Dismiss or, in the Alternative, To Compel Arbitration | 35 | JA0190 |
| Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Response to Objection | 35-1 | JA0202 |
| Notice of Motion Hearing | 36 | JA0245 |
| Supplement to Defendants' Motion to Dismiss or, in the Alternative, To Compel Arbitration | 41 | JA0247 |
| Supplemental Declaration of Jake Linthicum | 41-1 | JA0251 |
| Plaintiffs' Sur-Reply Based on Judicial Notice Based on Judicial Notice of Prior Admissions Made by Defendants in This Court | 48 | JA0365 |
| Defendants' Memorandum of Law in Support of Its Motion for Summary Judgment (<u>Bokanoski v. Lepage Bakeries Park St., LLC</u>, No. 15-00021, Dkt. 83-1 (D. Conn.)). | 48-1 | JA0370 |
| Declaration of Matthew Thomson In Support of Sur-Reply | 48-2 | JA0407 |

| | | |
|---|---|---|
| Defendants' Response to Plaintiffs' Sur-Reply and Request for Judicial Notice | 49 | JA0409 |
| Notice of Appeal | 53 | JA0416 |
| Transcript of Hearing on Motion to Dismiss | 55 | JA0418 |
| Docket Report | N/A | JA0453 |

UNITED STATES DISTRICT COURT
DISTRICT OF CONNNECTICUT

_____
                                        )
NEAL BISSONNETTE                        )      CIVIL ACTION NO: _____
and TYLER WOJNAROWSKI                   )
on behalf of themselves and all         )
others similarly situated,              )
                                        )
        Plaintiffs,                     )
                                        )
        v.                              )      JUNE 20, 2019
                                        )
LEPAGE BAKERIES PARK ST., LLC,          )
C.K. SALES CO., LLC, and FLOWERS        )
FOODS, INC.                             )
                                        )
        Defendants.                     )
_____)


## CLASS AND COLLECTIVE ACTION COMPLAINT

### INTRODUCTION

1.      This is an action brought on behalf of individuals who work or have previously

worked as distributors for Defendants LePage Bakeries Park St., LLC ("LePage Bakeries"), CK

Sales Co., LLC ("CK Sales"), and Flowers Foods, Inc. ("Flowers") (together, "Defendants") in

Connecticut during the relevant statutory period.  Plaintiffs and other distributors perform

delivery of breads and baked good products on behalf of Defendants in Connecticut.  Plaintiffs

seek to challenge Defendants' unlawful misclassification of distributors as independent

contractors instead of employees.  Plaintiffs bring this action on behalf of themselves and on

behalf of all others similarly situated in the State of Connecticut under Fed. R. Civ. P. 23 and the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).

JA0001

## PARTIES

2.     Plaintiff Neil Bissonette is an adult resident of Bristol, Connecticut.  Since approximately October 2015, Bissonette has delivered baked goods on behalf of Defendants in Connecticut. During the relevant time, he was Defendants' employee as that term is defined Conn. Gen. Stat. § 31-71a.

3.     Plaintiff Tyler Wojnarowski is an adult resident of Southington, Connecticut and a citizen of Connecticut.  Since approximately October 2016, Wojnarowski has delivered baked goods on behalf of Defendants in Connecticut. During the relevant time, he was Defendants' employee as that term is defined Conn. Gen. Stat. § 31-71a.

4.     The above-named Plaintiffs bring this action on their own behalf and on behalf of all similarly situated individuals as a "opt out" class action under Fed. R. Civ. P. 23 and as an "opt-in" collective action under the FLSA.

5.     Defendant LePage Bakeries Park St., LLC, is a Limited Liability Company formed under the laws of the State of Maine.  It conducts business through distribution facilities in Connecticut, among other states.

6.     Defendant CK Sales, Inc. is a Limited Liability Company formed in Delaware. CK Sales conducts business through distribution facilities in Connecticut, among other states.

7.     Defendant Flowers Foods, Inc. is incorporated under the laws of the State of Georgia. Flowers conducts business through distribution facilities in Connecticut, among other states.

8.     Defendants are engaged in interstate commerce and employ individuals engaged in interstate commerce and are therefore covered by the FLSA, and they are "employers" as that term is defined for purposes of the Connecticut wage laws.

2

**JURISDICTION AND VENUE**

9.      The Court has original jurisdiction over the FLSA claims asserted in this matter pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331.

10.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue in this forum is proper pursuant to 28 U.S.C. §§ 1391(a) and (c), because Defendants conduct business in Connecticut and are subject to personal jurisdiction in this District.

**FACTS**

12.     Defendants' business consists of manufacturing, delivering, and selling baked goods under brand names such as Country Kitchen and Wonder Bread.

13.     On its website, Flowers describes explains that it "is one of the largest producers of packaged bakery foods in the United States. The company operates 47 highly efficient bakeries that produce a wide range of bakery foods for retail and food service customers in the U.S."

14.     Defendants utilize a large workforce of delivery drivers in Connecticut to deliver baked goods and stock the shelves at retail locations in the state.

15.     Prior to October 2015, Plaintiff Bissonette performed delivery work as an employee of Defendants.

16.     In approximately October 2015, Plaintiff Bissonnette paid a substantial fee to Defendants to purchase purported "Distribution Rights," entered into a "Distributor Agreement"

JA0003

with Defendants.  Since that time, Plaintiff Bissonnette has been misclassified as an independent

contractor, performing delivery work for Defendants.

17.     In approximately October 2016, Plaintiff Wojnarowski also paid a substantial fee to

Defendants to purchase purported "Distribution Rights," entered into a similar "Distributor

Agreement" with Defendants.  Since that time, Plaintiff Wojnarowski has been misclassified as an

independent contractor, performing delivery work for Defendants.

18.     As distributors, Plaintiffs deliver baked good products to retailers and other

customers in Connecticut, thereby providing an integral service to the baked goods business of

Defendants.  Plaintiffs and other distributors pick-up products at a warehouse that have been

delivered from one of Defendants' commercial bakery locations, and then transport those goods

within the flow of interstate commerce by delivering them to various stores and retail locations.

19.     Defendants have required Plaintiffs and other Distributors to enter into a form

contract, typically called a "Distributor Agreement" in order to perform their work.  The

Distributor Agreements are adhesion contracts drafted exclusively by Defendants.   The terms

and conditions of each Distributor's Distributor Agreement are the same in material respects.

20.     For example, Defendants require all Distributors to form a corporation in order to

begin work.

21.     The Distributor Agreements purport to classify the Distributors as "independent

contractors."

22.     Defendants have the right to control, and in fact exercise substantial control over

the work performed by the Distributors.

23.     Defendants employ managers who have supervisory and disciplinary

authority over the Distributors.

4

24.     Defendants require Distributors to comply with their policies and procedures, including the time, place, and manner of pick-ups and deliveries.  For example, Defendants often require Distributors to bring a particular amount of product to a store location, even when the Distributor has determined that a lesser amount should be delivered.

25.     Defendants require Distributors to display product according to its requirements, and Defendants' employees visit stores to review Distributors' compliance with these policies.

26.     Defendants require Distributors to return to the warehouse each day after completing their deliveries so that they may "upload" data to Defendants' system, and sort stale bread for Defendants, which Defendants then resell.

27.     Defendants enforce these various requirements by giving Distributors "breach letters" if they do not meet Defendants' standards.  In these letters, Defendants threaten that if the distributor's performance is not improved, they can be terminated.

28.     Defendants also require Distributors to obtain its approval before selling their routes or substituting another driver for their route.

29.     The Distributors and Defendants are engaged in the same usual course of business: the sale and distribution of baked goods.

30.     Plaintiffs and other Distributors perform their work at Defendants' usual place of business.  Specifically, Plaintiffs pick up and drop off product at Defendants' warehouse in Waterbury, Connecticut approximately five days per week and perform their deliveries within a territory designated by Defendants and at retail locations that Defendants frequently visit to review their job performance.

JA0005

31.     Plaintiffs and Distributors are not customarily engaged in an independently established trade, occupation, profession, or business of the same nature as the services they provide to Defendants. Based on all the hours that Defendants require Plaintiffs to spend making deliveries and servicing their route(s), there is little or no time left for Plaintiffs to make deliveries for any other company besides Defendants.

32.     Since they started work for Defendants, neither Plaintiff Wojnarowski nor Plaintiff Bissonette have performed delivery work for any other company or entity other than Defendants.  As a result, the Plaintiffs and Distributors are economically dependent on Defendants.

33.     On a typical week, Distributors such as the named Plaintiffs work at least forty hours per week delivering the baked goods for Defendants.  This work mainly consists of driving vehicles to stores within a territory designated by Defendants, delivering Defendants' products to these stores, and arranging the products on the shelves according to Defendants' standards.

34.     The duties of Plaintiffs and other Distributors entail, at least in part, driving vehicles weighing less than 10,000 pounds because, for example, Plaintiffs and others often visit stores in their personal vehicles to drop off small orders of products and to arrange displays.

35.     Defendants do not pay any overtime premium to Plaintiffs and class members for hours worked over forty per week.

36.     Defendants deduct various amounts from the pay of Plaintiffs and other distributors. For example, Defendants deduct hundreds of dollars from Plaintiffs' and class members' wages on a weekly basis for truck lease payments, insurance premiums related to their delivery work, payments for "distribution rights," and administrative fees and warehouse fees.

JA0006

37. Defendants' misclassification of its delivery drivers and various violations described above are knowing, willful, and undertaken in bad faith. Defendants required employee distributors like Plaintiffs to enter into Distributor Agreements under which they are designated as independent contractors, even though Defendants maintain substantial control over the Distributors' work and the Distributors perform the core function of Defendants' baked goods delivery business, making distributors employees under nearly any applicable test, particularly Connecticut's strict "ABC" employment test set forth in . Defendants' knowingly and intentionally engaged in this misclassification so that they could unlawfully shift business expenses to their employees, deny Plaintiffs and Distributors overtime wages, withhold portions of their wages, and require them to pay for their jobs in violation of Connecticut law and the FLSA.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

38. Plaintiffs bring this class action lawsuit under Federal Rule Civil Procedure 23 on behalf of all individuals who have signed a distributor agreement and who personally deliver products for Defendants in the State of Connecticut.

39. The members of the class are so numerous that joinder of all of them is impracticable, and treatment of a class action is the superior method to adjudicate the class members' claims.

40. There are issues of law and fact common to all class members because Defendants have misclassified them as independent contractors rather than as employees and have unlawfully deprived them of the wage treatment and benefits accorded employees. These questions of law and fact predominate over any questions affecting only individual class members.

7

41.     The named plaintiffs and class counsel will fairly and adequately represent the interests of the class.

42.     Plaintiffs also assert claims under the FLSA on behalf of all similarly situated drivers in Connecticut.

43.     Plaintiffs' FLSA claims should proceed as a collective action because Plaintiffs and other putative collective members worked pursuant to the common policy described above under which Defendants did not provide any overtime premium when Distributors worked more than forty hours per week, and therefore they are "similarly situated" as that term is defined in 29 U.S.C. § 216(b).

# COUNT I

## UNPAID OR WITHHELD WAGES IN VIOLATION OF CONN. GEN. STAT. § 31-72

44.     Defendants have misclassified the Plaintiffs and other similarly situated delivery drivers as independent contractors when they are actually employees under the Connecticut wage laws.

45.     As a result of this misclassification, Defendants did not pay Plaintiffs and other similarly situated delivery drivers all the wages owed them under Conn. Gen. Stat. § 31-71a.

46.     Defendants unlawfully deducted hundreds of dollars from Plaintiffs and class members' wages on a weekly basis for purported fees, insurance charges, territory payments, and truck lease payments.

47.     Defendants' practice of making various unlawful and unauthorized deductions from the Plaintiffs' and class members' compensation violates Conn. Gen. Stat. § 31-71e.

JA0008

48.     Plaintiffs and Class Members seek compensation resulting from Defendants' violation of Conn. Gen. Stat. § 31-71e pursuant to Conn. Gen. Stat. § 31-72.

## COUNT II

## FAIR LABOR STANDARDS ACT–FAILURE TO PAY OVERTIME WAGES

49.     Plaintiffs and the members of the proposed FLSA collective routinely worked in excess of forty (40) hours per workweek for Defendants.

50.     Defendants failed to pay Plaintiffs and the members of the putative FLSA collective at the rate of one-and-a-half times their regular rate of pay for all hours worked in excess of forty hours weekly as required by section 7(a) of the FLSA, 29 U.S.C. § 207(a).

51.     Plaintiffs and the members of the Plaintiffs class are entitled to back wages at the rate of one-and-a-half times their regular rate of pay for all overtime hours worked in excess of forty hours per week, pursuant to section 16(b) of the FLSA, 29 U.S.C. § 216(b).

52.     The failure of Defendants to compensate Plaintiffs and the members of the Plaintiffs class for overtime work as required by the FLSA was knowing, willful, intentional, and done in bad faith.

53.     Plaintiffs and the members of the Plaintiffs class are also entitled to liquidated damages equal to the amount of unpaid overtime compensation due to them under the FLSA, pursuant to section 16(b) of the FLSA, 29 U.S.C. § 216(b).

54.     Plaintiffs and those similarly situated are also entitled to an award of reasonable attorneys' fees and costs incurred in prosecuting this action, pursuant to 29 U.S.C. § 216(b).

JA0009

## COUNT III

## UNJUST ENRICHMENT

55.    By misclassifying Plaintiffs and class members as independent contractors when they are employees under Connecticut law and requiring them to pay to acquire Distribution Rights and to bear the employer's operating expenses in order to work, including payments for Worker's Compensation and other insurances required to be furnished by employers, Defendants were unjustly enriched, to the detriment of Plaintiffs and class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs asks this honorable Court to enter the following relief:

a.   An Order granting certification of this case as an FLSA collective action and permitting notice to be sent to potential Opt-in Plaintiffs;

b.   An order certifying a class of similarly situated individuals pursuant to Fed. R. Civ. P. 23;

c.   An award of damages for all unpaid wages, expenditures, costs, deductions, benefits, or other losses resulting from Defendants' misclassification, as described in this Complaint;

d.   Restitution of the payments made by Plaintiffs in order to purchase their routes, and all other business expenses born by Plaintiffs on behalf of Defendants, in an amount sufficient to make Plaintiffs whole;

e.   Statutory penalty and liquidated damages, pursuant to Connecticut law and the FLSA;

f.   An order enjoining Defendants' from continuing their illegal practices and ordering them to reclassify Plaintiffs and the members of the class as employees;

g.   Attorneys' fees, costs, and prejudgment interest; and

h.   Such other legal and equitable relief as the Court deems just and proper.

JA0010

NEAL BISSONNETTE
and TYLER WOJNAROWSKI,
on behalf of themselves and all
others similarly situated,

By their Attorneys,


/s/ Zachary L. Rubin

Harold L. Lichten, *pro hac vice anticipated*
Matthew W. Thomson, *pro hac vice anticipated*
Zachary L. Rubin, (ct30192)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA  02116
(617) 994-5800
hlichten@llrlaw.com
mthomson@llrlaw.com
zrubin@llrlaw.com


DATED:  June 20, 2019

JA0011

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNNECTICUT**

| | | |
|---|---|---|
| ———————————————— | ) | |
| NEAL BISSONNETTE | ) | CIVIL ACTION NO: 3:19-CV-00965 |
| and TYLER WOJNAROWSKI | ) | |
| on behalf of themselves and all | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | AUGUST 19, 2019 |
| | ) | |
| LEPAGE BAKERIES PARK ST., LLC, | ) | |
| C.K. SALES CO., LLC, and FLOWERS | ) | |
| FOODS, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

## AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

### INTRODUCTION

1.     This is an action brought on behalf of individuals who work or have previously

worked as distributors for Defendants Lepage Bakeries Park St., LLC ("Lepage Bakeries"), CK

Sales Co., LLC ("CK Sales"), and Flowers Foods, Inc. ("Flowers") (together, "Defendants") in

Connecticut during the relevant statutory period.  Plaintiffs and other distributors perform

delivery of breads and baked good products on behalf of Defendants in Connecticut.  Plaintiffs

seek to challenge Defendants' unlawful misclassification of distributors as independent

contractors instead of employees.  Plaintiffs bring this action on behalf of themselves and on

behalf of all others similarly situated in the State of Connecticut under Fed. R. Civ. P. 23 and the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).

JA0012

**PARTIES**

2.       Plaintiff Neil Bissonette is an adult resident of Bristol, Connecticut.  Since

approximately 2017, Bissonette has delivered baked goods on behalf of Defendants in

Connecticut while being classified as an independent contractor. During the relevant time, he

was Defendants' employee as that term is defined in Conn. Gen. Stat. § 31-71a and under the

FLSA

3.       Plaintiff Tyler Wojnarowski is an adult resident of Southington, Connecticut and

a citizen of Connecticut.  Since approximately 2018, Wojnarowski has delivered baked goods on

behalf of Defendants in Connecticut while being classified as an independent contractor. During

the relevant time, he was Defendants' employee as that term is defined in Conn. Gen. Stat. § 31-

71a and under the FLSA.

4.       The above-named Plaintiffs bring this action on their own behalf and on behalf of

all similarly situated individuals as a "opt out" class action under Fed. R. Civ. P. 23 and as an

"opt-in" collective action under the FLSA.  For some putative class and collective members who

have previously released such claims up until March 2017, Plaintiffs do not seek to pursue

claims for such individuals that arose during the released period.

5.       Defendant Lepage Bakeries Park St., LLC, is a Limited Liability Company

formed under the laws of the State of Maine.  It conducts business through distribution facilities

in Connecticut, among other states.

6.       Defendant CK Sales, Inc. is a Limited Liability Company formed in Delaware.

CK Sales conducts business through distribution facilities in Connecticut, among other states.

JA0013

7.      Defendant Flowers Foods, Inc. is incorporated under the laws of the State of Georgia. Flowers conducts business through distribution facilities in Connecticut, among other states.

8.      Defendants are engaged in interstate commerce and employ individuals engaged in interstate commerce and are therefore covered by the FLSA, and they are "employers" as that term is defined for purposes of the Connecticut wage laws.

## JURISDICTION AND VENUE

9.      The Court has original jurisdiction over the FLSA claims asserted in this matter pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331.

10.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue in this forum is proper pursuant to 28 U.S.C. §§ 1391(a) and (c), because Defendants conduct business in Connecticut and are subject to personal jurisdiction in this District.

## FACTS

12.     Defendants' business consists of manufacturing, delivering, and selling baked goods under brand names such as Country Kitchen and Wonder Bread.

13.     On its website, Flowers explains that it "is one of the largest producers of packaged bakery foods in the United States. The company operates 47 highly efficient bakeries that produce a wide range of bakery foods for retail and food service customers in the U.S."

3

14.     Defendants utilize a large workforce of delivery drivers in Connecticut to deliver baked goods and stock the shelves at retail locations in the state.

15.     Prior to 2017, Plaintiff Bissonette performed delivery work as an employee of Defendants.

16.     In approximately 2017, Plaintiff Bissonnette paid a substantial fee to Defendants to purchase purported "Distribution Rights," entered into a "Distributor Agreement" with Defendants. Since that time, Plaintiff Bissonnette has been misclassified as an independent contractor, performing delivery work for Defendants.

17.     In approximately 2018, Plaintiff Wojnarowski also paid a substantial fee to Defendants to purchase purported "Distribution Rights," entered into a similar "Distributor Agreement" with Defendants.  Since that time, Plaintiff Wojnarowski has been misclassified as an independent contractor, performing delivery work for Defendants.

18.     As distributors, Plaintiffs deliver baked good products to retailers and other customers in Connecticut, thereby providing an integral service to the baked goods business of Defendants.  Plaintiffs and other distributors pick-up products at a warehouse that have been delivered from one of Defendants' commercial bakery locations, and then transport those goods within the flow of interstate commerce by delivering them to various stores and retail locations.

19.     Defendants have required Plaintiffs and other Distributors to enter into a form contract, typically called a "Distributor Agreement" in order to perform their work.  The Distributor Agreements are adhesion contracts drafted exclusively by Defendants.   The terms and conditions of each Distributor's Distributor Agreement are the same in material respects.

20.     For example, Defendants require all Distributors to form a corporation in order to begin work.

JA0015

21.     The Distributor Agreements purport to classify the Distributors as "independent contractors."

22.     Defendants have the right to control, and in fact exercise substantial control over the work performed by the Distributors.

23.     Defendants employ managers who have supervisory and disciplinary authority over the Distributors.

24.     Defendants require Distributors to comply with their policies and procedures, including the time, place, and manner of pick-ups and deliveries.  For example, Defendants often require Distributors to bring a particular amount of product to a store location, even when the Distributor has determined that a lesser amount should be delivered.

25.     Defendants require Distributors to display product according to its requirements, and Defendants' employees visit stores to review Distributors' compliance with these policies.

26.     Defendants require Distributors to return to the warehouse each day after completing their deliveries so that they may "upload" data to Defendants' system, and sort stale bread for Defendants, which Defendants then resell.

27.     Defendants enforce these various requirements by giving Distributors "breach letters" if they do not meet Defendants' standards.  In these letters, Defendants threaten that if the distributor's performance is not improved, they can be terminated.

28.     Defendants also require Distributors to obtain its approval before selling their routes or substituting another driver for their route.

29.     The Distributors and Defendants are engaged in the same usual course of business: the sale and distribution of baked goods.

30.     Plaintiffs and other Distributors perform their work at Defendants' usual place of business.  Specifically, Plaintiffs pick up and drop off product at Defendants' warehouse in Waterbury, Connecticut approximately five days per week and perform their deliveries within a territory designated by Defendants and at retail locations that Defendants frequently visit to review their job performance.

31.     Plaintiffs and Distributors are not customarily engaged in an independently established trade, occupation, profession, or business of the same nature as the services they provide to Defendants. Based on all the hours that Defendants require Plaintiffs to spend making deliveries and servicing their route(s), there is little or no time left for Plaintiffs to make deliveries for any other company besides Defendants.

32.     Since they started work for Defendants, neither Plaintiff Wojnarowski nor Plaintiff Bissonette have performed delivery work for any other company or entity other than Defendants.  As a result, the Plaintiffs and Distributors are economically dependent on Defendants.

33.     On a typical week, Distributors such as the named Plaintiffs work at least forty hours per week delivering the baked goods for Defendants.  This work mainly consists of driving vehicles to stores within a territory designated by Defendants, delivering Defendants' products to these stores, and arranging the products on the shelves according to Defendants' standards.

34.     The duties of Plaintiffs and other Distributors entail, at least in part, driving vehicles weighing less than 10,000 pounds because, for example, Plaintiffs and others often visit stores in their personal vehicles to drop off displays or small orders of product or to arrange

displays, and Plaintiffs and other Distributors often transport tools and materials needed for their work in these vehicles weighing less than 10,000 pounds.

35.     Defendants do not pay any overtime premium to Plaintiffs and class members for hours worked over forty per week.

36.     Defendants deduct various amounts from the pay of Plaintiffs and other distributors. For example, Defendants deduct hundreds of dollars from Plaintiffs' and class members' wages on a weekly basis for truck lease payments, insurance premiums related to their delivery work, payments for "distribution rights," and administrative fees and warehouse fees.

37.     Defendants' misclassification of its delivery drivers and various violations described above are knowing, willful, and undertaken in bad faith.  Defendants required employee distributors like Plaintiffs to enter into Distributor Agreements under which they are designated as independent contractors, even though Defendants maintain substantial control over the Distributors' work and the Distributors perform the core function of Defendants' baked goods delivery business, making distributors employees under nearly any applicable test, particularly Connecticut's strict "ABC" employment test set forth in .  Defendants' knowingly and intentionally engaged in this misclassification so that they could unlawfully shift business expenses to their employees, deny Plaintiffs and Distributors overtime wages, withhold portions of their wages, and require them to pay for their jobs in violation of Connecticut law and the FLSA.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

38.     Plaintiffs bring this class action lawsuit under Federal Rule Civil Procedure 23 on behalf of all individuals who have signed a distributor agreement and who personally deliver products for Defendants in the State of Connecticut.

JA0018

39.     The members of the class are so numerous that joinder of all of them is impracticable, and treatment of a class action is the superior method to adjudicate the class members' claims.

40.     There are issues of law and fact common to all class members because Defendants have misclassified them as independent contractors rather than as employees and have unlawfully deprived them of the wage treatment and benefits accorded employees. These questions of law and fact predominate over any questions affecting only individual class members.

41.     The named plaintiffs and class counsel will fairly and adequately represent the interests of the class.

42.     Plaintiffs also assert claims under the FLSA on behalf of all similarly situated drivers in Connecticut.

43.     Plaintiffs' FLSA claims should proceed as a collective action because Plaintiffs and other putative collective members worked pursuant to the common policy described above under which Defendants did not provide any overtime premium when Distributors worked more than forty hours per week, and therefore they are "similarly situated" as that term is defined in 29 U.S.C. § 216(b).

## COUNT I

## UNPAID OR WITHHELD WAGES IN VIOLATION OF CONN. GEN. STAT. § 31-72

44.     Defendants have misclassified the Plaintiffs and other similarly situated delivery drivers as independent contractors when they are actually employees under the Connecticut wage laws.

JA0019

45.     As a result of this misclassification, Defendants did not pay Plaintiffs and other similarly situated delivery drivers all the wages owed them under Conn. Gen. Stat. § 31-71a.

46.     Defendants unlawfully deducted hundreds of dollars from Plaintiffs and class members' wages on a weekly basis for purported fees, insurance charges, territory payments, and truck lease payments.

47.     Defendants' practice of making various unlawful and unauthorized deductions from the Plaintiffs' and class members' compensation violates Conn. Gen. Stat. § 31-71e.

48.     Plaintiffs and Class Members seek compensation resulting from Defendants' violation of Conn. Gen. Stat. § 31-71e pursuant to Conn. Gen. Stat. § 31-72.

## COUNT II

### FAILURE TO PAY OVERTIME WAGES IN VIOLATION OF CONN. GEN. STAT. § 31-76C

49.     Plaintiffs and the members of the proposed Rule 23 class routinely worked in excess of forty (40) hours per workweek for Defendants.

50.     Defendants failed to pay Plaintiffs and members of the putative Rule 23 class at a rate of one-and-a-half times their regular rate of pay for all hours worked in excess of forty as required by Conn. Gen. Stat. § 31-76c.

## COUNT III

### FAIR LABOR STANDARDS ACT–FAILURE TO PAY OVERTIME WAGES

51.     Plaintiffs and the members of the proposed FLSA collective routinely worked in excess of forty (40) hours per workweek for Defendants.

52.     Defendants failed to pay Plaintiffs and the members of the putative FLSA

JA0020

collective at the rate of one-and-a-half times their regular rate of pay for all hours worked in excess of forty hours weekly as required by section 7(a) of the FLSA, 29 U.S.C. § 207(a).

53.     Plaintiffs and the members of the Plaintiffs class are entitled to back wages at the rate of one-and-a-half times their regular rate of pay for all overtime hours worked in excess of forty hours per week, pursuant to section 16(b) of the FLSA, 29 U.S.C. § 216(b).

54.     The failure of Defendants to compensate Plaintiffs and the members of the Plaintiffs class for overtime work as required by the FLSA was knowing, willful, intentional, and done in bad faith.

55.     Plaintiffs and the members of the Plaintiffs class are also entitled to liquidated damages equal to the amount of unpaid overtime compensation due to them under the FLSA, pursuant to section 16(b) of the FLSA, 29 U.S.C. § 216(b).

56.     Plaintiffs and those similarly situated are also entitled to an award of reasonable attorneys' fees and costs incurred in prosecuting this action, pursuant to 29 U.S.C. § 216(b).

## COUNT III

## UNJUST ENRICHMENT

57.     By misclassifying Plaintiffs and class members as independent contractors when they are employees under Connecticut law and requiring them to pay to acquire Distribution Rights and to bear the employer's operating expenses in order to work, including payments for Worker's Compensation and other insurances required to be furnished by employers, Defendants were unjustly enriched, to the detriment of Plaintiffs and class members.

JA0021

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs asks this honorable Court to enter the following relief:

    a.   An Order granting certification of this case as an FLSA collective action and permitting notice to be sent to potential Opt-in Plaintiffs;

    b.   An order certifying a class of similarly situated individuals pursuant to Fed. R. Civ. P. 23;

    c.   An award of damages for all unpaid wages, expenditures, costs, deductions, benefits, or other losses resulting from Defendants' misclassification, as described in this Complaint;

    d.   Restitution of the payments made by Plaintiffs in order to purchase their routes, and all other business expenses born by Plaintiffs on behalf of Defendants, in an amount sufficient to make Plaintiffs whole;

    e.   Statutory penalty and liquidated damages, pursuant to Connecticut law and the FLSA;

    f.   An order enjoining Defendants' from continuing their illegal practices and ordering them to reclassify Plaintiffs and the members of the class as employees;

    g.   Attorneys' fees, costs, and prejudgment interest; and

    h.   Such other legal and equitable relief as the Court deems just and proper.

JA0022

NEAL BISSONNETTE
and TYLER WOJNAROWSKI,
on behalf of themselves and all
others similarly situated,

By their Attorneys,


*/s/ Harold L. Lichten*

Harold L. Lichten, *pro hac vice*
Matthew W. Thomson, *pro hac vice*
Zachary L. Rubin, (ct30192)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA  02116
(617) 994-5800
hlichten@llrlaw.com
mthomson@llrlaw.com
zrubin@llrlaw.com


DATED:  August 19, 2019

JA0023

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NEAL BISSONNETTE
and TYLER WOJNAROWSKI
on behalf of themselves and all
others similarly situated,

                      Plaintiffs,

    v.

LEPAGE BAKERIES PARK ST., LLC,
C.K. SALES CO., LLC, and FLOWERS
FOODS, INC.

                      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:19-cv-00965-
KAD


September 3, 2019

**ANSWER OF DEFENDANTS TO PLAINTIFFS' AMENDED CLASS AND
COLLECTIVE ACTION COMPLAINT**

    NOW COME Defendants Lepage Bakeries Park Street, LLC ("Lepage")[1], CK Sales Co.,

LLC ("CK Sales"), and Flowers Foods, Inc. ("Flowers Foods") (collectively, "Defendants"), by

and through their undersigned counsel, and hereby file their Answer to Plaintiffs' Amended Class

and Collective Action Complaint and state:

**INTRODUCTION**

    1.      Defendants admit that Plaintiffs purport to bring this action on behalf of themselves

and "all others similarly situated" in Connecticut under Fed. R. Civ. P. 23 and 29 U.S.C. § 216(b)

during the "relevant statutory period" challenging Defendants' alleged misclassification of them

as independent contractors. Defendants deny that any "similarly situated" distributors exist under

29 U.S.C. § 216(b), that class treatment is appropriate under Fed. R. Civ. P. 23, or that Plaintiffs

or those they seek to represent have any viable claims against Defendants. Defendants further deny

that Plaintiffs or those they seek to represent are entitled to bring their claims in court because they

---

[1] The correct spelling is Lepage Bakeries Park Street, LLC instead of Lepage Bakeries Park St., LLC.

have signed valid, binding arbitration agreements with class action waivers. Defendants deny all remaining allegations contained in Paragraph 1 of Plaintiffs' Amended Complaint.

## PARTIES

2.      Defendants admit that, upon information and belief, Plaintiff Neal Bissonnette is an adult resident of Bristol, Connecticut. Defendants also admit that, since approximately June 2017, as an independent contractor and through his independent corporation, Bissonnette sold and delivered certain baked goods to customers in Connecticut. Defendants deny the remaining allegations contained in Paragraph 2 of Plaintiffs' Amended Complaint.

3.      Defendants admit that, upon information and belief, Plaintiff Tyler Wojnarowski is an adult resident of Southington, Connecticut and a citizen of Connecticut. Defendants also admit that, since approximately May 2018, as an independent contractor and through his own independent corporation, Wojnarowski has sold and delivered baked goods to customers in Connecticut. Defendants deny the remaining allegations contained in Paragraph 3 of Plaintiffs' Amended Complaint.

4.       Defendants admit that Plaintiffs purport to bring this action on behalf of all "similarly situated individuals" as an "opt out" class action under Fed. R. Civ. P. 23 and as an "opt in" collective action under the FLSA and that Plaintiffs reportedly do not seek to pursue claims for distributors who previously released claims up to March of 2017. Defendants deny, however, that class or collective action treatment would be appropriate, that Plaintiffs or those individuals they seek to represent have any viable claims, or that Plaintiffs or those they seek to represent can pursue their claims in court.

5.      Defendants admit that Lepage is a Maine limited liability company and conducts certain business in Connecticut, among other states. Defendants deny the remaining allegations contained in Paragraph 5 of Plaintiffs' Amended Complaint.

JA0025

6.    Defendants admit that CK Sales is a Delaware limited liability company. Defendants further admit that CK Sales contracts with distributors in Connecticut, among other states, through the distributors' own corporations. Defendants deny the remaining allegations contained in Paragraph 6 of Plaintiffs' Amended Complaint.

7.    Defendants admit that Flowers Foods is a Georgia corporation but deny the remaining allegations contained in Paragraph 7 of Plaintiffs' Amended Complaint.

8.    Defendants admit that they are engaged in and employ certain individuals engaged in "interstate commerce" within the meaning of and as defined by the FLSA and are therefore covered by the FLSA. Defendants deny, however, that they employ Plaintiffs or those Plaintiffs seek to represent. Defendants further deny that Plaintiffs and those they seek to represent are "engaged in foreign or interstate commerce" within the meaning of Section 1 of the Federal Arbitration Act ("FAA"). Defendants admit, however, that Plaintiffs and those they seek to represent are engaged in transactions "affecting commerce" or "involving commerce" under Section 2 of the FAA. Defendants deny the remaining allegations contained in Paragraph 8 of the Amended Complaint.

## JURISDICTION AND VENUE

9.    Defendants deny the allegations contained in Paragraph 9 of the Amended Complaint.

10.    Defendants deny the allegations contained in Paragraph 10 of the Amended Complaint.

11.    Defendants deny the allegations contained in Paragraph 11 of the Amended Complaint.

JA0026

**FACTS**

12.     Defendants admit that the business of Lepage includes, in part, manufacturing baked goods under brand names such as Country Kitchen and Wonder Bread. Defendants deny the remaining allegations contained in Paragraph 12 of the Amended Complaint.

13.     Defendants admit that the Flowers Foods website contains the language quoted, but deny that such language, in isolation, accurately portrays its organizational structure, including its subsidiaries.

14.     Defendants admit that CK Sales contracted with a number of independent contractor distributors, through their independently-established corporations, to sell and distribute various products in the State of Connecticut and that such distributors are also responsible for, among other things, properly stocking shelves at retail locations. Defendants deny the remaining allegations contained in Paragraph 14 of the Amended Complaint.

15.     Defendants deny the allegations contained in Paragraph 15 of the Amended Complaint.

16.     Defendants admit that in approximately June 2017, Plaintiff Bissonnette made a significant investment by purchasing distribution rights to a defined territory and, through his independent corporation, entered into a Distributor Agreement with CK Sales. Defendants deny the remaining allegations contained in Paragraph 16 of the Amended Complaint.

17.     Defendants admit that in approximately May 2018, Plaintiff Wojnarwski made a significant investment by purchasing distribution rights to a defined territory and, through his independent corporation, entered into a Distributor Agreement with CK Sales. Defendants deny the remaining allegations contained in Paragraph 17 of the Amended Complaint.

18.     Defendants admit that as distributors, Plaintiffs, through their respective corporations, sell and distribute certain baked goods to customers (including various stores and

retail locations), that they may pick up these products from a warehouse, and that such products are produced in response to specific orders they place for their customers by other subsidiary bakeries, several of which may be located out of state. Defendants further admit that those products remain in the stream of interstate commerce, within the meaning of and as that term is defined in the FLSA. Defendants also admit that the flow of such products affects or involves commerce under Section 2 of the FAA. Defendants deny, however, that distributors are "engaged in interstate commerce" under Section 1 of the FAA and deny the remaining allegations contained in Paragraph 18 of the Amended Complaint.

19.     Defendants admit that CK Sales entered into a Distributor Agreement with Plaintiffs and those individuals they seek to represent, through their own independent corporations, but deny the remaining allegations contained in Paragraph 19 of the Amended Complaint.

20.     Defendants admit that CK Sales only contracts with distributors who operate their businesses through a corporation but deny the remaining allegations contained in Paragraph 20 of the Amended Complaint.

21.     Defendants admit that the Distributor Agreements contains an "Essential Term" under which distributor operate as independent contractors. Defendants deny the remaining allegations contained in Paragraph 21 of the Amended Complaint.

22.     Defendants deny the allegations contained in Paragraph 22 of the Amended Complaint.

23.     Defendants deny the allegations contained in Paragraph 23 of the Amended Complaint.

24.     Defendants deny the allegations contained in Paragraph 24 of the Amended Complaint.

JA0028

25.     Defendants deny the allegations contained in Paragraph 25 of the Amended Complaint.

26.     Defendants deny the allegations contained in Paragraph 26 of the Amended Complaint.

27.     Defendants deny the allegations contained in Paragraph 27 of the Amended Complaint.

28.     Defendants deny the allegations contained in Paragraph 28 of the Amended Complaint.

29.     Defendants deny the allegations contained in Paragraph 29 of the Amended Complaint.

30.     Defendants deny the allegations contained in Paragraph 30 of the Amended Complaint.

31.     Defendants deny the allegations contained in Paragraph 31 of the Amended Complaint.

32.     Defendants are without sufficient knowledge or information to form a belief regarding whether either named Plaintiff performed delivery work for any other company or entity and therefore deny the same. Defendants deny the remaining allegations contained in Paragraph 32 of the Amended Complaint.

33.     Defendants are without knowledge or information sufficient to form a belief regarding whether named Plaintiffs work at least forty hours per week and therefore deny the same. Defendants deny the remaining allegations contained in Paragraph 33 of the Amended Complaint.

34.     Defendants deny that the "duties" of Plaintiffs and other distributors entail, at least in part, driving vehicles weighing less than 10,000 pounds and lack sufficient knowledge or

JA0029

information to form a belief as to whether Plaintiffs and other distributors often transport tools and other materials needed for their work in these vehicles and therefore deny the same. Defendants deny the remaining allegations contained in Paragraph 34 of the Amended Complaint.

35.     Defendants admit that they do not pay overtime to Plaintiffs or those individuals Plaintiffs seek to represent because they are independent contractors or otherwise exempt from overtime. Defendants deny the remaining allegations contained in Paragraph 35 of the Amended Complaint.

36.     Defendants deny the allegations contained in Paragraph 36 of the Amended Complaint.

37.     Defendants admit that Plaintiffs and the individuals they seek to represent, through their own independent corporations, enter into Distributor Agreements under which they are designated as independent contractors. Defendants deny the remaining allegations contained in Paragraph 37 of the Amended Complaint.

38.     Defendants admit that Plaintiffs purport to bring this lawsuit under Fed. R. Civ. P. 23 on behalf of all individuals who signed a distributor agreement and personally deliver products in Connecticut. Defendants deny that the remaining allegations contained in Paragraph 38 of the Amended Complaint, including that class treatment is appropriate or that those individuals Plaintiffs seek to represent have any viable claims or that they can bring their claims in court.

39.     Defendants deny the allegations contained in Paragraph 39 of the Amended Complaint.

40.     Defendants deny the allegations contained in Paragraph 40 of the Amended Complaint.

JA0030

41.     Defendants deny the allegations contained in Paragraph 41 of the Amended Complaint.

42.     Defendants admit that Plaintiffs purport to assert claims under the FLSA on behalf of all "similarly situated" drivers in Connecticut. Defendants deny the remaining allegations contained in Paragraph 42 of the Amended Complaint, including that Plaintiffs or those individuals they seek to represent have viable claims, that they are similarly situated, that collective treatment is appropriate, or that they can bring their claims in court.

43.     Defendants deny the allegations contained in Paragraph 43 of the Amended Complaint.

## COUNT I

## UNPAID OR WITHHELD WAGES IN VIOLATION OF CONN. GEN. STAT. 31-72

44.     Defendants deny the allegations contained in Paragraph 44 of the Amended Complaint.

45.     Defendants deny the allegations contained in Paragraph 45 of the Amended Complaint.

46.     Defendants deny the allegations contained in Paragraph 46 of the Amended Complaint.

47.     Defendants deny the allegations contained in Paragraph 47 of the Amended Complaint.

48.     Defendants admit that Plaintiffs and those individuals they seek to represent seek compensation for violations of Conn. Gen. Stat. 31-71(e) pursuant to Conn. Gen. Stat. 31-72 but deny that they have any claims thereunder or are entitled to any relief against Defendants. Defendants deny the remaining allegations contained in Paragraph 48 of the Amended Complaint.

JA0031

**COUNT II**

**FAILURE TO PAY OVERTIME WAGES IN VIOLATION OF
CONN. GEN. STAT. 31-76C**

49.     Defendants lack sufficient knowledge or information to form a belief whether Plaintiffs and members of the proposed Rule 23 class routinely worked in excess of forty (40) hours per workweek and therefore deny the same. Defendants further deny that any Rule 23 class is appropriate and deny the remaining allegations contained in Paragraph 49 of the Amended Complaint.

50.     Defendants admit that they did not pay Plaintiffs and those individuals they seek to represent at a rate of one-and-a-half times the regular rate of pay for all hours worked in excess of 40 because they were independent contractors or otherwise exempt. Defendants deny the remaining allegations contained in Paragraph 50 of the Amended Complaint.

**COUNT III**

**FAIR LABOR STANDARDS ACT-FAILURE TO PAY OVERTIME**

51.     Defendants lack sufficient knowledge or information to form a belief whether Plaintiffs and members of the proposed FLSA collective routinely worked in excess of forty (40) hours per workweek and therefore deny the same. Defendants deny that collective treatment is appropriate of these claims and deny the remaining allegations contained in Paragraph 51 of the Amended Complaint.

52.     Defendants admit that they did not pay Plaintiffs and those individuals they seek to represent at a rate of one-and-a-half times the regular rate of pay for all hours worked in excess of 40 because they were independent contractors or otherwise exempt. Defendants deny the remaining allegations contained in Paragraph 52 of the Amended Complaint.

JA0032

53.     Defendants deny the allegations contained in Paragraph 53 of the Amended Complaint.

54.     Defendants deny the allegations contained in Paragraph 54 of the Amended Complaint.

55.     Defendants deny the allegations contained in Paragraph 55 of the Amended Complaint.

56.     Defendants deny the allegations contained in Paragraph 56 of the Amended Complaint.

57.     Defendants deny the allegations contained in Paragraph 57 of the Amended Complaint.

## PRAYER FOR RELIEF

Defendants deny the Plaintiffs or those they seek to represent are entitled to any of the relief set forth in their Prayer for Relief, including in subparagraphs (a)-(h).

Defendants deny each and every allegation contained in the Amended Complaint not expressly admitted above.

## AFFIRMATIVE AND OTHER DEFENSES

As for separate defenses to the Amended Complaint, and without conceding that Defendants bear the burden of proof or persuasion as to any of them, except as required by applicable law with the respect to the defense asserted, Defendants state as follows:

## FIRST DEFENSE

Plaintiffs' claims must be dismissed because they signed valid agreements to arbitrate their claims on an individual basis only with class action waivers and are bound by the same. Therefore, this court lacks jurisdiction over their claims and the claims of those they seek to represent.

JA0033

### SECOND DEFENSE

The claims against Flowers Foods are barred to the extent the Court lacks personal jurisdiction over Flowers Foods and to the extent Flowers Foods is not a real party in interest. Flowers Foods does not exercise and has not exercised control over CK Sales, the entity with whom Plaintiffs and those they seek to represent contracted. Flowers Foods does not have (nor did it ever have) any contractual or other relationship with Plaintiffs or those individuals they seek to represent, nor was Flowers Foods ever their "employer." As such, Flowers Foods has insufficient contacts with the State of Connecticut to allow the Court to assert personal jurisdiction under either the doctrine of general or specific jurisdiction.

### THIRD DEFENSE

To the extent Plaintiffs or any individuals they seek to represent any have valid claims against Flowers Foods, which is denied, venue is improper.

### FOURTH DEFENSE

Plaintiffs' claims against Lepage are barred because Lepage never had a contractual or other relationship with Plaintiffs or those individuals Plaintiffs seek to represent, nor is Lepage a real party in interest.

### FIFTH DEFENSE

Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted because neither Plaintiffs nor those individuals they seek to represent are "employees" under the FLSA or Connecticut law.

### SIXTH DEFENSE

Plaintiffs' Amended Complaint, in whole or in part, fails to state a claim upon which relief can be granted because Plaintiffs and those individuals Plaintiffs seek to represent were not "employees" but rather are self-employed, performed services for CK Sales through their own

JA0034

independent corporations, and were not paid "wages" for services rendered under Conn. Gen. Stat. §§ 31-71- 31-73. Rather, Plaintiffs and those individuals they seek to represent earned a profit margin (i.e. the difference between the price they purchased the products from CK Sales for, less the price they sold the products to their customers for, less business expenses). This profit margin was paid to their corporations directly.

## SEVENTH DEFENSE

Assuming, *arguendo*, Plaintiffs and those individuals they seek to represent are/were employees within the meaning of applicable law, which is expressly denied, and to the extent Plaintiffs and those individuals they seek to represent are/were paid "wages," which is expressly denied, Plaintiffs' claims and the claims of those individuals they seek to represent for unlawful deductions are barred, in whole or in part, to the extent any such amounts withheld do not constitute deductions under applicable law, to the extent Defendants were empowered to make any such deductions by state law, and/or to the extent any such deductions were knowingly and voluntarily authorized by Plaintiffs or those individuals they seek to represent in their Distributor Agreements, Settlement Statement Authorization, or otherwise.

## EIGHTH DEFENSE

Neither Plaintiffs nor those individuals they purport to represent are "similarly situated" under the FLSA, 29 U.S.C. §§ 201-219, as amended by the Portal-to-Portal Act, id. §§ 251-62, because, among other things, Plaintiffs and those they seek to represent worked in multiple different warehouses, in association with different sales managers with different day-to-day practices, at different time periods, and under different circumstances, among other reasons, during the relevant time period.

JA0035

**NINTH DEFENSE**

Assuming, *arguendo*, Plaintiffs and those individuals they seek to represent are employees under the FLSA, which is denied, their claims for overtime and all associated costs, expenses, and fees are barred due to the "Outside Sales" Exemption set forth in Section 13(a)(1) of the FLSA because Plaintiffs and those individuals Plaintiffs purport to represent are consistently and regularly engaged in making sales away from the premises of Defendants or any other subsidiary of Flowers Foods.

**TENTH DEFENSE**

Assuming, *arguendo*, Plaintiffs and those individuals they purport to represent are employees under the FLSA, which is denied, their claims for overtime and all associated costs, expenses, and fees are barred by the Motor Carrier Exemption set forth in Section 13 (b)(1) of the FLSA, because Plaintiffs and those individuals Plaintiffs seek to represent drive or drove vehicles with a Gross Vehicle Rating or Gross Vehicle Weight of at least 10,001 pounds, transport or were subject to transporting certain goods originating out of state, and because there is practical continuity of movement of these goods until they reach retail customers and other customers.

**ELEVENTH DEFENSE**

Plaintiffs' claims, and the claims of those they individuals seek to represent, are barred to the full extent of the operation of the equitable doctrine of laches, estoppel, payment, unclean hands, *in pari delicto*, accord and satisfaction, and/or payment or set off to the extent they have been fully compensated for any owed "wages" and, by accepting the payments made to them, have effectuated an accord and satisfaction of their claims.

**TWELFTH DEFENSE**

Plaintiffs' claims for benefits, and the benefit claims of those individuals they seek to represent, are barred by the doctrine of waiver in that they expressly waived in their Distributor

JA0036

Agreements their right to participate in any benefits plans offered by CK Sales to employees. Plaintiffs' benefits claims, and the benefit claims of those individuals they seek to represent, are also barred because they are expressly excluded from the coverage of such benefits.

**THIRTEENTH DEFENSE**

Plaintiffs' unjust enrichment claims and the unjust enrichment claims of those individuals Plaintiffs seek to represent are barred because Plaintiffs and those individuals they seek to represent operate under valid contracts with CK Sales, which clearly delineate the parties' respective rights and obligations and method of compensation, and which provide adequate remedies.

**FOURTEENTH DEFENSE**

Plaintiffs' unjust enrichment claims and the unjust enrichment claims of those individuals Plaintiffs seek to represent are barred to the extent they were/are adequately compensated for any benefit Defendants received, or, alternatively, because Defendants did not receive a benefit for which they were obligated to compensate Plaintiffs or those individuals Plaintiffs seek to represent.

**FIFTEENTH DEFENSE**

Plaintiffs' claims and the claims of those individuals they seek to represent are barred by the doctrines of release and waiver to the extent any such individual executed a valid waiver and release of such claims in exchange for consideration.

**SIXTEENTH DEFENSE**

Plaintiffs' claims, and the claims of those individuals Plaintiffs seek to represent, are barred because they lack standing to assert such claims to the extent they are not covered by the statutes sought to be invoked. Further, Plaintiffs' claims on behalf of any former distributors are barred because such individuals lack standing with respect to their claims for declaratory and injunctive relief.

14

## SEVENTEENTH DEFENSE

Plaintiffs' claims and the claims of those individuals they seek to represent are barred, at least in part, by the doctrine of judicial estoppel to the extent they have filed for bankruptcy and not disclosed the claims asserted herein as assets of the bankruptcy estate in the bankruptcy petition or attached schedules.

## EIGHTEENTH DEFENSE

Plaintiffs' claims and the claims of those individuals they seek to represent are barred, at least in part, because they knowingly submitted to and acquiesced in the obligations and relationship set forth in their Distributor Agreements, from which they have received and accepted financial benefits.

## NINETEENTH DEFENSE

Plaintiffs' requests for relief that are equitable in nature must be dismissed because Plaintiffs and those individuals they seek to represent have adequate remedies at law.

## TWENTIETH DEFENSE

Plaintiffs have failed to plead facts with sufficient particularity to support an award of liquidated damages or, alternatively, any award of liquidated damages is barred or must be reduced, as applicable, because Defendants acted in good faith, with reasonable basis and an honest intention to comply with the law at all times.

## TWENTY-FIRST DEFENSE

Plaintiffs are inadequate representatives of the allegedly similarly situated group of persons whom they purport to represent, the existence of which is expressly denied, and certain of Plaintiffs' interests are in conflict with the interests of some or all of the members of the individuals Plaintiffs purport to represent.

JA0038

## TWENTY-SECOND DEFENSE

The alleged claims of Plaintiffs are neither common nor typical of each other's or of those, if any, of the class Plaintiffs seeks to represent, the existence of which is expressly denied, because Plaintiffs and the individuals they seek to represent worked in different warehouses, under different sales managers with different day-to-day practices, for different customers with different customer-service requirements, if any, and under different circumstances, among others, during the relevant time period, all of which would need to be examined, by Plaintiff, to adjudicate their claims and which is not subject to common proof.

## TWENTY-THIRD DEFENSE

Some or all of the purported claims in Plaintiffs' Amended Complaint are barred because the purported class members are not so numerous that joinder of each member would be impracticable.

## TWENTY-FOURTH DEFENSE

Some or all Plaintiffs' claims are barred because Plaintiffs have not and cannot show that class action treatment is superior to other available methods for the fair and efficient adjudication of this controversy.

## TWENTY-FIFTH DEFENSE

Certification of a class action under these circumstances would violate the parties' rights under the United States Constitution.

## TWENTY-SIXTH DEFENSE

The types of claims Plaintiffs have alleged on their own behalf and on behalf of other "similarly situated employees," the existence of whom Defendants expressly deny, are claims in which individual questions predominate and for which class treatment is not appropriate.

JA0039

### TWENTY-SEVENTH DEFENSE

Plaintiffs' claims fail to meet the mandatory requirements of Fed. R. Civ. Pro. 23(a) or (b).

### TWENTY-EIGHTH DEFENSE

If any damages have been sustained by Plaintiffs, or by any of those individuals Plaintiffs seek to represent, which is expressly denied, Defendants are entitled under the equitable doctrine of setoff and recoupment to offset all obligations owed by Plaintiffs and those individuals Plaintiffs seek to represent to Defendants against any judgment that may be entered against Defendants.

### TWENTY-NINTH DEFENSE

Plaintiffs' claims, and the claims of those individuals Plaintiffs seek to represent, are preempted, in whole or in part, by federal law, in particular the Federal Aviation Administration Authorization Act of 1994 ("FAAAA") and the Employee Retirement Income Security Act ("ERISA").

### THIRTIETH DEFENSE

Some or all of Plaintiffs' claims, and the claims of those individuals Plaintiffs seek to represent, are barred to the extent they have failed to exhaust administrative remedies under the employee benefits plans at issue and/or under applicable administrative rules.

### THIRTY-FIRST DEFENSE

Plaintiffs' claims and the claims of those they seek to represent for overtime under Connecticut law are barred, even assuming they are employees, which is denied, to the extent they are exempt from overtime under the outside sales or motor carrier exemptions.

### THIRTY-SECOND DEFENSE

Plaintiffs are not entitled to injunctive relief because the allegations in the Amended Complaint do not meet the legal requirements for such relief.

JA0040

## THIRTY-THIRD DEFENSE

Some or all of the purported claims in Plaintiffs' Amended Complaint are barred because Defendants have not acted or refused to act on any grounds generally applicable to the purported class members and therefore final injunctive relief or corresponding declaratory relief with respect to the purported class members is not appropriate.

## THIRTY-FOURTH DEFENSE

Plaintiffs' claims are barred to the extent they arose outside of the applicable statute of limitations.

## THIRTY-FIFTH DEFENSE

Plaintiffs and those individuals they seek to represent may not recover liquidated damages because neither Lepage, CK Sales, or Flowers Foods, nor its officers, directors, managers, or agents committed any willful violation of the overtime provisions, nor did they ratify any such violation.

## THIRTY-SIXTH DEFENSE

Plaintiffs' request for a jury trial is barred to the extent Plaintiffs or distributors they seek to represent signed Distributor Agreements waiving such right, including but not limited to an arbitration provision waiving such right.

## THIRTY-SEVENTH DEFENSE

Plaintiffs' claims for declaratory judgment are barred and/or should be dismissed because there are specific statutory remedies for each of the claims asserted by Plaintiffs and the persons they purport to represent, and Plaintiffs are presently pursuing such statutory remedies in the instant action.

JA0041

## THIRTY-EIGHTH DEFENSE

Assuming, *arguendo*, Plaintiffs and those individuals Plaintiffs seek to represent are employees under the FLSA, and further assuming, *arguendo*, Plaintiffs and those individuals they seek to represent could establish an FLSA claim, Plaintiffs and those individuals they seek to represent are not entitled to pre-judgment interest because CK Sales, Lepage, and Flowers Foods acted in good faith or because such interest is not otherwise properly recoverable.

## THIRTY-NINTH DEFENSE

Assuming, *arguendo*, Plaintiffs and those individuals they seek to represent are employees under the FLSA, which is denied, and assuming, *arguendo*, Plaintiffs and those distributors they seek to represent do not fall within any exemption to the FLSA, which is denied, some or all of the time worked by Plaintiffs or those individuals they seek to represent is not compensable under the provisions of the Portal-to-Portal Act, 29 U.S.C. § 251-62, nor are any of the Plaintiffs entitled to pre-judgment interest on these claims.

## FORTIETH DEFENSE

Assuming, *arguendo*, Plaintiffs and those distributors they seek to represent are employees under the FLSA, which is denied, and further assuming, *arguendo*, Plaintiffs and those distributors they seek to represent could establish such actual claims, which is denied, Plaintiffs and those individuals they seek to represent are not entitled to liquidated damages because, under Section 11 of the Portal-to-Portal Act, Defendants acted in good faith and have reasonable grounds for believing that the alleged acts or omissions did not violate the FLSA.

## FORTY-FIRST DEFENSE

Defendants will rely on all proper defenses lawfully available that may be disclosed by evidence and reserve the right to amend this Amended Answer and state additional affirmative or

other defenses and/or otherwise supplement this Amended Answer upon discovery of additional

facts or evidence as appropriate.

Dated this the 3rd day of September, 2019.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

*/s/John G. Stretton*
John G. Stretton (CT 19902)
john.stretton@ogletree.com
Kelly M. Cardin (CT 29162)
kelly.cardin@ogletree.com
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
281 Tresser Boulevard, Suite 602
Stamford, CT 06901
Tel.: 203-969-3100
Fax: 203-969-3150
Margaret S. Hanrahan (NC Bar No. 52927)*
maggie.hanrahan@ogletree.com
Benjamin R. Holland (NC Bar No. 28580)*
benjamin.holland@ogletree.com
Elizabeth R. Gift (NC Bar No. 44331)*
elizabeth.gift@ogletree.com
*Admitted Pro Hac Vice*
201 S. College Street, Suite 2300
Charlotte, North Carolina 28244
Tel.: 704-342-2588
Fax: 704-342-4379

20

## CERTIFICATE OF SERVICE

I, John G. Stretton, hereby certify that I have this day electronically filed the foregoing

**ANSWER OF DEFENDANTS TO PLAINTIFFS' AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT** with the Clerk of Court using the CM/ECF system,

which will send notification of the filing to the following:

> Harold L. Lichten
> Matthew W. Thomson
> Zachary L. Rubin
> LICHTEN & LISS-RIORDAN, P.C.
> 729 Boylston St., Suite 2000
> Boston, MA 02116
> (617) 994-5800
> hlichten@llrlaw.com
> mthompson@llrlaw.com
> zrubin@llrlaw.com

Dated this the 3rd day of September, 2019.

*/s/John G. Stretton*
John G. Stretton

JA0044

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NEAL BISSONNETTE and TYLER WOJNAROWSKI on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>LEPAGE BAKERIES PARK ST., LLC, C.K. SALES CO., LLC, and FLOWERS FOODS, INC.<br><br>    Defendants. | Civil Action No. 3:19-cv-00965-KAD |

## MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION

COME NOW Defendants Lepage Bakeries Park Street, LLC, CK Sales Co., LLC, and Flowers Foods, Inc. (collectively, "Defendants"), by and through undersigned counsel, and respectfully move to dismiss Plaintiffs' lawsuit pursuant to Federal Rule of Civil Procedure 12(b)(1) and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*.  In the alternative, Defendants request an order compelling individual arbitration.[1]

As set forth in Defendants' supporting memorandum and declaration filed simultaneously herewith, Plaintiffs entered into binding arbitration agreements under which they agreed to arbitrate all of the claims in this lawsuit on an individual basis.  Therefore, the present putative class and collective action lawsuit should be dismissed in favor of individual arbitration.

WHEREFORE, Defendants request that the Court grant this Motion and enter an Order dismissing this lawsuit in light of Plaintiffs' promises to arbitrate the claims in this lawsuit

---

[1] In the remote event the FAA is determined to be inapplicable, Defendants seek an order requiring individual arbitration pursuant to Conn. Gen. Stat. § 52-408 *et seq*.

**\*Pursuant to D. Conn. L. Civ. R. 7(a)(1), Defendants request oral argument.**

individually. Alternatively, Defendants request that the Court compel individual arbitration. Defendants also request all other relief the Court deems just and proper, including, but not limited to, an award of their costs and reasonable attorneys' fees incurred in bringing this motion.

Dated this the 18th day of September, 2019.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.

/s/John G. Stretton
John G. Stretton (CT 19902)
john.stretton@ogletree.com
Kelly M. Cardin (CT 29162)
kelly.cardin@ogletree.com
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
281 Tresser Boulevard, Suite 602
Stamford, CT 06901
Tel.: 203-969-3100
Fax: 203-969-3150

Margaret S. Hanrahan (NC Bar No. 52927)*
maggie.hanrahan@ogletree.com
Benjamin R. Holland (NC Bar No. 28580)*
benjamin.holland@ogletree.com
Elizabeth R. Gift (NC Bar No. 44331)*
elizabeth.gift@ogletree.com
*Admitted Pro Hac Vice*
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 S. College Street, Suite 2300
Charlotte, North Carolina 28244
Tel.: 704-342-2588
Fax: 704-342-4379

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION** with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following:

> Harold L. Lichten
> Matthew W. Thomson
> Zachary L. Rubin
> LICHTEN & LISS-RIORDAN, P.C.
> 729 Boylston St., Suite 2000
> Boston, MA 02116
> (617) 994-5800
> hlichten@llrlaw.com
> mthompson@llrlaw.com
> zrubin@llrlaw.com

Dated this the 18th day of September, 2019.

/s/John G. Stretton
John G. Stretton

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NEAL BISSONNETTE                          )
and TYLER WOJNAROWSKI                      )
on behalf of themselves and all           )
others similarly situated,                )
                                          )
                       Plaintiffs,        )        Civil Action No. 3:19-cv-00965-
            v.                            )        KAD
                                          )
LEPAGE BAKERIES PARK ST., LLC,            )
C.K. SALES CO., LLC, and FLOWERS          )
FOODS, INC.                               )
                                          )
                       Defendants.

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION**

COME NOW Defendants Lepage Bakeries Park Street, LLC ("Lepage"), CK Sales Co.,

LLC ("CK Sales"), and Flowers Foods, Inc. ("Flowers Foods") (collectively, "Defendants"), by

and through undersigned counsel, and submit this Memorandum in Support of Defendants'

Motion to Dismiss or, in the Alternative, to Compel Arbitration.

## I.      Introduction

Plaintiffs Neal Bissonnette and Tyler Wojnarowski ("Plaintiffs") are current independent

distributor franchisees contracted with Defendant CK Sales via corporations they own and

operate, signing a Distributor Agreement in the process.[1]  Under this Distributor Agreement,

Plaintiffs purchased distribution rights to sell and distribute products to customers within a

defined geographic territory.   (Exhibit 1, Declaration of Jake Linthicum (hereinafter cited as

"Linthicum Decl."), ¶ 3 and Attachments 1 and 2 to the same).  Plaintiffs have an equity interest

in their businesses, which can be sold in whole or in part, and are contractually obligated to use

---

[1] CK Sales is a wholly-owned subsidiary of Lepage who, in turn, is a wholly-owned subsidiary
of Flowers Foods.  (Dkt. Entry No. 17).

their "Best Efforts" to increase sales in their territories.  (*Id*. at ¶ 8).  Plaintiffs could do this through asking for displays, effective merchandising, soliciting new accounts, and several other things.  (*Id*.)

When signing their Distributor Agreements, each Plaintiff agreed to arbitrate "any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, [or] any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor."  (*Id*. at Attachments 1 and 2, Exhibits K).  They also agreed to waive any right to "INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS IN COURT OR ARBITRATION."  (*Id*.)

In breach of these contractual promises, Plaintiffs filed the instant suit, alleging that they are misclassified as independent contractors, rather than employees, under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA") and Connecticut law.  In further breach of their arbitration agreements, Plaintiffs bring this suit as a putative class and collective action, seeking to represent all other "similarly situated" distributors in Connecticut within the "relevant statutory period."  Ironically, Plaintiffs seek to circumvent their individual arbitration promises despite the fact that their counsel previously touted the benefits of the same to this Court in 2017 – when seeking settlement approval in a suit against Lepage and CK Sales involving Connecticut distributors like Plaintiffs.  **Notably, the arbitration agreement opposing counsel advocated for to this Court is, in all material respects, the very same arbitration agreement they ignore in this case.  And, it is the same arbitration agreement nearly all putative class members Plaintiffs seek to represent also signed, either in connection with that settlement or after the fact if they became distributors after the settlement was finalized.**

2

In light of the foregoing, Plaintiffs' lawsuit should be dismissed in favor of individual arbitration. Plaintiffs signed binding arbitration agreements containing promises to arbitrate the claims asserted in this lawsuit on an individual basis only. Almost every distributor they seek to represent also signed binding arbitration agreements containing promises to arbitrate the claims Plaintiffs purport to bring on their behalf. These arbitration agreements contain enforceable class and collective action waivers, requiring individual arbitration. Plaintiffs' counsel is well aware of the arbitration requirement as they actually advocated for it in a previous suit. Accordingly, Defendants respectfully request that the Court dismiss this lawsuit pursuant to Fed. R. Civ. P. 12(b)(1) and 9 U.S.C. § 1, *et seq.*, or in the alternative, compel individual arbitration.

## II.    Relevant Factual Background

Plaintiffs, who are current independent distributor franchisees, filed this lawsuit on June 20, 2019. (Dkt. Entry No. 1; Linthicum Decl. ¶¶ 6-7). Plaintiffs filed an Amended Complaint on August 19, 2019. (Dkt. Entry No. 24 (hereinafter cited as "Compl.")). They allege that they were misclassified as independent contractors and, as a result, are entitled to relief under the FLSA and Connecticut state law. (Compl. ¶¶ 44-57).

Plaintiff Bissonnette owns Bissonnette Inc., a Connecticut corporation. (Linthicum Decl., Attachment 1, pg. 2). Plaintiff Wojnarowski owns Blue Star Distributors Inc., also a Connecticut corporation. (*Id.* at Attachment 2, pg. 2). Both Bissonnette Inc. and Blue Star Distributors Inc. entered into a Distributor Agreement ("Distributor Agreements") with CK Sales. (*Id.* at Attachments 1 and 2).[2] Under the Distributor Agreements, Bissonnette Inc. and Blue Star Distributors Inc. obtained the exclusive right to sell and distribute products purchased

---

[2] Plaintiffs also signed Personal Guarantees, whereby they personally guaranteed all obligations under the Distributor Agreement. (Linthicum Decl., Attachments 1 and 2, Exhibit F).

JA0050

from CK Sales to customers in a defined distribution area.  (*Id*. at Attachments 1 and 2, Recitals and Sections 2.4).  Plaintiffs purchase products from CK Sales, which they ultimately resell to their customers for a higher price.  (*Id*. ¶ 9).  The difference between the price at which they sell the products less the price at which they purchase them, less their business expenses, represents Plaintiffs' "profit margin."  (*Id*.)

As distributors, and under the Distributor Agreements they executed, Plaintiffs do not have to perform any services personally but can hire employees to perform all or part of the services for them, can operate outside businesses, and are contractually obligated to increase sales in their territories, which they can do in several ways, including by asking for displays, providing good customer service, recommending new products, and soliciting new accounts, among other things.  (*Id*. ¶ 8).  Because Plaintiffs are compensated based on their sales of products, it is in their best interests to devote necessary time to increasing their sales in their accounts on a daily basis.  (*Id*. ¶ 9).

In connection with the purchase of their distributorship businesses, Plaintiffs entered into arbitration agreements ("Arbitration Agreements"), found as an exhibit to the Distributor Agreements.  (*Id*. at Attachments 1 and 2, Exhibits K (hereinafter cited as "Agreements")).  Each of the Arbitration Agreements contains virtually identical language.  (*Id*.)

A.      **The Arbitration Agreements**

The Arbitration Agreements cover any and all claims pertaining to Plaintiffs' distributorships, explicitly referencing any claims challenging their independent contractor status and claims for compensation.  Specifically, the Arbitration Agreements state:

> The parties agree that any claim, dispute, and/or controversy
> except as specifically excluded herein[3], that either DISTRIBUTOR

---

[3] No applicable exclusions apply.  (Agreements, ¶¶ 8-9).

JA0051

(including its owner or owners) may have against COMPANY (and/or its affiliated companies …) or that COMPANY may have against DISTRIBUTOR … arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between DISTRIBUTOR and COMPANY, including … any other association that DISTRIBUTOR may have with COMPANY ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.) ("FAA") in conformity with the Commercial Arbitration Rules of the American Arbitration Association ("AAA" or "AAA Rules"), or any successor rules, except as otherwise agreed to by the parties and/or specified herein.…

…

Covered Claims covered under this Arbitration Agreement include, but are not limited to: breach of contract, any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor, … claims for alleged unpaid compensation, … or statutory penalties under either federal or state law.

(Agreements, ¶¶ 1, 7).

The Arbitration Agreements also require that covered claims must be brought on an individual basis:

All Covered Claims against COMPANY must be brought by DISTRIBUTOR on an individual basis only and not as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. DISTRIBUTOR further agrees that if it is within any such class, collective, representative, or multi-plaintiff action, it will take all steps necessary to opt-out of the action or refrain from opting in or joining, as the case may be, and DISTRIBUTOR expressly waives any right to recover any relief from any such class, collective, representative, or multi-plaintiff action. Similarly, all Covered Claims by COMPANY against DISTRIBUTOR may not be brought as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. The parties understand that there is no right or authority for any Covered Claim to be heard or arbitrated on a multi-plaintiff, collective, or class action basis, as a private attorney general, or any other representative basis. The parties understand that there are no

5

bench or jury trials and no class, collective, representative, or multi-plaintiff actions are permitted under this Arbitration Agreement.…

(Agreements, ¶ 3).

Indeed, the Arbitration Agreements emphasize the class and collective action waiver, stating the following, in bold, capital letters:

**TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICIT[L]Y WAIVE ANY RIGHT TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION; (2) SERVE OR PARTICIPATE AS A REPRESENTATIVE OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; (3) SERVE OR PARTICIPATE AS A MEMBER OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; OR (4) RECOVER ANY RELIEF FROM ANY SUCH CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF ACTION.**

(Agreements, ¶ 4).

The Arbitration Agreements are clear that "[a]ny issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement (except for those concerning the validity or enforceability of the prohibition against class, collective, representative, or multi-plaintiff action arbitration and/or applicability of the FAA) shall be resolved by the arbitrator, not a court." (Agreements, ¶ 5). When signing the Arbitration Agreements, Plaintiffs acknowledged: (1) "…**this is an important document that affects its legal rights and that the DISTRIBUTOR has been given the opportunity to discuss this Arbitration Agreement with private legal counsel**"; and (2) he **"understands that this Arbitration Agreement requires that disputes that involve matters subject to the Agreement be submitted to arbitration pursuant to the Arbitration Agreement rather than to a judge or jury in court and that**

6

**such disputes must be brought on an individual basis only.**"   (Agreements, ¶¶ 12, 14) (emphasis in original).

Under the Arbitration Agreements, the Company agreed to pay for all filing fees and costs typically associated with American Arbitration Association ("AAA") arbitration, subject to the arbitrator's ability to award the Company costs and fees as the prevailing party. (Agreements, ¶ 2).   Further, both the agreement to arbitrate covered claims and the class/collective action waiver are mutual, the arbitration is conducted by a neutral arbitrator, and the arbitrator has the authority to award the same damages and other relief that would have been available in court under applicable law, including attorneys' fees and costs.  (Agreements, ¶¶ 1-3).  The Arbitration Agreements state that they "shall be governed by the FAA and <u>Connecticut</u> law to the extent <u>Connecticut</u> law is not inconsistent with the FAA."   (Agreements, ¶ 13) (emphasis in original).

### B.    Opposing Counsel's Involvement in the Arbitration Agreements

In 2017, Plaintiffs' counsel settled a putative class action lawsuit in this Court against Defendants Lepage and CK Sales on behalf of Connecticut-based distributors.  (*Bokanoski et al. v. Legpage Bakeries Park St., LLC et al.*, Civil Action No. 3:15-cv-00021-JCH).  To facilitate the prior settlement, Plaintiffs' counsel made repeated representations to this Court that contradict their current suit, <u>including advocating for the arbitration promise they now flout</u>.  For example, opposing counsel described the ADR program involving arbitration as giving distributors "**the right to effectively resolve disputes moving forward in a very efficient manner**" and as "**more convenient and cost-effective**."  (*Bokanoski*, Dkt. Entry No. 125, pp. 2, 11) (emphasis added).

JA0054

In connection with the *Bokanoski* settlement, multiple Connecticut distributors signed the arbitration agreement advocated by Plaintiffs' counsel in exchange for valuable consideration and chose to continue to operate their businesses.[4]   (Linthicum Decl. ¶¶ 11, 14).   Since the *Bokanoski* settlement, new distributors who have purchased territories from the company have likewise executed this same Arbitration Agreement.  (*Id*. at ¶ 12).   Distributors who purchased territories from existing distributors are likewise subject to this Arbitration Agreement given their execution of an assumption agreement when they purchased the distributorship, under which they agreed to assume all obligations associated with the newly-purchased distributorship, including the Arbitration Agreement.  (*Id*. at ¶ 13).   Despite formerly praising arbitration as a cost-effective means for dispute resolution, Plaintiffs' counsel filed the instant suit without even disclosing the existence of the Arbitration Agreements.   However, this case is subject to individual arbitration – an efficient and cost-effective process as Plaintiffs' counsel previously acknowledged.

### III.    Argument and Authorities

The Federal Arbitration Act ("FAA") pronounces a liberal policy favoring enforcement of arbitration agreements.  9 U.S.C. § 1, *et seq*.; *AT&T Mobility, LLC v. Conception*, 131 S. Ct.

---

[4] Other distributors elected to sell their businesses in connection with the settlement and release or were former distributors at the time of settlement and release and are, therefore, not putative class members.  (Compl. ¶ 4).   However, as set forth in the attached declaration of Jake Linthicum, two of the putative class members are not subject to an arbitration agreement. (Linthicum Decl. ¶ 15).

JA0055

1740, 1745 (2011).[5]  Under the FAA, "a written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Section 4 of the FAA specifically provides for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement.   9 U.S.C. § 4;  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991).  As the Second Circuit Court of Appeals has explained, "it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we 'have often and emphatically applied.'"  *Arciniaga v. General Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) (quoting *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 24 (2d Cir. 1995)).

In adjudicating motions to compel under the FAA, "the Court must examine '(1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement.'"  *Considine v. Brookdale Senior Living, Inc.*, 124 F. Supp. 3d 83, 88 (D. Conn. 2015) (quoting *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002)).[6]  As discussed below, each element is satisfied,

---

[5] Even prior to *Conception*, the Supreme Court previously confirmed this liberal policy favoring arbitration in several other decisions.  *See, e.g., Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *accord Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983).  The FAA governs all contracts "involving commerce," subject only to a narrow exception for the employment contracts of transportation workers contained in Section 1.  9 U.S.C. §§ 1-2; *Circuit City Stores v. Adams*, 532 U.S. 105, 119 (2001).  As discussed below in Section III, D, this exception, which is explicitly narrower than the broad parameters of Section 2 coverage, is inapplicable.

[6] Connecticut District Courts also examine whether the suit involves federal statutory claims that are non-arbitrable.  *Morales v. Rent-A-Ctr., Inc.*, 306 F. Supp. 2d 175, 179 (D. Conn. 2003).

JA0056

rendering arbitration the only appropriate forum for Plaintiffs to pursue their claims on an individual basis only.

A.     **Plaintiffs Agreed to Arbitration and Their Counsel Praised the Very Arbitration Agreements They Now Ignore.**

To determine whether the parties agreed to arbitrate a given dispute, ordinary principles of state contract formation law apply. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Morales*, 306 F. Supp. 2d at 180. Under the parties' contractual choice-of-law provision in the Distributor Agreements, Connecticut law applies. (Distributor Agreements, ¶ 20.11). Likewise, the Arbitration Agreements provide that Connecticut law applies to the extent not inconsistent with the FAA. (Agreements, ¶ 13). Plaintiffs bear the burden of establishing that such Arbitration Agreements are inapplicable or invalid. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

Connecticut law requires a meeting of the minds and consideration to form a valid contract. *Deleon v. Dollar Tree Stores, Inc.*, No. 3:16-CV-00767 (CSH), 2017 WL 396535, at *2 (D. Conn. Jan. 30, 2017) (citations omitted). When a litigant actually signs the arbitration agreement at issue, this "serves as presumptive evidence that an agreement was formed." *Morales*, 306 F. Supp. 2d at 181 (citations omitted).

In this case, there is no question that the parties agreed to arbitration. The Arbitration Agreements are clear, unambiguous, and provided Plaintiffs with ample and prominent notice of their rights. Plaintiffs each made an informed decision to sign the Arbitration Agreements, after being explicitly advised that it affected their legal rights and that they may want to consult a lawyer. Plaintiffs' signatures alone are conclusive evidence of contract formation. *D'Antuono v.*

---

However, the federal statutory claim asserted here under the FLSA is plainly arbitrable, satisfying this inquiry. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018).

JA0057

*Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 323 (D. Conn. 2011) ("In Connecticut, the fact that a party signed a written agreement is usually conclusive evidence of contract formation."). Moreover, the Arbitration Agreements are supported by adequate consideration under Connecticut law, including, but not limited to, the mutuality of the obligation to arbitrate disputes. *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 767, n.2 (D. Conn. 1996) (citing *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 411 (2d Cir. 1959)) ("Mutual promises to arbitrate are sufficient to support an arbitration agreement.").

Not only did Plaintiffs clearly agree to arbitration through a written, binding, and enforceable agreement, but their counsel actually advocated for the same on behalf of Connecticut distributors in 2017. As set forth above, in order to obtain approval from this Court to settle the *Bokanoski* lawsuit, Plaintiffs' counsel made repeated representations to this Court about the benefits of arbitration for distributors. (*Bokanoski*, Dkt. Entry No. 125, pp. 2, 11). Moreover, they actually negotiated for an arbitration agreement, which is virtually identical to the Arbitration Agreements Plaintiffs signed. (*Bokansoki*, Dkt. Entry No. 116-2; Agreements). Any attempt to disavow an agreement they praised to this Court should not be permitted.[7]

---

[7] To avoid this result, Plaintiffs will predictably argue that the Supreme Court's 2019 decision in *New Prime Inc. v. Oliveira* provided a new avenue to avoid the arbitration agreement their counsel previously lauded. Specifically, Plaintiffs will argue that they are "transportation workers" and are thus exempt from the FAA under § 1 – an exemption discussed in *New Prime*. However, the FAA was enacted in 1925 – nearly 100 years ago. Since that time, numerous litigants have argued, and courts have discussed, § 1 and its exemption. The 2019 *New Prime* decision did not create a new legal avenue unknown to courts or experienced counsel like Lichten & Liss-Riordan since their 2017 representations, it simply clarified certain issues under § 1. In fact, opposing counsel argued the § 1 exemption in an effort to avoid arbitration on behalf of delivery drivers in 2015 – well before the *Bokanoski* settlement or the *New Prime* decision. *See Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1152 (N.D. Cal. 2015). Any attempt to renounce their previous representations about arbitration to this Court on the basis of *New Prime* is meritless. Regardless, as discussed below in Section 3, D, Plaintiffs do not fall within § 1's narrow exemption and the FAA's arbitration mandate is, therefore, applicable.

**B.    Plaintiffs' Claims Fall Within the Scope of the Agreements.**

The second inquiry considers whether the dispute in question falls within the scope of the Arbitration Agreements.  *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (citation omitted).   "[A]ny doubts concerning the scope of an agreement to arbitrate 'should be resolved in favor of arbitration'" and courts are required 'to construe arbitration clauses as broadly as possible.'"  *Deleon*, 2017 WL 396535, at *2 (citing *Am. Express*, 672 F. 3d at 128).

Here, the inquiry is a simple one:  Plaintiffs' misclassification claims under state and federal law are expressly covered by the Arbitration Agreements, which require individual "binding arbitration" for "[a]ll claims, disputes, and controversies arising out of or in any manner relating to" their Distributor Agreements, including "any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor . . . and claims for alleged unpaid compensation . . . . under either federal or state law."  (Agreements, ¶¶ 1, 7).  Therefore, there can be no question the claims asserted in this lawsuit are covered by the Arbitration Agreements.

The Court, however, should not even reach this conclusion because the parties clearly and unmistakably delegated issues of arbitrability, including scope, to the arbitrator.   In the Second Circuit and under Connecticut law, when parties clearly evidence an intent to delegate issues of arbitrability to the arbitrator, the arbitrator (and not the Court) must decide the same. *Deleon*, 2017 WL 396535, at *5 (citations omitted).  Parties may delegate issues of arbitrability – including whether an arbitration clause applies to a particular controversy – to the arbitrator either expressly or by incorporation of arbitration rules so providing.  *Saizhang Guan v. Uber*

12

*Techs., Inc.*, 236 F. Supp. 3d 711, 727 (E.D.N.Y. 2017); *Considine*, 124 F. Supp. 3d at 90-91. Issues of arbitrability include disputes on the scope of the arbitration agreement. *Considine*, 124 F. Supp. 3d at 89 (explaining, "Because the parties' dispute focuses on the scope of the arbitration agreement, it is squarely one of arbitrability.").

In this case, the Arbitration Agreements provide that, with the exception of the class action waiver, "[a]ny issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement … shall be resolved by the arbitrator" – evidencing the parties' express agreement to delegate issues of arbitrability. (Agreements, ¶ 5); *Considine*, 124 F. Supp. 3d at 90 (collecting cases on express delegation). Further, the Arbitration Agreements state that any arbitration will be held "in conformity with the Commercial Arbitration Rules of the American Arbitration Association." (Agreements, ¶ 1). The AAA's Commercial Rule 7 provides that "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Via incorporation of the AAA's rules, including Rule 7, the parties clearly and unmistakably delegated questions of arbitrability, including scope, to the arbitrator. *See Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (affirming holding that arbitrator would decide questions of arbitrability where parties' agreement stated that arbitration shall be held in accordance with the AAA's Commercial Arbitration Rules, stating: "We have held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.").

JA0060

**C.**   **Under *Epic Systems*, Plaintiffs' Claims Must be Resolved on an Individual Basis in Arbitration.**

Plaintiffs' claims are subject to individual arbitration under the FAA. Here, the Arbitration Agreements are not silent on class arbitration. They provide:

> The parties understand that there is no right or authority for any Covered Claim to be heard or arbitrated on a multi-plaintiff, collective, or class action basis ….
>
> **TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICIT[L]Y WAIVE ANY RIGHT TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION ….**

(Agreements ¶¶ 3, 4) (emphasis in original). Pursuant to the plain terms of the Arbitration Agreements, the parties clearly agreed that any claims brought by Plaintiffs must proceed to arbitration on an individual basis.

The Supreme Court considered and resolved the issue of the enforceability of class action waivers in arbitration agreements last year. *Epic Sys.*, 138 S. Ct. 1612. *Epic Systems* was a consolidation of actions from the Fifth, Seventh, and Ninth Circuits where employees who signed arbitration agreements containing class actions waivers brought putative collective actions under the FLSA – and in two instances an accompanying state law class action – against their employers seeking allegedly unpaid wages. *Id.* at 1612. Rejecting that effort, the Supreme Court held that Congress, when it enacted the FAA, was "instruct[ing] federal courts to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Id.* at 1619.

14

Just as in *Epic Systems*,[8] these Plaintiffs – after given ample opportunity to decide – signed Arbitration Agreements where they agreed in exchange for valuable consideration to waive their rights to pursue their claims in court, or on a class or collective basis. And, just as in *Epic Systems*, these Plaintiffs improperly ignored their contractual obligations in seeking to collectively pursue these claims. Under *Epic Systems*, Plaintiffs are bound to resolve this dispute on an individualized basis, as their Arbitration Agreements provide, and this Court should likewise abide by the liberal policy favoring enforcement of arbitration agreements and enforce them as written.

**D.      Plaintiffs Do Not Fit Into the Narrow "Transportation Workers" Exemption Found in § 1 of the FAA.**

**1.      The Narrow Transportation Workers Exemption is Inapplicable.**

Despite the clear language of the Arbitration Agreements they signed, Plaintiffs will inevitably argue that their claims should not be compelled to arbitration because they are "transportation workers" exempt from the FAA under § 1. But, this argument lacks merit.

Section 1 of the FAA excludes coverage for "contracts of employment of seaman, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Plaintiffs are obviously not railroad employees or seamen. Rather, they will likely try to squeeze within the so-called "residual" clause for "any other class of workers engaged in foreign or interstate commerce." It is Plaintiffs' burden to prove that the FAA does not apply.

---

[8] While Defendants, of course, do not concede that Plaintiffs or those they seek to represent are employees, Plaintiffs are contending that they were misclassified and should be employees. As discussed above, misclassification claims are clearly covered within the scope of the Arbitration Agreements. Further, since *Epic Systems*, courts have found that its reasoning also applies to arbitration agreements within independent contractors. *See, e.g., McGrew v. VCG Holding Corp.,* 735 F. App'x 210 (6th Cir. 2018).

JA0062

*Gilmer*, 500 U.S. at 35.  And, as set forth below, the residual clause is inapplicable, rendering enforcement of the Arbitration Agreements appropriate under the FAA.

The Supreme Court "narrowly interpreted" the FAA's residual clause.  *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 482 (S.D.N.Y. 2008) (citing *Circuit City v. Adams*, 532 U.S. 105, 115 (2001)).  Even prior to the Supreme Court's direction, the Second Circuit likewise narrowly construed the same, adopting the majority position.  *Id*. at 481.  To fall within the exemption, an individual must be within a class of transportation workers employed in the transportation industry.  *Id*. at 481; *Circuit City*, 532 U.S. at 119; *Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005) ("it is apparent Congress was concerned only with giving the arbitration exemption to 'classes' of transportation workers within the transportation industry.").  Plaintiffs – who are not members of a class of transportation workers in the transportation industry – cannot make their required showing.

> **a)** **Plaintiffs Do Not Work in the Transportation Industry Such As Railroad, a Maritime Shipping Company, or a Trucking Company.**

To be a transportation worker, the individual must first be employed in the transportation industry.  *Adams v. Suozzi*, 433 F.3d 220, 226 (2d Cir. 2005); *Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 982 (2d Cir. 1997); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1069, n1 (2d Cir. 1972).  That is not the case here.  Indeed, "[t]he Second Circuit has consistently viewed the exclusion clause in § 1 narrowly, holding it applies 'only to those actually in the transportation industry.'"  *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 765, n.1 (D. Conn. 1996) (quoting *Erving*, 468 F.2d at 1069).  This requires "being a member of an industry that primarily involves the actual, physical movement of goods through interstate commerce."  *Kowalewski*, 590 F. Supp. at 484 (citation omitted).  For example, this Court

JA0063

concluded that the § 1 residual clause did not apply to a Vice President of an apparel manufacturer because, under the "narrow" clause, it applies only to those *in the transportation industry*. *Topf*, 942 F. Supp. at 765, n.1

Other courts have sought to determine the true nature of what it means to work in the transportation industry, interpreting it narrowly.  Two cases, both of which were cited by the Southern District of New York in *Kowalewski*, are worth noting.  The first is *Hill v. Rent-A-Ctr., Inc.*, in which the Eleventh Circuit found that Rent-A-Center – a business that sells furniture and appliances to customers on a rent-to-own basis – was not in the transportation industry.  398 F.3d 1286, 1288-90.  Instead, the court unsurprisingly found that Rent-A-Center was in the business of selling furniture – despite the fact that their business dealings caused employees to cross state lines.  *Id*.  As such, plaintiff "was not within the class of workers within the transportation industry." *Id*.

The second case is *Tran v. Texan Lincoln Mercury, Inc.*  No. CIV.A. H-07-1815, 2007 WL 2471616 (S.D. Tex. Aug. 29, 2007).  In it, the Southern District of Texas provided perhaps the most cogent analysis of the issue, stating that "a transportation worker is someone who works in the transportation industry—an industry whose mission it is to move goods."  *Id*. at *5.  In contrast, the court explained that "[Plaintiff] worked in the automobile industry—an industry whose mission it is to manufacture and sell automobiles …. His duties were not to transport goods on behalf of a carrier like a railroad or a vessel like a ship." *Id*.

Under this reasoning, Defendants are simply not transportation companies.  Indeed, they are not common carriers like a railroad or over-the-road trucking companies.  Rather, CK Sales, with whom Plaintiffs contracted, is in the business of contracting with distributors and Lepage is

JA0064

in the business of manufacturing bread and bakery products.[9]  (Linthicum Decl. ¶ 2).  Lepage – like every other business – needs to get their products to customers, and one of the primary channels used by them to distribute bakery products is a network of independent distributors who contract with CK Sales to operate their own franchise businesses.  *Id.*  As with most businesses, Lepage's transportation function is incidental to the overall business.  Plaintiffs do not – and cannot – claim Defendants are in the business of merely transporting goods like a trucking company, a railroad, or a fleet of ships, such that their alleged employment occurred in the transportation industry.  Thus, they are not within a class of workers in the transportation industry and the residual clause does not apply.

> **b)  Plaintiffs Are Not Transportation Workers Because Their Delivery of Goods[10] is Incidental to Their Overall Business Duties.**

Even if Defendants were members of the transportation industry (and they are not), Plaintiffs cannot show that they, themselves, belong to a class of transportation workers.  Much like a transportation company must be primarily focused on the movement of goods in interstate commerce to satisfy prong one, a transportation worker must be primarily focused on moving goods in interstate commerce within the meaning of the § 1 exemption.  *Kowalewski*, 590 F. Supp. 2d at 485 (rejecting plaintiffs' effort to "extend the scope of the residual exemption to any 'transportation worker' who crosses state lines, as long as the worker is transporting goods or people and citing *Hill*, 398 F. 3d at 1289 ("The emphasis [of *Circuit City*] … was on a class of

---

[9] Neither can it be claimed that Defendant Flowers Foods is a transportation company.  Flowers Foods is the parent holding company of numerous operating subsidiaries, which produce fresh breads, buns, rolls, and snack cakes.  (Linthicum Decl. ¶ 2).

[10] The goods ordered, sold, and delivered by Plaintiffs do originate from other states, and if any is ultimately determined to be an employee, he would be exempt from the overtime provisions of the FLSA pursuant to the Motor Carrier Act exemption.

workers in the transportation industry, rather than on workers who incidentally transported goods interstate as part of their job …").

The key inquiry is whether the workers are "*engaged* in … interstate commerce." 9 U.S.C. § 1. This is a far more demanding test than, for example, § 2 of the FAA which governs its general applicability and uses the broader formulation: "contract evidencing a transaction *involving* commerce." *Id*. at § 2; *Kowalewski*, 590 F. Supp. 2d at 481, n. 2. The Supreme Court has ruled that this difference reflects a deliberate difference:  while § 2's use of "the word 'involving . . . signals an intent to exercise Congress' commerce power to the full" the words "engaged in commerce" in § 1 "have a more limited reach." *Circuit City*, 532 U.S. at 115. Under § 1, it is not enough to be in some attenuated sense involved in the flow of interstate commerce; instead, it applies to those "'in, or closely related to the actual movement of goods in interstate commerce.'" *Kowalewski*, 590 F. Supp.2d at 481 (internal quotation omitted). Indeed, "the reference to 'seaman, railroad employees, or any other class of workers engaged in foreign or interstate commerce,' suggests that Congress intended to refer to workers engaged in commerce in the same way that seaman and railroad workers are." *Powers v. Fox Television Stations, Inc.*, 923 F. Supp. 21, 23 (S.D.N.Y. 1996) (quoting *DiCrisci v. Lyndon Guar. Bank of New York*, 807 F. Supp. 947, 953 (W.D.N.Y. 1992)); *See also Circuit City*, 532 U.S. at 114-115 (explaining that residual clause is "read to give effect to the terms 'seaman' and 'railroad employees' and should itself by controlled and defined by reference to the enumerated categories of workers which are recited just before it.").

To be a transportation worker within the narrow meaning of § 1 of the FAA, then, the movement of goods in interstate commerce must be the primary job duty. *Kowalewski*, 590 F. Supp. 2d at 483 ("The extant case law is harmonious with the proposition that the interstate

JA0066

shipment of physical goods is central to the analysis, given, for example, the consensus among courts that truck drivers—workers *dedicated to* the interstate shipment of physical goods—fall within the narrow residuary exemption.") (emphasis added).  For example, in *Veliz v. Cintas Corp.*, another case cited by the Southern District of New York in *Kowalewski*, the court found that workers who performed many of the same duties as Plaintiffs were <u>not</u> transportation workers.  No. C 03-1180 SBA, 2004 WL 2452851, at *8 (N.D. Cal. Apr. 5, 2004), *modified on reconsideration*, No. 03-01180(SBA), 2005 WL 1048699 (N.D. Cal. May 4, 2005).  There, Sales Service Representatives ("SSRs") drove from customer to customer delivering and picking up product, restocking supplies, and receiving orders or facilitating sales for more supplies.  *Id*.  The District Court held:

> While SSRs deliver goods, they also perform customer service functions. They note supply levels at different customer sites and re-stock those supplies. They pick-up used or dirty products such as uniforms and mats and replace them with new ones. These job duties certainly entail driving. They do not, however, entail delivery of product in the same manner that a truck driver does. The primary duty of SSRs is more akin to customer service than it is to a warehouse trucker, railroad employee or seamen. Accordingly, based on the evidence at hand, SSRs are not transportation workers within the meaning of the FAA exemption.

*Id*. at *10.

Here, Plaintiffs own and manage distribution businesses, the cornerstone of which is distribution rights to various bakery products in a defined geographical area.  Plaintiffs purchase bakery products from CK Sales and sell those products to customers in such territories. (Linthicum Decl. ¶ 9).  Plaintiffs are responsible for operating their own businesses, including hiring employees at their discretion to run their businesses; identifying and engaging potential new customers; developing relationships with key customer contacts; determining and ordering product based on customer needs; servicing the customers in their territory; stocking and

JA0067

replenishing product at the customer locations;   removing stale product; and other activity necessary to promote sales, customer service, and otherwise operate their businesses.  (*Id*. at ¶ 8). The businesses can appreciate in value and can be sold for a profit.  *Id*.  As such, Plaintiffs are not transportation workers in any reasonable sense, let alone as contemplated by § 1.

Exempting Plaintiffs here would flout the FAA's history and purpose.  Unlike workers engaged in long-distance transportation, local distribution franchise businesses do not resemble § 1's exemption for "enumerated categories of workers" – i.e., seamen and railroad employees – which, again, "control[]" and help to "define[]" the scope of the residual clause.  *Circuit City*, 532 U.S. at 115.  The "exemption was intended to reach workers who would, by virtue of a strike, interrupt the free flow of goods to third parties in the same way that a seamen's strike or railroad employee's strike would."  *Vargas v Delivery Outsourcing, LLC*, No. 15-03408, 2016 WL 946112, *3 (N.D. Ca. Mar. 14, 2016) (citation omitted).  Plaintiffs have no more power to do that than any other workers that make important contributions to a retail enterprise, such as "cashiers" and "shelf-stockers."  *Lee v. Postmates Inc.*, No. 18-03421, 2018 WL 6605659, at *7, *7 (N.D. Cal. Dec. 17, 2018); *see also Vargas*, 2016 WL 946112, at *5.

Indeed, while the FAA exemption for railroad employees and seaman "was motivated by a desire not to upset pre-existing or developing statutory schemes in those areas," *no such framework applies to Plaintiffs*.  *Kowalewski*, 590 F.Supp.2d at 485 (explaining that its rejection of the § 1 exemption was in accord with the Supreme Court's decision in *Circuit City* where "there is no suggestion that applying the FAA [to this case] … would upset any pre-existing or developing statutory scheme.").  Moreover, as the Second Circuit has explained, though the legislative history of § 1 is "vague and inconclusive," it "apparently was inserted at the request of the Seaman's Union, which felt that disputes involving the contracts of seaman came within

21

the admiralty jurisdiction and should not be subject to arbitration." *Signal-Stat Corp. v. Local 475, United Elec. Radio & Mach. Workers of Am.*, 235 F.2d 298, 302 (2d Cir. 1956), *overruled on other grounds by Coca-Cola Bottling Co. of New York v. Soft Drink & Brewery Workers Union Local 812 Int'l Bhd. of Teamsters*, 242 F.3d 52 (2d Cir. 2001).  Again, no such issue exists with respect to local franchise business owners, like Plaintiffs.[11]

Simply put, Plaintiffs are a far cry from traditional transportation workers like a long-haul trucker, railroad worker, or seaman who principally deliver goods in interstate commerce for employers in the transportation industry.  They are more akin to sales workers or managers who are generally responsible for all aspects of a bakery products distribution business.  Therefore, even assuming *arguendo*, Plaintiffs work in the transportation industry, they are still not transportation workers and do not fit into the narrow § 1 exemption.

  c)    **Plaintiffs Are Not Engaged in Interstate Commerce under the FAA Because Their Incidental Deliveries Are Purely Intrastate.**

In addition to the foregoing, § 1 does not apply here because Plaintiffs admit that they deliver goods within a single state (Connecticut).  (Compl. ¶¶ 2-3, 14, 18; *See also* Linthicum Decl. ¶ 10).

The § 1 exemption applies to "transportation workers" like seamen and railroad employees engaged in foreign or interstate deliveries; and any other exempt workers must be

---

[11] Indeed, as set forth above, § 1 of the FAA is, by its very terms, extremely narrow, focusing on the nature of the workers' specific activities.  More specifically, in *Circuit City,* the Supreme Court rejected the notion that § 1 exempts all contracts of employment from the FAA, "whether or not the worker is engaged in transportation." 532 U.S. at 109.  In fact, when looking at § 2 coverage of the FAA, it becomes even more clear that Congress did not intend to expand § 1. Section 2, for example, provides that the FAA should apply to arbitration provisions "in any maritime transaction or contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Section 1, on the other hand, is much narrower – limiting application to individuals "engaged in foreign or interstate commerce."  9 U.S.C. § 1.

JA0069

defined in light of the narrowness of these two categories.  *Circuit City*, 532 U.S. at 115-118.

Not surprisingly, then, subsequent cases have construed § 1 to apply only to transportation

workers whose duties include interstate deliveries – i.e., actual crossing of state lines.  *See Levin*

*v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1154 (N.D. Cal. 2015) ("a number of courts have held that

local delivery drivers do not fall within the transportation exemption to the FAA."); *See also*

*Bonner v. Mich. Logistics, Inc.*, 250 F.Supp.3d 388, 396-97 (D. Ariz. 2017) (citation omitted)

(emphasis added) (finding the FAA applied to delivery drivers and explaining that § 1 is "meant

to exclude the contracts of workers *who are literally engaged in the process of moving goods*

*across state and national boundaries—workers like seamen and railroad employees*."); *Vargas*

*v. Delivery Outsourcing, LLC*, No. 15-CV-03408-JST, 2016 WL 946112, at *5 (N.D. Cal. Mar.

14, 2016) (rejecting § 1 challenge and applying the FAA to intrastate delivery of luggage, despite

plaintiff's argument that there is "continuity of movement" between the interstate travel of the

luggage and Plaintiff's purely intrastate deliveries); *Lee v. Postmates Inc.*, No. 18-CV-03421-

JCS, 2018 WL 4961802, at *8 (N.D. Cal. Oct. 15, 2018), *motion to certify appeal granted*, No.

18-CV-03421-JCS, 2019 WL 1864442 (N.D. Cal. Apr. 25, 2019) (rejecting § 1 challenge and

applying the FAA to local delivery driver, even though deliveries may include goods that were

manufactured out of state); *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 899 (N.D. Cal.

2018), *appeal filed* November 20, 2018 (rejecting § 1 challenge and finding that because delivery

driver did not allege he crossed state lines as part of his work "there is no allegation that he

engaged in interstate commerce under the definition of the narrowly-construed term."); *Wallace*

*v. Grubhub Holdings Inc.*, No. 18 C 4538, 2019 WL 1399986, at *4 (N.D. Ill. Mar. 28, 2019)

(rejecting § 1 challenge and applying the FAA to local delivery driver where delivery involved

JA0070

purely intrastate sales and finding that delivery drivers were not similar to enumerated categories of seaman and railroad employees).[12]

Here, Plaintiffs, admittedly, did not cross state lines while delivering the products they sell to customers within the State of Connecticut.  (Compl. ¶¶ 2-3, 14, 18).  Therefore, the residual clause of the FAA is not properly applied.  *See, e.g., Int'l. Bro. Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 955-958 (7th Cir. 2012) (applying § 1 exemption to trucker who crossed state lines occasionally and suggesting that a trucker who failed to cross state lines would not be a transportation worker under § 1).  This finding is, again, in accord with the notion that Congress intended § 1 to apply to workers who, by virtue of a strike, would "interrupt the free flow of goods to third parties *in the same way that a seamen's strike or railroad employee's strike would*."  *Veliz*, 2004 WL 2452851, at *8-10 (emphasis added).  Here, of course, a strike by Plaintiffs making local deliveries of baked goods within a single state simply would not have the same broad impact as that of a strike by the enumerated categories of workers, i.e., railroad employees or seaman, which define and control the residual clause.  *See Lee*, 2018 WL 6605659, at *7 ("A strike by local couriers would presumably have no more effect on interstate commerce than a national strike of, say, cashiers, shelf-stockers, or any number of

---

[12] While there is some authority for the proposition that a plaintiff need not deliver goods across state lines for § 1 to apply, these cases are readily distinguishable and not persuasive.  At present, the Second Circuit has not issued a decision addressing the issue.  However, one district court in the circuit has noted, via a footnote, that delivery drivers contracted with a third-party logistics company were engaged in interstate commerce under the FAA, though they did not actually cross states lines.  *Diaz v. Michigan Logistics Inc.*, 167 F. Supp. 3d 375, 381, n.3 (E.D.N.Y. 2016).  However, unlike here, the *Diaz* plaintiffs were engaged primarily to transport auto parts, which was the "heart of Defendant's business."  *Id*.  In this case, while Plaintiffs certainly deliver products they sell to customers through their business, such delivery is incidental to the operation of their franchisee businesses (i.e., sale of bakery products to customers) and is not the heart of CK Sales', Lepage's, or Flowers Foods' businesses.  Therefore, this footnote is inapposite.

JA0071

other classes of employees who are not interstate transportation workers."). As a result, enforcement of the Arbitration Agreements under the FAA is appropriate.

> **2.**  **Even if Plaintiffs Fit Within the FAA's "Narrow" Transportation Worker Exemption, the Arbitration Agreement is Still Enforceable Under State Law.**

Even if the transportation workers exemption applies to Plaintiffs, making the FAA inapplicable, that would not end the analysis. Rather, if the FAA does not apply, state arbitration law governs. *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 24 (1st Cir. 2017) (emphasizing that the § 1 exemption "applie[d] only when arbitration is sought under the FAA, and it has no impact on other avenues (such as state law) by which a party may compel arbitration"); *See also Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 529 (S.D.N.Y. 2003) (citations omitted) (adopting "weight of authority" that state law will apply to contracts not covered by the FAA and explaining that the opposite position "flouts" arbitration policy, "departs from clear authority," and "most importantly … essentially rewrites what is merely an exemption providing that the FAA does not apply to a substantive pronouncement that such clauses in transportation workers' contracts are unenforceable."). This conclusion has been reached more recently by courts within and outside the Second Circuit. *See Michel v. Parts Auth., Inc.*, No. 15CV5730ARRMDG, 2016 WL 5372797, at *3 (E.D.N.Y. Sept. 26, 2016); *Burgos v. Ne. Logistics, Inc.,* No. 15CV6840CBACLP, 2017 WL 10187756, at *4 (E.D.N.Y. Mar. 30, 2017); *Merrill v. Pathway Leasing LLC*, No. 16-CV-02242-KLM, 2019 WL 1915597, at *5 (D. Colo. Apr. 29, 2019); *Colon v. Strategic Delivery Sols., LLC*, 459 N.J. Super. 349, 360, 210 A.3d 932, 939 (App. Div. 2019). Therefore, this Court should still compel arbitration under Connecticut state law.

Connecticut law accords with the FAA and its liberal policy favoring arbitration. *Nussbaum v. Kimberly Timbers, Ltd.*, 856 A. 2d 364, 368 (Conn. 2004) ("Connecticut has

JA0072

adopted a clear public policy in favor of arbitrating disputes.").  Under Conn. Gen. Stat. § 52-408, "An agreement in any written contract … to settle by arbitration any controversy thereafter arising out of such contract … shall be valid, irrevocable and enforceable, except where there exists sufficient cause at law or in equity for the avoidance of written contracts generally."  Here, consistent with the Connecticut arbitration statute, the Arbitration Agreements are in writing.  In addition, as set forth above, the parties' Arbitration Agreements were properly formed under Connecticut law through mutual assent and consideration.  (*See supra* Section III, A).  Therefore, this Court must still compel arbitration under applicable state law, in the event the FAA is determined to be inapplicable.

**E.    The Court Should Dismiss Plaintiffs' Claims and Compel Individual Arbitration.**

Courts uniformly emphasize the strong federal and state policy favoring arbitration – and there is no reason to deviate from that policy in this case.  Plaintiffs entered into valid Arbitration Agreements which apply to all claims they seek to assert against Defendants.  Thus, the Court should order the parties to proceed with individual arbitration as required by the FAA or, alternatively, state law.  9 U.S.C. § 3; *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 218 (1985) (The FAA "requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel"); *MSO, LLC v. DeSimone*, 313 Conn. 54, 63, 94 A.3d 1189, 1195 (2014) (quoting *Gores v. Rosenthal*, 150 Conn. 554, 557, 192 A.2d 210 (1963)) ("When parties have a valid arbitration agreement, 'the courts are empowered to direct compliance with its provisions.'").

Defendants also request dismissal of Plaintiffs' claims.  "Although Section 3 of the FAA only speaks of staying proceedings, it is well-settled that an arbitrable dispute may be dismissed in lieu of a stay if the defendant requests dismissal."  *Nicosia v. Amazon.com, Inc.*, 384 F. Supp.

26

3d 254, 277 (E.D.N.Y. 2019) (citing *Zambrano v. Strategic Delivery Solutions, LLC*, No. 15-CV-8410 IER), 2016 WL 5339552, at *10 (S.D.N.Y. Sept. 22, 2016)).  In this case, all of Plaintiffs' claims are subject to binding arbitration, and therefore, retaining jurisdiction over them would serve no purpose.  As such, Defendants request that Plaintiffs' claims be dismissed in favor of the arbitration forum selected by the parties to this dispute.

**IV.     Conclusion**

Defendants respectfully request that the Court dismiss this lawsuit and compel individual arbitration of all of Plaintiffs' claims pursuant to the Arbitration Agreements they signed – and their counsel previously blessed before this Court.  Defendants also pray for such other and further relief to which they may be entitled.

Dated this the 18th day of September, 2019.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.

/s/John G. Stretton
John G. Stretton (CT 19902)
john.stretton@ogletree.com
Kelly M. Cardin (CT 29162)
kelly.cardin@ogletree.com
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
281 Tresser Boulevard, Suite 602
Stamford, CT 06901
Tel.: 203-969-3100
Fax: 203-969-3150

JA0074

Margaret S. Hanrahan (NC Bar No. 52927)*
maggie.hanrahan@ogletree.com
Benjamin R. Holland (NC Bar No. 28580)*
benjamin.holland@ogletree.com
Elizabeth R. Gift (NC Bar No. 44331)*
elizabeth.gift@ogletree.com
*Admitted Pro Hac Vice
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 S. College Street, Suite 2300
Charlotte, North Carolina 28244
Tel.: 704-342-2588
Fax: 704-342-4379

JA0075

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION** with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following:

Harold L. Lichten
Matthew W. Thomson
Zachary L. Rubin
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116
(617) 994-5800
hlichten@llrlaw.com
mthompson@llrlaw.com
zrubin@llrlaw.com

Dated this the 18th day of September, 2019.

/s/John G. Stretton
John G. Stretton

JA0076

# EXHIBIT 1

JA0077

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NEAL BISSONNETTE )
and TYLER WOJNAROWSKI )
on behalf of themselves and all )
others similarly situated, )
)
                           Plaintiffs, )
                                              ) Civil Action No. 3:19-cv-00965-
        v.                                    ) KAD
                                              )
LEPAGE BAKERIES PARK ST., LLC, )
C.K. SALES CO., LLC, and FLOWERS )
FOODS, INC. )

                    Defendants.

## DECLARATION OF JAKE LINTHICUM

I, Jake Linthicum, hereby depose and state as follows:

1.      I am currently employed as the Distributor Enablement Operations Coordinator
("DEOC"), a position that was formerly referred to as the Director of Distributor Relations
("DDR"), for Lepage Bakeries Park Street, LLC ("Lepage") with responsibility for the New
England Region, which includes Connecticut. Lepage owns CK Sales Co., LLC ("CK Sales")
and is, in turn, a wholly owned subsidiary of Flowers Foods, Inc. I became the DEOC in January
2018 and, before that, worked as the DDR since April 2013.

2.      Flowers Foods is the parent holding company of numerous operating subsidiaries,
which produce fresh breads, buns, rolls, and snack cakes. Lepage, one such subsidiary, is a
baker of fresh breads, buns, and other baked goods products (i.e., a manufacturer of bread and
bakery products). CK Sales is in the business of contracting with independent distributors.

3.      Lepage uses a direct-store-delivery ("DSD") system whereby independent
distributor franchisees, like Plaintiffs Neal Bissonnette and Tyler Wojnarowski, purchase the
rights from CK Sales to sell and distribute products to customers in a defined territory.

4.     As the DEOC, and previously as the DDR, I am (and was) responsible for, among other things, maintaining distributor files for distributors, including Distributor Agreements and the Arbitration Agreements attached to Distributor Agreements.  In addition, I am familiar with various aspects of the DSD distribution system, the distributor business model, distributor product orders, and products produced for distributors.

5.     The relationship between CK Sales and distributors, including Plaintiffs Neal Bissonnette and Tyler Wojnarowski, is governed by a Distributor Agreement.  Plaintiffs, through their own independent corporations, executed the Distributor Agreement with CK Sales.

6.     Neal Bissonnette is a current distributor pursuant to the Distributor Agreement between his corporation, Bissonnette Inc., and CK Sales.  Attachment 1 to this Declaration is a true and accurate copy of the Distributor Agreement and Arbitration Agreement signed by Neal Bissonnette, President of Bissonnette Inc., which became effective June 7, 2017.

7.     Tyler Wojnarowski is a current distributor pursuant to the Distributor Agreement between his corporation, Blue Star Distributors, Inc., and CK Sales.  Attachment 2 to this Declaration is a true and accurate copy of the Distributor Agreement and Arbitration Agreement signed by Tyler Wojnarowski, President of Blue Star Distributors, Inc., which became effective April 25, 2018.

8.     Distributors contracted with CK Sales, including Plaintiffs Neal Bissonnette and Tyler Wojnarowski, are responsible for operating their businesses, including hiring employees at their discretion to run their businesses; identifying and engaging potential new customers; developing relationships with key customer contacts; ordering products based on customer needs; servicing the customers in their territory; stocking and replenishing product at the customer locations;  removing stale product; and other activity necessary to promote sales,

2

customer service, and otherwise operate their businesses. Because the distributors own the territory, they can build equity in their distributorship businesses. These businesses can appreciate in value and can be sold for a profit. Moreover, under the Distributor Agreements, including those executed by Plaintiffs Neal Bissonnette and Tyler Wojnarowski, distributors do not have to perform any services personally and are contractually obligated to use their "Best Efforts" to increase sales in their territories, which they can do in several ways, including by asking for displays, providing good customer service, recommending new products, soliciting new accounts, and effective merchandising, among other things.

9.      Distributors, including Plaintiffs Neal Bissonnette and Tyler Wojnarowski, purchase products from CK Sales, which they ultimately resell to their customers for a higher price. The difference between the price at which they sell the products less the price at which they purchase them, less their business expenses, represents Plaintiffs' "profit margin." Because Plaintiffs and other distributors are compensated based on their sales of products, it is in their best interests to devote necessary time to increasing their sales in their accounts on a daily basis.

10.     Plaintiffs Bissonnette and Wojnarowski do not cross state lines to deliver goods in connection with the operation of their businesses.

11.     I am aware that in March 2017, a lawsuit involving Connecticut-based distributors, the *Bokanoski* lawsuit, settled. In connection with the *Bokanoski* settlement, distributors who wished to retain their businesses signed a new Distributor Agreement containing an Arbitration Agreement with a class action waiver, in exchange for consideration offered as part of the settlement terms. Other distributors sold their businesses in connection with the settlement and released any and all claims at that time.

3

12.     All distributors that first contracted with CK Sales after the March 2017 *Bokanoski* settlement through the present signed the same type of Distributor Agreements containing Arbitration Agreements with a class action waiver.

13.     Distributors who purchase territories from existing distributors are likewise subject to this Arbitration Agreement given their execution of an assumption agreement when they purchase the distributorship, under which they agree to assume all obligations associated with the newly-purchased distributorship, including the Arbitration Agreement.

14.     Based on the foregoing, each potential class member, except for two, in this lawsuit is subject to the Arbitration Agreement as follows:

| Name | Distributor Status | Warehouse | Participated in *Bokanoski* Settlement and Signed Arbitration Agreement in Connection with Settlement | Became a Distributor After *Bokanoski* Settlement and Signed or are Subject to a New Arbitration Agreement in Connection with Purchase of Distributorship[1] |
|------|--------------------|-----------|------|------|
| Michael Rivera-Negron | Active | Windsor | | X |
| Eldis Senderovic | Active | Windsor | | X* |
| Roy Rodriguez | Active | Windsor | X | |
| Tyler Wojnarowski | Active | Waterbury | | X |
| Joe Bokanoski | Active | Windsor | X | |
| Neal Bissonnette | Active | Waterbury | | X |

[1] Individuals who assumed arbitration agreements via execution of an assumption agreement when they purchased their distributorships are identified with an asterisk.

JA0081

| | | | | |
|---|---|---|---|---|
| Kyle Sullivan | Active | Waterbury | | X |
| Danny Burgos-Javier | Active | Waterbury | | X |
| Roshawn Telfer | Active | Bridgeport | | X |
| Bruce Hessleton | Active | Bridgeport | | X |
| Ana Villegas | Active | Bridgeport | | X* |
| Anthony Calderon | Active | Bridgeport | | X |
| Zeleh Kolubah | Active | Bridgeport | | X* |
| Richard Kreidel | Active | Waterbury | | X* |
| Joseph Allen | Active | Bridgeport | | X |
| Ivan Reyes | Active | Bridgeport | X | |
| Louis Galli | Active | Bridgeport | X | |
| Joseph Grogan | Active | Bridgeport | X | |
| Michael Rodriguez | Active | Bridgeport | | X* |
| Joseph Felion | Active | Putnam | | X* |
| David Stockford | Active | Putnam | | X* |
| Mark Murray | Active | Waterbury | | X |
| Miguel Otero | Active | Bridgeport | | X |
| Benjamin Nelson | Active | Putnam | | X |
| Wayne Nogler | Inactive | N/A | X | |
| Jared Smith | Inactive | N/A | X | |
| Charles Sperow | Inactive | N/A | X | |
| Kathy Bergeron | Inactive | N/A | X | |
| Kurtley Roberts | Inactive | N/A | | X* |

JA0082

| Christopher Williams | Inactive | N/A | | X* |
| John Elias | Inactive | N/A | | X |
| Hector Irizarry | Inactive | N/A | | X |
| Tramain Williams | Inactive | N/A | | X |
| Thomas Cunningham | Inactive | N/A | | X |
| Brandon Hall | Inactive | N/A | | X |

15.     Joshua Reynolds, a distributor from December 14, 2016 to July 27, 2017 is not subject to an arbitration agreement of which Defendants are aware at this time. Additionally, a current distributor named Amy Longo purchased Mr. Reynolds' business and, in doing so, assumed his obligations via execution of an assumption agreement. Like Mr. Reynolds, Ms. Longo is not subject to an arbitration agreement of which Defendants are aware.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Dated this _17th_ day of September, 2019.

Jake Linthicum

6

JA0083

# ATTACHMENT 1

JA0084

# DISTRIBUTOR AGREEMENT
## TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| I. | Warranty | 1 |
| II. | Definitions | 2 |
| III. | Relationship | 3 |
| IV. | Sale of Products | 4 |
| V. | Best Efforts/Distributor | 4 |
| VI. | Best Efforts/Company | 6 |
| VII. | Accounts/Trademarks Exempt From Agreement | 6 |
| VIII. | Payment for Products | 7 |
| IX. | Equipment and Insurance | 8 |
| X. | Proprietary Services | 9 |
| XI. | Product Delivery | 10 |
| XII. | Product Code | 10 |
| XIII. | Advertising and Promotions | 11 |
| XIV. | Service Requirements | 11 |
| XV. | Transfer or Sale of Rights | 12 |
| XVI. | Independent Business | 13 |
| XVII. | Termination by Company | 14 |
| XVIII. | Dispute Resolution | 16 |
| XIX. | Trademarks, Tradenames and Proprietary Materials | 17 |
| XX. | Miscellaneous | 19 |
| Exhibit A | Territory | 23 |
| Exhibit B | Products | 24 |
| Exhibit C | Authorized Products | 25 |
| Exhibit D | Bill of Sale | 26 |
| Exhibit E | Owner | 27 |
| Exhibit F | Personal Guaranty | 28 |
| Exhibit G | Settlement Statement Authorization | 29 |
| Exhibit H | Distributor Choice of Insurance Coverages | 30 |
| Exhibit I | Distributor Choice of Delivery Location | 31 |
| Exhibit J | Distributor Choice of Fee for Service | 32 |
| Exhibit K | Arbitration Agreement | 33 |
| Maryland Addendum (if applicable) | | 36 |
| Indiana Addendum (if applicable) | | 37 |

JA0085

## DISTRIBUTOR AGREEMENT

This Distributor Agreement ("Agreement") is made effective the **19th** day of **June, 2017**, by and between **CK SALES CO., LLC**, with its office and principal place of business at 11 Adamian Drive, Auburn, Maine 04210 ("COMPANY"), and **Bissonnette Inc**, a Connecticut corporation, with its principal place of business at **47 Harvest Ln Bristol, CT 06010** ("DISTRIBUTOR").

### W I T N E S S E T H:

COMPANY has developed or acquired a license or franchise for the use of formulae, recipes, trademarks and trade names through which it manufactures and/or markets bread, rolls, and other fresh-baked products, as defined herein; and

Whereas, COMPANY, through the expenditure of time and effort and through its continuing research and marketing programs, has over the years developed a reputation for excellence in quality, value, and superior service which has created strong consumer recognition, approval, and demand for its products; and

Whereas, COMPANY has determined that the divestiture and division of its market area into distribution territories, and the sale of its products to independent franchise distributors for distribution and ultimate retail sale in said territories, will result in a superior distribution system; and

Whereas, DISTRIBUTOR is an independent contractor with the resources, expertise and capability to act as a franchise distributor of COMPANY's products in the Territory; and

Whereas, the parties desire to create a right in DISTRIBUTOR, under which DISTRIBUTOR will be authorized to sell certain defined products within a territory or territories and otherwise operate the distributorship business hereunder.

Now, therefore, in consideration of these premises, and of the covenants and conditions contained in this Agreement, and for other good and valuable consideration given and received, the receipt and the sufficiency of which are hereby specifically agreed to and acknowledged, the parties mutually agree as follows:

### I. WARRANTY

**1.1**     The foregoing preambles are incorporated herein by reference and shall constitute warranties, representations, agreements and undertakings by the parties.

### II. DEFINITIONS

**2.1**     **Outlets**:  Shall mean all retail stores (except thrift stores) selling food to the general public and all restaurant, fast food, military and institutional accounts, in each case which allow direct

store delivery (DSD) products and/or Authorized Products, except those exempt from this Agreement as set forth in Article VII, below.

2.2 **Products**: Shall mean fresh baked goods, as specifically described in **Exhibit B**, attached hereto and made a part hereof, which are currently produced and/or distributed by COMPANY, provided, however, that the Distribution Rights granted herein shall survive only so long as COMPANY and/or its affiliate(s) has/have the legal right to produce and sell such goods, whether by ownership, license, franchise, or otherwise, and COMPANY produces and/or sells such goods. Products shall not include products other than those specifically described in **Exhibit B** nor products intended to be sold as frozen or refrigerated.

2.3 **Authorized Products**: Shall mean fresh baked goods, as specifically described in **Exhibit C**, attached hereto and made a part hereof, provided, however, that DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive. COMPANY may cease selling such Authorized Products to DISTRIBUTOR upon notice, with or without cause. COMPANY may also add Authorized Products to **Exhibit C** upon notice to DISTRIBUTOR. Authorized Products may include products with logos and/or labels, or without.

2.4 **Distribution Rights**: Except as expressly limited by this Agreement, Distribution Rights shall mean the right to sell and distribute Products to Outlets in the Territory, which right has been purchased by DISTRIBUTOR from COMPANY as evidenced by a Bill of Sale executed by the parties, which is attached hereto as **Exhibit D**, and made a part hereof.

2.5 **Territory**: Shall mean that geographic area as more specifically described in **Exhibit A** within which DISTRIBUTOR owns the Distribution Rights.

2.6 **Good Industry Practice**: Shall mean the standards that have developed and are generally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products and Authorized Products in all Outlets in the Territory requesting service, actively soliciting all Outlets in the Territory not being serviced, properly rotating all Products and Authorized Products, promptly removing all stale Products and Authorized Products, maintaining proper service and delivery to all Outlets in the Territory requesting service in accordance with Outlet's requirements, maintaining all equipment in a sanitary condition and in good safe working order, and operating the distributorship business hereunder in compliance with all applicable federal, state and local laws, rules and regulations, including but not limited to, all motor vehicle, Department of Transportation, food, drug, health, bioterrorism, security, and sanitary laws and regulations. **DISTRIBUTOR specifically**

acknowledges and agrees that such standards do not reflect control by COMPANY as to the specific details or manner and means of DISTRIBUTOR's business, but reflect only COMPANY's interests in the results achieved by DISTRIBUTOR, protecting the reputation of the brands, and protecting the business reputation of both DISTRIBUTOR and COMPANY.

**2.7** **Stale**: Shall mean Products and Authorized Products removed from the market on the appropriate color code or designated pick up date.

**2.8** **Out of Code**: Shall mean Products and Authorized Products left in the market beyond the appropriate color code or designated pick up date.

**2.9** **Chain**: Shall mean a person or business entity that operates more than one Outlet and/or which makes centralized decisions regarding the purchase of Products and/or Authorized Products for more than one Outlet.

**2.10** **Owner**: Shall mean the individual holding a majority ownership in the stock of DISTRIBUTOR and listed on **Exhibit E** hereto. Such individual must personally guarantee the conditions and obligations herein by executing the Personal Guaranty, attached hereto as **Exhibit F** and made a part hereof. As long as DISTRIBUTOR owns the Distribution Rights hereunder, Owner agrees to ensure DISTRIBUTOR is properly established, organized and at all times in good standing with the appropriate state agency(s) and in compliance with appropriate state law(s). Upon request, DISTRIBUTOR shall provide COMPANY documentation showing that its corporate registration is in good standing and in compliance with appropriate state law(s).

### III. RELATIONSHIP

**3.1** **Extent and Duration**: COMPANY hereby recognizes DISTRIBUTOR's ownership of the Distribution Rights, said ownership to continue until:

**(a)** transferred, assigned or sold by DISTRIBUTOR or anyone acting on behalf of DISTRIBUTOR (this includes a sale by COMPANY for the account of DISTRIBUTOR in the event of a termination of this Agreement upon the terms defined below), or

**(b)** COMPANY, for legitimate business reasons unrelated to Section 3.1(c) immediately below, ceases to use distributors to distribute Products in the **Newington 2** market area. In such event, COMPANY will repurchase the Distribution Rights from DISTRIBUTOR at ten (10) times the average weekly sales volume of Products (not Authorized Products) in the Territory calculated over the six (6) month period preceding the repurchase, or

**(c)** either party exercises its right to terminate pursuant to Section 16.1. In such event, COMPANY will repurchase the Distribution Rights from DISTRIBUTOR at fair market value,

which in no event shall exceed the purchase price paid by DISTRIBUTOR for the Distribution Rights

**3.2** **Nature of Rights:** The parties agree that the Distribution Rights sold to DISTRIBUTOR pursuant to the Bill of Sale can be exercised only pursuant to the terms of this Agreement and that any termination of this Agreement other than in accordance with Section 3.1 (b) or (c) requires DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, to sell such Distribution Rights subject to the terms of this Agreement.

### IV. SALE OF PRODUCTS AND AUTHORIZED PRODUCTS

**4.1** Products and Authorized Products will be sold to DISTRIBUTOR at such terms and prices as established by COMPANY from time to time. Title and risk of loss shall pass to DISTRIBUTOR upon delivery to DISTRIBUTOR as set forth in Section 11.1 below.

### V. BEST EFFORTS/DISTRIBUTOR

**5.1** **Obligations of DISTRIBUTOR:** DISTRIBUTOR agrees and covenants to use DISTRIBUTOR's commercially reasonable best efforts to develop and maximize the sale of Products to Outlets within the Territory and service the Territory in accordance with Good Industry Practice as defined above, including servicing all Outlets in accordance with the Outlet's then-established service requirements. DISTRIBUTOR further agrees and covenants to use DISTRIBUTOR's commercially reasonable best efforts to maximize the sale of Authorized Products to those Outlets in the Territory for which such Authorized Products have been produced and to distribute such Authorized Products to such Outlets in accordance with Good Industry Practice as defined above, including servicing all Outlets in accordance with the Outlet's then-established service requirements. DISTRIBUTOR shall cooperate with COMPANY on its marketing and sales efforts and ensure its employee(s) maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with COMPANY, and customer requirements. DISTRIBUTOR may not sell products in the Territory which are competitive with the Products or Authorized Products. DISTRIBUTOR may sell noncompetitive products, as long as this does not interfere with the distribution of the Products or Authorized Products. **DISTRIBUTOR specifically acknowledges and agrees that the obligations herein do not reflect control by COMPANY as to the specific details or manner and means of DISTRIBUTOR's business, but reflect only COMPANY's interests in the results achieved by DISTRIBUTOR, protecting the reputation of the brands, and protecting the business reputation of both DISTRIBUTOR and COMPANY.** As set forth in Section 2.10,

DISTRIBUTOR must be properly established, organized and at all times in good standing with the appropriate state agency(s) and in compliance with appropriate state law(s).

**5.2** **Alternate Distribution**: Should DISTRIBUTOR believe a certain account or accounts is/are unprofitable to service, DISTRIBUTOR shall provide COMPANY written notice of such belief and the reasons therefor, including a detailed financial analysis. Within ten (10) business days thereafter, COMPANY representative(s) and DISTRIBUTOR shall meet to discuss DISTRIBUTOR's concerns. DISTRIBUTOR and COMPANY agree to work in good faith to explore opportunities to remedy the unprofitability of such account(s), and DISTRIBUTOR further agrees to give its best effort to remedy the unprofitability of such account(s), including the exercise of any recommendations made by COMPANY. After exhausting all such efforts, if the COMPANY agrees with DISTRIBUTOR's position, DISTRIBUTOR shall be relieved of its contractual obligation to service such account(s) for a period of time determined by COMPANY. During such period, COMPANY may make alternate distribution arrangements for such account(s) and DISTRIBUTOR shall not receive any credit for sales associated with such alternate distribution. At the end of the period specified by COMPANY, COMPANY and DISTRIBUTOR shall meet again to determine future service of such account(s), including DISTRIBUTOR resuming service once such account(s) become profitable.

**5.3** **Non-Compliance**: Failure to comply with Section 5.1 and/or any of the terms, conditions and obligations elsewhere in this Agreement shall be considered a material breach of this Agreement and shall be governed by the provisions of this Agreement dealing with termination.

## VI. BEST EFFORTS/COMPANY

**6.1** **Obligations of Company**: COMPANY shall use its commercially reasonable best efforts to manufacture and deliver to DISTRIBUTOR sufficient quantities of Products and Authorized Products to supply Outlets requesting service in the Territory, preserve and develop the quality and marketability of the Products, and cooperate with DISTRIBUTOR on DISTRIBUTOR's sales and marketing efforts. In order to assist DISTRIBUTOR with product sales to Chains, which may require COMPANY and/or its affiliate(s) involvement to obtain authorization to sell Products or Authorized Products, DISTRIBUTOR hereby designates COMPANY and/or its affiliate(s) and COMPANY and/or its affiliate(s) agree(s) to act as DISTRIBUTOR's limited agent to obtain such authorization. This limited agency designation is for the sole purpose of authorization

discussions (including space, position and pricing) with regard to Chain accounts. Nothing herein shall obligate COMPANY and/or its affiliate(s) to seek authorization or otherwise pursue business opportunities with any specific Chain or other account. Additionally, nothing herein shall prevent DISTRIBUTOR from having the right to deal directly with Chain accounts with regard to such terms, although DISTRIBUTOR acknowledges Chains may decide not to deal with either COMPANY or DISTRIBUTOR.

**6.2**   **Non-Compliance**:   Failure to comply with Section 6.1 shall be considered a material breach of this Agreement and shall be governed by Section 20.2 below (Company Breach).   Repeated breaches by COMPANY which threaten to do substantial harm to DISTRIBUTOR'S business shall entitle DISTRIBUTOR to terminate this Agreement.

**VII. ACCOUNTS AND/OR TRADEMARKS EXEMPT FROM DISTRIBUTORSHIP**

**7.1**   **Accounts Exempt From Agreement**:   COMPANY reserves the right to solicit and service drop delivery and other non-DSD accounts with Products and Authorized Products, in whole or in part, in DISTRIBUTOR's Territory, so long as it is done for legitimate business reasons and not for the purpose of undermining DISTRIBUTOR's business.

**7.2**   **Thrift Stores**:   COMPANY reserves the right to continue to sell Products and Authorized Products through its retail thrift store operation, COMPANY-owned and/or independently owned.

**7.3**   **Other Trademarks**:   The parties hereto stipulate that COMPANY and COMPANY affiliates produce a variety of products marketed under a variety of trademarks distributed through multiple channels of distribution, including warehouse distribution.   This Agreement does not restrict any other distribution of products by COMPANY and COMPANY affiliates marketed under trademarks not listed on **Exhibit B** via warehouse distribution or otherwise.

**VIII. PAYMENT FOR PRODUCTS**

**8.1**   **Settlement of Account**:   On or before Friday of each week, DISTRIBUTOR will remit to COMPANY a full settlement of all Products and Authorized Products sold to DISTRIBUTOR in the preceding week, in accordance with terms established by COMPANY from time to time. DISTRIBUTOR authorizes COMPANY to make credits and charges to its weekly settlement as set forth on the Settlement Statement Authorization, a sample of which is attached hereto as **Exhibit G**.

**8.2**   **Cash Sales**:   DISTRIBUTOR is solely responsible for the collection of all cash sales in the Territory.

**8.3**   **Non-Cash Sales**:  In cases where Products and/or Authorized Products are sold and distributed to Outlets which have been approved by COMPANY for credit and in its sole discretion, COMPANY will accept electronic data with corresponding proof of delivery, charge slips, Outlet-generated authorizations or other forms of payment authorizations as may be required by the Outlet or COMPANY (including but not limited to, authorizations signed by the Outlet's authorized representative, such as the store manager, or its designee) in lieu of cash, and credit DISTRIBUTOR's account for such sales, provided DISTRIBUTOR fully complies with COMPANY's credit policies as established from time to time.  In the event DISTRIBUTOR fails to comply with COMPANY's credit policy, fails to provide complete documentation as required by the Outlet or COMPANY, or falsifies any documentation or credit information, COMPANY shall be entitled to charge DISTRIBUTOR's account for any credit extended to DISTRIBUTOR resulting therefrom without limiting any other remedies available to COMPANY.  DISTRIBUTOR is wholly responsible for collection of accounts receivable not authorized by COMPANY.  COMPANY is obligated to credit DISTRIBUTOR only for such payments made by the Outlet.

**8.4**   **Chain Accounts**:  COMPANY and/or its affiliate(s) reserves the right to continue carrying the accounts receivable for all Chain and other major accounts and to promptly credit DISTRIBUTOR for DISTRIBUTOR's sales to all such accounts.

**8.5**   **Scan Based Trading**:  In the event a Chain account implements Scanned Based Trading (SBT), Pay By Scan (PBS) or other accounting methodologies and/or technology, DISTRIBUTOR agrees to comply with policies and procedures as may be necessary to comply with such Chain accounting and/or technology requirements.

**8.6**   **Security Interest**:  To secure the prompt payment and timely performance of all indebtedness, obligations and liabilities of DISTRIBUTOR to COMPANY under this Agreement, whether now existing or hereafter arising, DISTRIBUTOR hereby grants and conveys to COMPANY a presently existing and continuing security interest in the Distribution Rights, in this Agreement, in all Products and/or Authorized Products now or hereafter in DISTRIBUTOR's possession, in all accounts now or hereafter arising out of the sale by DISTRIBUTOR of Products and/or Authorized Products, and in all proceeds thereof. DISTRIBUTOR agrees that this security interest attaches immediately upon execution of this Agreement by DISTRIBUTOR and that COMPANY has all of the rights of a secured party under the applicable Uniform Commercial Code, as amended from time to time.  DISTRIBUTOR expressly authorizes COMPANY to file and refile all appropriate Uniform Commercial Code financing statements necessary to perfect the security interests granted hereunder.

JA0092

**8.7**   **Default:** Nothing herein shall be deemed to require COMPANY to fill an order of DISTRIBUTOR during the time when DISTRIBUTOR has failed to make any payment due to COMPANY in a timely fashion.

## IX. EQUIPMENT AND INSURANCE

**9.1**   **Delivery Vehicle(s):**  DISTRIBUTOR is responsible for obtaining DISTRIBUTOR's own delivery vehicle(s) and purchasing adequate insurance thereon, as described in Section 9.2 below. Consistent with good industry practice, DISTRIBUTOR agrees to keep the delivery vehicle(s) clean at all times and in a manner consistent with the professional image customers and the public associates with COMPANY, and to maintain the delivery vehicle(s) in such condition as to provide safe, prompt, and regular service to all customers.  If legally required, DISTRIBUTOR agrees to have painted in a conspicuous manner on any delivery vehicle owned or leased by it to carry out the terms hereof: "Owned and Operated by (DISTRIBUTOR's name), An Independent Contractor".

**9.2**   **Insurance:**  DISTRIBUTOR shall maintain at all times throughout the duration of this Agreement insurance policies from insurance companies that maintain a financial strength rating of A- or better and are licensed to do business in the state(s) in which the Territory is located, and naming COMPANY as an additional insured party on all such insurance policies.  DISTRIBUTOR may select either option as set forth in **Exhibit H** attached hereto and made a part hereof.  DISTRIBUTOR agrees to provide COMPANY with written evidence of insurance and endorsement within three (3) days upon request by COMPANY.  COMPANY reserves the right to change the insurance coverage requirements by providing DISTRIBUTOR with thirty (30) calendar days notice.

**9.3**   **Other Insurance:**  In addition to the insurance coverage required under this Agreement, it is DISTRIBUTOR'S responsibility to carry and maintain any other insurance coverage DISTRIBUTOR may desire.

## X. PROPRIETARY SERVICES

**10.1**   **Services Provided:**   COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist DISTRIBUTOR in the conduct of DISTRIBUTOR's business for the following purposes: (i) collection of sales data; (ii) preparation of sales tickets; (iii) accumulation of sales histories; (iv) preparation of daily and weekly settlements; (v) preparation of automated "adds" to and "cuts" from DISTRIBUTOR's daily order of Products and Authorized Products; (vi) direct communication to COMPANY for the purpose of DISTRIBUTOR's ordering of product and receipt of daily load information; (vii)

providing automated route book information; (viii) providing automatic product movement information; (ix) providing individual customer sales profiles; and (x) providing suggested orders for each customer. **DISTRIBUTOR specifically acknowledges and agrees that the use of such proprietary administrative services is a necessary component of transacting business with Outlets and maximizing sales and does not reflect control by COMPANY of the specific details or manner and means of DISTRIBUTOR's business.**

10.2   **Administrative Fee:**   COMPANY shall charge, and DISTRIBUTOR shall pay, a fair market, reasonable administrative fee for these services, which shall be established from time to time by COMPANY.

10.3   **Confidentiality:**   DISTRIBUTOR agrees to maintain and hold in confidence any and all information obtained from or derived about COMPANY's proprietary administrative services pursuant to the provisions of Section 20.7.

10.4   **No Proprietary Rights:**  DISTRIBUTOR acknowledges that DISTRIBUTOR cannot and shall not acquire any proprietary rights in COMPANY's proprietary administrative services and no rights shall accrue to DISTRIBUTOR by virtue of the use of the proprietary administrative services. The right to use these proprietary administrative services shall not be assigned by DISTRIBUTOR without the express written consent of COMPANY.

10.5   **Termination or Amendment of Services:** This provision shall remain in effect for as long as this Agreement is in effect. However, in the event this Agreement is terminated for any reason, so shall DISTRIBUTOR's right to use the proprietary administrative services. COMPANY may, in its sole discretion, alter, amend or terminate the proprietary administrative services herein made available by the giving of fourteen (14) calendar days' notice to DISTRIBUTOR.

10.6   **Accurate and Truthful Reporting:**   DISTRIBUTOR shall at all times utilize the proprietary services in an honest and ethical manner.  This specifically includes accurate and truthful reporting of transactions and related information so as to allow COMPANY to comply with applicable legal disclosure and reporting requirements.  COMPANY reserves the right to audit DISTRIBUTOR's transactional records and inventory to ensure accurate and truthful reporting and COMPANY's compliance with applicable legal requirements.

## XI. PRODUCT DELIVERY

11.1   COMPANY shall deliver Products and Authorized Products to DISTRIBUTOR at the location chosen by DISTRIBUTOR, as reflected on **Exhibit I** attached hereto and made a part hereof. DISTRIBUTOR will be charged a fee for warehouse use.  DISTRIBUTOR may request to change

JA0094

the location upon thirty (30) days' notice to COMPANY, provided COMPANY is able to accommodate the requested change, such decision being COMPANY's sole discretion.  If COMPANY is not able to accommodate the requested change, it may provide DISTRIBUTOR with other location options.

## XII. PRODUCT CODE

**12.1**  Maintaining a fresh market is a fundamental tenet of the baking industry.  Accordingly, Out of Code Products or Authorized Products left in the market is a material breach of this Agreement.    Repeated violations will be grounds for termination of this Agreement. **DISTRIBUTOR specifically acknowledges and agrees that removing Stale Products and Authorized Products from the market on the appropriate color code or designated pick up date is necessary to maintain the reputation of the brands and to protect the business reputation of both DISTRIBUTOR and COMPANY.**

**12.2**  DISTRIBUTOR is not obligated to sell its Stale Products and Authorized Products back to COMPANY.  However, to assist DISTRIBUTOR in maintaining a fresh market, COMPANY will repurchase a certain percentage of DISTRIBUTOR's Stale Products or Authorized Products, in accordance with COMPANY's Stale allowance policy as established by COMPANY from time to time.

**12.3**  DISTRIBUTOR may not sell any Out of Code Products or Authorized Products,  or those not in a saleable condition for distribution to the general public, but may otherwise sell such products to purchasers for non-human consumption.

## XIII. ADVERTISING AND PROMOTIONS

**13.1**  COMPANY will provide all COMPANY initiated advertising material at no cost to DISTRIBUTOR, including, but not limited to, point of sale material and COMPANY scheduled media advertising.  Subject to COMPANY's prior approval, which approval will not be unreasonably withheld, DISTRIBUTOR may use other advertising materials.

**13.2**  DISTRIBUTOR will adhere to all promotions and feature pricing with respect to the major and Chain accounts in the Territory.  Such promotions and feature pricing are optional with respect to local accounts.  When DISTRIBUTOR follows promotions or feature pricing, DISTRIBUTOR will receive a reduction in the purchase price accounting for such promotion or feature pricing, such that DISTRIBUTOR and COMPANY share the price allowance.  With respect to local accounts, DISTRIBUTOR shall be required to provide COMPANY with sufficient proof that the promotion or feature pricing was extended to the local accounts(s) in order to obtain a pricing

JA0095

adjustment for such sales. DISTRIBUTOR and COMPANY will each share in any resulting pricing allowance(s).

## XIV. SERVICE REQUIREMENTS

**14.1**  DISTRIBUTOR is responsible for providing proper service of the Territory at all times.

**14.2**  If DISTRIBUTOR does not service the Territory, for any reason, COMPANY reserves the right to service the Territory, and DISTRIBUTOR agrees to pay a daily fee as indicated on **Exhibit J**, plus any operating expenses COMPANY incurs, including but not limited to fuel, truck rental and travel costs. COMPANY reserves the right to change its daily fee. Such temporary service by COMPANY does not relieve DISTRIBUTOR of the obligation imposed on it by the AGREEMENT nor act to cure any breach by DISTRIBUTOR.

## XV. TRANSFER OR SALE OF RIGHTS

**15.1**  **Conditions:  The Distribution Rights are owned by the DISTRIBUTOR and may be sold or transferred in whole or in part by DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, subject to the prior written approval of COMPANY, which approval shall not be unreasonably withheld.**  Any sale or transfer of the Distribution Rights must be bona fide, for legitimate business purposes, and compliant with all applicable laws.  Additionally, the prospective purchaser or transferee must be fully qualified to meet all of the obligations under this Agreement, including but not limited to, conducting the business as a corporation pursuant to the conditions set forth in Section 2.10.  COMPANY's right of approval in this Section shall expire if not exercised within thirty (30) days after the later of (a) receipt by COMPANY of written notice from DISTRIBUTOR of its intent to sell or transfer to a named bona fide purchaser or transferee on terms and conditions fully set forth in such notice, and (b) an evaluation by COMPANY of the proposed purchaser or transferee.  The transfer, whether in one or a series of transactions, of a majority of the ownership or voting interests in the stock of DISTRIBUTOR, whether by operation of law or otherwise, shall constitute a sale, subject to the prior written approval of COMPANY for purposes of this Article.  DISTRIBUTOR shall execute and deliver to COMPANY and its affiliates a release of all its interests and claims to and in such Distribution Rights and all of its interests under or arising out of this Agreement, together with a general release of claims against COMPANY and its affiliates, in the event of any transfer or sale of the Distribution Rights.  COMPANY will concurrently execute a general release of claims as to DISTRIBUTOR, except for any claim for monies due and owing COMPANY.  Except as specifically set forth in Article III hereof, COMPANY has no obligation to repurchase the Distribution Rights.

JA0096

**15.2**  **Settlement of Accounts:** No transfer or sale of DISTRIBUTOR's rights under this Agreement is to be made unless and until DISTRIBUTOR has settled with COMPANY all outstanding accounts and settled all other outstanding liens and debts related to the distributorship; provided, however, that COMPANY may waive this requirement depending on the circumstances of the particular transaction, including if it is satisfied that under the terms of the sale, the purchaser assumes all such liabilities and is financially capable of such assumption.

**15.3**  **Transfer Fee:** In the event of a sale by DISTRIBUTOR, or by anyone other than COMPANY acting on behalf of DISTRIBUTOR of DISTRIBUTOR's Distribution Rights to a third party, DISTRIBUTOR shall be solely responsible for ensuring the purchaser is fully qualified to operate the business hereunder, and shall pay a transfer fee to COMPANY in an amount equal to two percent (2%) of such gross sales price, but not less than $2,000, in consideration of the administrative activities undertaken by COMPANY in connection with such sale. In the event of a sale of the Distribution Rights to COMPANY, or by COMPANY on behalf of DISTRIBUTOR, DISTRIBUTOR shall pay a transfer fee to COMPANY in an amount equal to five percent (5%) of such gross sales price, but not less than $3,000, in consideration of the administrative activities undertaken by COMPANY in connection with such sale.

**15. 4**  **Taxes and Reporting Requirements:** DISTRIBUTOR shall be solely responsible for all taxes and transactional reporting requirements, including but not limited to the nature of the conveyance, related to the transfer or sale of the Distribution Rights.

### XVI. INDEPENDENT BUSINESS

**16.1**  **Essential Term:** The status of DISTRIBUTOR pursuant to this Agreement is that of independent contractor for all purposes and the parties hereby signify their express intention to this effect. DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner and means of DISTRIBUTOR's business, it being understood that the interests of COMPANY are the results achieved by DISTRIBUTOR, protecting the reputation of the brands, and protecting the business reputation of both DISTRIBUTOR and COMPANY. DISTRIBUTOR's business is separate and apart from that of COMPANY and it is of the essence of this Agreement that DISTRIBUTOR is an independent business. Any final determination that DISTRIBUTOR is not an independent contractor shall entitle either party to cancel this Agreement, such determination being contrary to the parties' express intention herein to create an independent contractor relationship. Neither DISTRIBUTOR nor any of DISTRIBUTOR's employees, agents, or servants shall be considered or deemed in any way to be employees, agents or servants of COMPANY

and neither party has the right or power, express or implied, to do any act or thing that would bind the other, except as herein specifically provided. The parties do not intend to act as joint employers, parent/subsidiary, joint venturers, or any other legal capacity other than separate and distinct businesses acting pursuant to the terms of this Agreement. There is no fiduciary relationship between the parties. Furthermore, none of the benefits provided by COMPANY to its employees are available from COMPANY to DISTRIBUTOR or to DISTRIBUTOR's employees, agents, or servants. In the event DISTRIBUTOR and/or DISTRIBUTOR's employees, agents or servants hereafter become eligible to participate in any such benefits, DISTRIBUTOR, on behalf of DISTRIBUTOR and DISTRIBUTOR's employees, agents and servants, hereby waives any right to participate in such benefits. Such waiver is not dependent upon DISTRIBUTOR's status as an independent contractor.    DISTRIBUTOR will be solely and entirely responsible for DISTRIBUTOR's acts and for the acts of DISTRIBUTOR's employees, agents, and servants during the performance of this Agreement, and will save and hold COMPANY harmless from any and all damages which may arise therefrom, including attorneys' fees.

**16.2**  **Non-Personal Service**:  This Agreement does not require that DISTRIBUTOR's obligations hereunder be conducted personally, or by any specific individual in DISTRIBUTOR's organization.  DISTRIBUTOR shall be free to engage such persons as DISTRIBUTOR deems appropriate to assist in discharging DISTRIBUTOR's responsibilities hereunder. Any breach of this Agreement by any person engaged by DISTRIBUTOR shall be deemed to be a breach by DISTRIBUTOR.

**16.3**  **DISTRIBUTOR Employees**:  DISTRIBUTOR shall ensure all persons assisting in fulfilling DISTRIBUTOR's obligations hereunder are treated as employees, not as contractors, for all purposes including, but not limited to, payment for services, payroll and income taxes, tax withholding, and legally required insurance.  DISTRIBUTOR agrees to provide proof of such compliance at request of COMPANY.

**16.4**  **Professional Services:**  DISTRIBUTOR may engage any legal and/or accounting professional services it deems necessary for purposes of legal compliance, meeting its obligations under this Agreement, and otherwise.

**XVII. TERMINATION BY COMPANY**

**17.1**  **Performance**:  Except as set forth in Sections 3.1 (b) and (c) and 16.1 above, or this Article, COMPANY shall not terminate or cancel this Agreement, provided DISTRIBUTOR faithfully carries out the terms hereof.  In the event DISTRIBUTOR fails to perform DISTRIBUTOR's

JA0098

obligations under this Agreement, COMPANY may terminate this Agreement as set forth below.

**17.2**  **Non-Curable Breach**:  COMPANY may terminate upon twenty-four (24) hours' written notice and DISTRIBUTOR shall have no right to cure if DISTRIBUTOR's failure of performance involves criminal activity, threatens public or private health or safety, involves violent activity or violations of law, or threatens to do substantial harm to COMPANY's business, trademarks or reputation, including, but not limited to, any action or inaction on DISTRIBUTOR's part that results in DISTRIBUTOR's inability to service any Chain account.  COMPANY may also terminate upon twenty-four (24) hours written notice and DISTRIBUTOR shall have no right to cure if DISTRIBUTOR fails to maintain the insurance coverage requirements as set forth in Section 9.2 above and **Exhibit H**, or if DISTRIBUTOR dissolves its corporate status.

**17.3**  **Curable Breach**:  In any event of failure of performance by DISTRIBUTOR, COMPANY must give DISTRIBUTOR ten (10) business days written notice within which DISTRIBUTOR may cure DISTRIBUTOR's failure of performance.   If DISTRIBUTOR does not cure such failure of performance within this ten (10) day period, COMPANY may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure.  Furthermore, the parties agree that repeated violations, even if cured, constitute a chronic failure of performance and threaten substantial harm to COMPANY's business, trademarks or reputation, and in such event COMPANY shall be entitled to terminate this Agreement immediately and DISTRIBUTOR shall have no further right to cure.

**17.4**  **Actions Following Termination**:  If this Agreement is terminated under either Section 17.2 or 17.3, COMPANY, within the limits of its ability to do so, will operate the business for the account of DISTRIBUTOR, deducting its reasonable expenses in connection with the operation thereof, and sell DISTRIBUTOR's Distribution Rights to a qualified purchaser(s) at the best price which can reasonably be obtained after proper notice and advertisement.  Such sale shall be for the account of the terminated DISTRIBUTOR, and the proceeds of such sale, after deducting therefrom any monies owed by DISTRIBUTOR to COMPANY, the amount of any outstanding liens, any other known liabilities of the distributorship and the reasonable costs incurred in effecting the sale, shall be turned over to DISTRIBUTOR in exchange for the release of DISTRIBUTOR's Distribution Rights and interests under this Agreement, together with a general release of claims as to COMPANY and its affiliates.  COMPANY will concurrently execute a general release of claims as to DISTRIBUTOR, except for any claim for monies due and owing COMPANY.

JA0099

## XVIII. DISPUTE RESOLUTION

18.1   **Negotiation**: DISTRIBUTOR and COMPANY shall attempt in good faith and employ their best efforts to resolve and terminate any controversy, claim or dispute arising out of or relating to this Agreement promptly by negotiations.   Such negotiations shall take place between representatives of COMPANY and DISTRIBUTOR who have the authority to settle and resolve the dispute.   Such negotiations shall begin upon written notice from one party to the other describing any dispute or claim which has not been resolved in the ordinary course of business and suggesting a location for a meeting between the parties to conduct such negotiations within ten (10) business days after delivery of such notice.   Representatives of DISTRIBUTOR and COMPANY shall meet at a mutually acceptable time and place within ten (10) calendar days after delivery of such notice and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute.   Any such meeting may be attended by one or more representatives of each party.   No such meeting shall be attended by an attorney representing either party unless such party shall have first given the other party at least three (3) calendar days' notice that it will be accompanied by an attorney at the next scheduled meeting, and at such meeting the other party may also be accompanied by an attorney.

18.2   **Mediation**: If the dispute has not been resolved within thirty (30) calendar days of the initial notice, or if the party receiving such notice has failed to meet within fifteen (15) calendar days, either party may initiate mediation by a request therefore in writing to the other party.   Upon receipt of such notice, DISTRIBUTOR or COMPANY shall be obligated to engage in mediation. If the parties fail to agree within fifteen (15) calendar days of the date of such request for mediation on the selection of a mediator, then the Center for Public Resources shall appoint a mediator in accordance with its Mediation Procedure and the parties shall continue efforts through mediation to resolve the controversy and dispute between them until mediation is terminated by the occurrence of any of the following events:

    (i)   A written resolution in settlement of the dispute is reached, or

    (ii)   The mediator informs the parties in writing that further efforts would not be productive or useful, or

    (iii)   The parties agree in writing that further efforts would not be productive, or

    (iv)   Sixty (60) calendar days elapse from the commencement of the mediation without

resolution.

Neither COMPANY nor DISTRIBUTOR may withdraw from mediation before such a termination of the process.

**18.3**   **Mandatory and Binding Arbitration**:  All claims, disputes, and controversies arising out of or in any manner relating to this Agreement or any other agreement executed in connection with this Agreement, or to the performance, interpretation, application or enforcement hereof, including, but not limited to breach hereof and/or termination hereof, which has not been resolved pursuant to the negotiation and mediation provisions herein shall be submitted to binding arbitration in accordance with the terms and conditions set forth in the Arbitration Agreement attached hereto as **Exhibit K**, excepting only such claims, disputes, and controversies as specifically excluded therein.

**18.4**   **Confidentiality**:  All negotiations and mediations pursuant to this Article of the Agreement are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and any similar state rules of evidence.

**18.5**   **Tolling**:  All applicable statutes of limitation and defenses based upon the passage of time shall be tolled during the negotiation and mediation procedures specified in this Article.   All deadlines specified in such procedures may be extended by mutual agreement of the parties.

## XIX. TRADEMARKS, TRADE NAMES, AND PROPRIETARY MATERIALS

**19.1**   **Permission for Use**:  Subject to the terms and conditions of this Article and to the Distribution Rights granted herein, for the Duration of this Agreement, COMPANY authorizes DISTRIBUTOR to use, on a non-exclusive basis, the trade names and trademarks (collectively, "Trademarks"), trade dress, package designs, logos, artwork, advertising materials and other works protected by copyright, and other intellectual property of or associated with the Products (collectively, including the Trademarks, the "Proprietary Materials") solely in connection with DISTRIBUTOR's advertising, promoting, marketing, sale, and distribution of Products in the Territory.   DISTRIBUTOR may not assign or transfer this authorization except in the context of a sale or transfer of all or a portion of the Distribution Rights as provided in this Agreement. DISTRIBUTOR will not use any of the Proprietary Materials in any manner different from how they are used generally by COMPANY.

**19.2**   **Conditions of Use**:  DISTRIBUTOR shall make no use of the Trademarks or Proprietary Materials, nor engage in any program or activity which makes use of or contains any reference to COMPANY, its products, Trademarks or Proprietary Materials, other than as specifically provid-

ed herein, except with the prior written consent of COMPANY. Should DISTRIBUTOR advertise other services or products on its delivery vehicle, such advertising shall not dilute or negatively affect the reputation and goodwill of COMPANY, the Trademarks or the Proprietary Materials. DISTRIBUTOR will not (i) do anything that would or might be inconsistent with, impair, or conflict with ownership of the Proprietary Materials by COMPANY or, if licensed, franchised, or otherwise, the owner thereof; (ii) use any of the Proprietary Materials in any manner likely to (a) deceive or mislead the public, (b) endanger the validity or enforceability of any of the Proprietary Materials, or (c) damage or impair the reputation or value of COMPANY, any of the Proprietary Materials, or any Product; (iii) attack, contest, oppose, or interfere with the right, title, or interest in or to any Proprietary Materials of COMPANY or the owner thereof in any jurisdiction; or (iv) adopt or use any work confusingly or substantially similar to any of the Proprietary Materials. DISTRIBUTOR will not use any of the Trademarks or Proprietary Materials in either its legal or fictitious trade name without the prior written consent of COMPANY. DISTRIBUTOR will not use any of the Trademarks, Proprietary Materials, or any variation thereof as a business and/or corporate name or d/b/a of DISTRIBUTOR, an Internet domain name or a mnemonic, cipher, or "vanity" telephone number without COMPANY's prior written approval.

19.3   **Monitoring and Cooperation:** To insure the uniform quality of the goods in connection with which the Proprietary Materials are used, COMPANY will have the right to require DISTRIBUTOR to immediately discontinue any non-approved use of any Proprietary Materials or any other activity that COMPANY in its sole judgment considers likely to impair the value or validity of the Proprietary Materials. DISTRIBUTOR will immediately observe and require that other persons under its control observe any and all instructions of the COMPANY limiting or halting the use of the Proprietary Materials. DISTRIBUTOR will notify COMPANY, in writing, as soon as DISTRIBUTOR becomes aware of any infringement, imitation, impairment, counterfeiting, or other unlawful or improper use of any of the Proprietary Materials or any of the Products. DISTRIBUTOR will cooperate with and provide testimony and other evidence to COMPANY in and in connection with any application for, registration and protection of, or enforcement of the Proprietary Materials in the Territory as and when requested by COMPANY.

19.4   **Acknowledgment:** DISTRIBUTOR acknowledges and agrees that (i) all the rights concerning the Proprietary Materials are owned by COMPANY or the owner thereof, (ii) DISTRIBUTOR does not have, and will not as a result of this Agreement or performance hereunder acquire, any ownership or legal rights in any of the Proprietary Materials used in connection with the Products, and (iii) DISTRIBUTOR's sole rights with respect to the Proprietary Materials are set forth in this

Article.

**19.5**   **Return Upon Termination:**  Upon termination of this Agreement, DISTRIBUTOR shall cease use of COMPANY's Proprietary Materials and shall deliver to COMPANY any advertising, promotional or merchandising material.

## XX. MISCELLANEOUS

**20.1**   **Notice:**  Any notice required or permitted under this Agreement shall be deemed properly given and received on the date received if hand delivered; on the next business day after deposit with a nationally recognized overnight courier service for overnight delivery; or three (3) days after deposited in the mails, return receipt requested, registered or certified mail postage pre-paid, addressed to the parties at the addresses first referenced above, or at such other address as either party may designate by written notice given pursuant to this section.

**20.2**   **Company Breach:**  If DISTRIBUTOR maintains that COMPANY is in breach of this Agreement, DISTRIBUTOR should notify COMPANY President in writing, by certified mail, return receipt requested.   Such written notice must include the specific section of this Agreement DISTRIBUTOR maintains has been breached and sufficient facts to provide reasonable notice to COMPANY of the action or failure to act which DISTRIBUTOR maintains is a breach of this Agreement.  Upon receipt of the DISTRIBUTOR's notice of breach, COMPANY shall have a reasonable period of time to investigate and cure any breach.  Any failure to comply with this provision shall not affect DISTRIBUTOR's right to submit a claim to mandatory and binding arbitration.

**20. 3**   **Survival:**  This agreement shall be binding upon the heirs, personal representatives, successors or assigns of the parties to this Agreement.   Notwithstanding any termination of this Agreement, all provisions hereof that, by their terms or reasonable interpretation thereof, set forth obligations that extend beyond the termination of this Agreement, shall survive and remain in full force and effect.

**20. 4**   **Incorporation of Bill of Sale:**  This Agreement is subject to and affected by a Bill of Sale simultaneously executed by the parties, such Bill of Sale being fully incorporated in this Agreement by reference.

**20.5**   **Entire Agreement:**   This Agreement, together with all Exhibits incorporated herein by reference, as amended from time to time in accordance with the Agreement, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between

JA0103

them with respect to this subject matter. Unless set forth in this Agreement, no party shall be liable for any representation made to any other. Except as otherwise expressly authorized herein, this Agreement may be amended or modified only by a writing signed by all parties.

**20. 6**  **Indemnification:** DISTRIBUTOR agrees to indemnify and hold harmless COMPANY from and against any and all claims, actions, liabilities, expenses, losses or demands, including reasonable attorneys' fees, growing out of or based upon this Agreement or any acts or omissions of DISTRIBUTOR arising in the normal course of the conduct of business by DISTRIBUTOR pursuant to this Agreement.  DISTRIBUTOR shall also indemnify COMPANY against all liability and loss in connection with, and shall assume full responsibility for, payment of all federal, state and local taxes and/or contributions imposed or required under unemployment insurance, workers' compensation insurance, and income tax laws with respect to DISTRIBUTOR or DISTRIBUTOR's employees engaged in performance of this Agreement.

**20.7**  **Trade Secrets/Confidential Business Information:** DISTRIBUTOR recognizes and acknowledges that COMPANY and its affiliated entities have, through the expenditure of substantial time, effort and money, developed and acquired certain trade secrets and confidential business information ("Confidential Information") which are of great value to COMPANY. DISTRIBUTOR further acknowledges and understands that through the distributor relationship with COMPANY, DISTRIBUTOR will have access to Confidential Information of COMPANY and its affiliated entities. Accordingly, except as and to the extent required by law, DISTRIBUTOR covenants that DISTRIBUTOR will make no disclosure, or any use, in any manner whatsoever, of any of the Confidential Information of COMPANY and/or any of its affiliated entities while this Agreement is in effect and thereafter, except as specifically authorized by COMPANY. Upon termination of this Agreement, DISTRIBUTOR shall return to COMPANY all embodiments of such Confidential Information that are in DISTRIBUTOR's possession, custody or control. As used herein the term Confidential Information includes (a) sales data, financial statements and information, marketing arrangements and plans, trade secrets, pricing information and strategies, business development plans, and any other business methods, processes and techniques of COMPANY and/or its related entities to the extent all of which are not generally known to the trade or industry and/or (b) confidential or proprietary information or trade secrets of third parties, including retail customers, with which COMPANY and/or its related entities conducts business and which is supplied to DISTRIBUTOR for purposes of this Agreement.  Notwithstanding the foregoing, Confidential Information shall not include information that: (i) is or becomes generally known to the public not as a result of a disclosure

JA0104

by DISTRIBUTOR; (ii) is received by DISTRIBUTOR in good faith and without restriction from a third party having the right to make such disclosure; and/or (iii) is known to DISTRIBUTOR at the time of COMPANY's disclosure thereof to DISTRIBUTOR or DISTRIBUTOR's becoming aware thereof in the course of and as a result of DISTRIBUTOR's business relationship with COMPANY. DISTRIBUTOR's obligations in this paragraph shall be in addition to, and not in lieu of, any and all obligations imposed upon DISTRIBUTOR by applicable law.

**20.8** **Injunctive Relief**: DISTRIBUTOR agrees and acknowledges that a violation of Section 20.7 will cause irreparable harm to COMPANY and that there will be no adequate remedy at law to redress the resulting harm that will be suffered by COMPANY. Therefore, DISTRIBUTOR further agrees that in the event of any violation or threatened violation of this Section, COMPANY shall be entitled as a matter of course to an immediate injunction out of any court of competent jurisdiction restraining such violation or threatened violation by DISTRIBUTOR, such right to be cumulative and in addition to whatever other remedies, at law or in equity, that COMPANY may have.

**20.9** **Savings Provision/Non-Waiver**: Should any portion, word, clause, sentence or paragraph of this Agreement be declared void or unenforceable, including the Arbitration Agreement attached hereto, such portions shall be modified or deleted in such a manner as to make this Agreement as modified legal and enforceable to the fullest extent permitted under applicable law. Except as expressly provided herein, no waiver by either party of any default in the performance of any part of this Agreement by the other party shall be deemed a waiver of any other default hereunder.

**20.10** **Legal Counsel**: DISTRIBUTOR acknowledges that it has been given a reasonable opportunity to discuss this Agreement with an attorney of its choosing; that it has carefully read and fully understands the provisions of this Agreement, and that it is entering into this Agreement knowingly, voluntarily, and with the intention of being legally bound by all of the terms of this Agreement.

**20.11** **Governing Law**: This Agreement and the construction thereof shall be governed by the laws of the State of Connecticut, without regard to the conflict-of-law rules.

**20.12** **Revocation**: This Agreement, including the Arbitration Agreement attached hereto, may be revoked by DISTRIBUTOR within seven (7) calendar days after DISTRIBUTOR executes it ("Revocation Period") by sending written notice of revocation to Peter Roy, and the Agreement will not become effective or enforceable until this Revocation Period has expired, without revocation.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR have executed this Agreement this **7th** day of **June, 2017**, and each signatory hereto represents that he or she has the authority to execute this Agreement and legally bind the respective party.

DISTRIBUTOR

By: Neal Bissonnette

Its: President

COMPANY

By: Mike Brock

Its: Vice President

WITNESSES:

ATTEST:

JA0106

## EXHIBIT "A" – TERRITORY

Territory begins at intersection of Northfield Road and Route 6. Go north on Route 6 to Hill Street. Turn left on Hill Street to James P. Casey Road. Turn right on James P. Casey Road and James P. Casey Road turns into Peacedale Street. Continue on Peacedale Street and Peacedale Street turns into Maple Ave. Continue on Maple Ave and Maple Ave turns into Mix Street. Continue on Mix Street to Route 6. Turn left on Route 6 to New Britain Ave. Turn left on New Britain Ave to Meadow Road. Turn right on Meadow Road to Route 10. Turn right on Route 10 to Northwest Drive. Turn right on Northwest Drive to Route 177. Turn left on Route 177 to West Main Street. Turn right on West Main Street and West Main Street turns into Pine Street. Continue on Pine Street to Route 72. Turn left on Route 72 and Route 72 turns into Mountain Road. Continue and Mountain Road and Mountain Road turns into South Street. Continue on South Street to West Street. Turn right on West Street to Route 72. Turn left on Route 72 to Route 6 working both sides throughout.

**Acknowledged and Agreed:**

**DISTRIBUTOR**

**COMPANY**

**EXHIBIT "B" – PRODUCTS**

Except as expressly limited by the Distributor Agreement, DISTRIBUTOR shall have the exclusive right to sell and distribute the following Products in the Territory specifically described in **Exhibit A**.

1. Nature's Own
2. Country Kitchen
3. Barowsky's
4. TastyKake
5. Wonder Bread
6. Home Pride
7. Cobblestone Bread Company
8. Old Fashion Hearth

## EXHIBIT "C" – AUTHORIZED PRODUCTS

Except as expressly limited by the Distributor Agreement, DISTRIBUTOR is authorized to distribute the following products.  Authorized Products may include products with logos and/or labels, or without.  DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive, and COMPANY may cease selling such Authorized Products to DISTRIBUTOR upon notice.  COMPANY may also add Authorized Products to this Exhibit upon notice to DISTRIBUTOR.

1. Best Yet
2. C & S
3. Clear Bag
4. HANNAFORD
5. Middle East
6. Shurfine
7. Sunbeam
8. SuperBuy
9. Great Value
10. Dave's Killer Bread Products

## EXHIBIT "D" – BILL OF SALE

**CK SALES CO., LLC,** ("COMPANY"), subject to the consideration set forth below, effective the **19th** day of **June, 2017,** hereby conveys, sells, transfers and delivers to **Bissonnette Inc,** ("DISTRIBUTOR"), the Distribution Rights specifically described in the Distributor Agreement executed simultaneously with this Bill of Sale.  Both the Distributor Agreement and all appendices (Exhibits) thereto are specifically incorporated into and made a part of this Bill of Sale.

The terms of this sale are as follows:

Purchase price shall be **$60,650.00**.  A minimum five percent (5%) down payment shall be required at or before the effective date of the Distributor Agreement.

DISTRIBUTOR shall own all Distribution Rights in the Territory consistent with the terms and conditions contained in the Distributor Agreement.

COMPANY has lawful title to the Distribution Rights in the Territory free from all encumbrances.  COMPANY warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR execute this Bill of Sale this **7th** day of **June, 2017.**

DISTRIBUTOR

By: _Neal Bissonnette_

Its: _President_

COMPANY

By: _Mike Brock_

Its: _Vice President_

WITNESSES:

_Kimberly Doughty_

ATTEST:

**EXHIBIT "E" – OWNER**

**Owner's Name:**     Neal P. Bissonnette

**Address:**               47 Harvest Ln

**City, State, ZIP**     Bristol, CT 06010

## EXHIBIT "F" – PERSONAL GUARANTY

In consideration of the foregoing premises, covenants and conditions, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged,     Neal          P. Bissonnette, an individual ("GUARANTOR"), does hereby irrevocably and unconditionally guarantee to COMPANY, and become surety to COMPANY, for the performance and compliance with the terms, conditions and obligations of this Distributor Agreement entered into by and between **Bissonnette Inc**(Corporation Name), a **Connecticut** corporation ("DISTRIBUTOR"), and COMPANY.  If any term, condition or obligation of the Distributor Agreement is not complied with, performed, or paid by DISTRIBUTOR as required therein, including any terms, conditions or obligations due following termination thereof, GUARANTOR will, upon COMPANY's demand, immediately ensure the timely and complete performance of DISTRIBUTOR of each and every obligation and duty imposed on it by the Distributor Agreement, and/or pay any amounts due and owing due to DISTRIBUTOR's breach of the Distributor Agreement or as required by the terms and conditions thereof.  GUARANTOR shall also pay to COMPANY upon demand all costs and expenses, including but not limited to reasonable attorney fees, which may be incurred by COMPANY in the enforcement and/or collection of monies due hereunder.  GUARANTOR is fully responsible for ensuring DISTRIBUTOR is properly established, organized and at all times in good standing with the appropriate state agency(s), and in compliance with appropriate state law(s) in accordance with Section 2.10 of the Distributor Agreement.  GUARANTOR agrees and acknowledges he/she is subject to the Arbitration Agreement attached hereto as **Exhibit K.**

_____   6/7/17

GUARANTOR Signature          Date

Neal Bissonnette
_____

GUARANTOR Name (Print)

WITNESSES: _____

## EXHIBIT "G" – SETTLEMENT STATEMENT AUTHORIZATION

I understand that on a weekly basis I will receive a settlement statement from the Company (a sample of the current format is shown below and is subject to change). I also understand that this statement reflects an ongoing accounting between the Company and me for product purchases, adjustment to product purchases, various credits, and business expenses.

I hereby authorize the Company to make the adjustments noted on the settlement statement, both charges and credits, on a weekly basis. I understand that my portion of customer price allowances is included in the standard discount.

I also authorize the Company to collect from me, via the weekly settlement statement, business expenses such as those shown below, on a weekly basis. I understand and agree that should I dispute any of the credits or charges on a weekly statement that I must bring such dispute to the Company's attention in writing within ten (10) calendar days of receipt of the statement with the disputed credit or charge. If I do not, I understand that my failure to do so indicates my agreement that all charges and credits on the statement are proper.

DISTRIBUTOR _____    WITNESS _____

| | | |
|---|---|---|
| Name: | | |
| Distributor Number: | | |
| Route: | | |
| Warehouse: | | VP of Sales: |
| Date: | Week # 52   ( 12/27/2015 to 01/02/2016 ) | Director RSM: |
| Company Code: | | Branch: |

| | | |
|---|---|---|
| Beginning Balance Owed | | 14,626.30 |
| Funds Paid To Distributor | | 781.41 |
| Funds Received From Distributor | | 0.00 |

| | Accountability | Margin / Discounts | |
|---|---|---|---|
| Total Product Charged | 19,038.76 | | |
| Relay Adjustment | 0.00 | | |
| Load Adjustment | 0.00 | | |
| Damaged | 0.00 | | |
| Short Code | 0.00 | | |
| Product Transfers | 191.69- | | |
| Cust Price Allwnce/Overrides | 4,495.16- | | |
| Stales | 1,866.04- | | |
| Standard Discount | | 2,628.53- | |
| Additional Discount | | 0.00 | |
| Contest Earnings | | 0.00 | |
| Other Earnings | | 0.00 | |
| Authorized Charges | 4,032.40- | | |
| AR Ticket Chargebacks | 0.00 | | |
| | | | |
| Scan Based Trading Adj. ( 12/20/2015 to 12/26/2015 ): | | | |
| Point of Sale Data | 7,281.12- | | |
| Revaluation Variance | 67.33- | | |
| Shrink | 0.00 | | |
| | | | |
| New Distributor Balance | 1,103.96 | 2,628.53- | 1,524.57- |

| | | | |
|---|---|---|---|
| Business Expenses: | | | |
| Stale Adjustment | 0.00 | Administrative Fee | 36.00 |
| Territory Payment | 339.73 | Warehouse Fee | 36.00 |
| Truck Purchase | 0.00 | FICA Tax-Current Wk | 149.31 |
| Truck Lease | 182.69 | FICA Tax-Adjustment | 0.00 |
| Truck Rental | 0.00 | Sales and Use Tax | 0.00 |
| Truck Repair | 0.00 | Open Route Expense | 0.00 |
| Truck Tax,Tag,License,Fees | 0.00 | Supplies / Equipment | 0.00 |
| Truck/Bus Insurance | 73.79 | Apparel | 0.00 |
| Health / Disability | 24.56 | Temp Svcs Fee | 0.00 |
| Health License | 0.00 | SBT Shrink Charges | 0.00 |
| Life Insurance | 0.00 | Miscellaneous Expense | 0.00 |
| | | | |
| Total Business Expense | | | 726.08 |

| | |
|---|---|
| Total Distributor Balance | 14,609.22 |
| Scan Based Trading Credits | |
| Less Prior Week Scan Based Trading Inventory ( 12/26/2015 ): | 8,058.20- |
| Less Current Week SBT Delivery Tickets ( 12/27/2015 to 01/02/2016 ): | 7,576.56- |
| | |
| Weekly Distributor Balance | 1,025.54- |
| To be paid via Direct Deposit to bank account on record this Friday | |

**EXHIBIT "H" — DISTRIBUTOR CHOICE OF INSURANCE COVERAGES**

## Option 1:

(i)   Automobile liability insurance, including hired auto and non-owned auto, on all vehicles used in the business, in such amounts as may reasonably be established by COMPANY from time to time, which as of the date of this Agreement will include combined single limit coverage of at least $1,000,000; and collision and comprehensive loss coverage for the actual cash or replacement cost value of any and all delivery vehicles operated by DISTRIBUTOR that are financed or leased, with no more than a $500 deductible.  Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

(ii)  Comprehensive general liability coverage, in such amounts as may reasonably be established by COMPANY from time to time, which as of the date of this Agreement will include an occurrence and aggregate limit of at least $1,000,000.  Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

(iii) Umbrella or excess liability coverage, in such amounts as may reasonably be established by COMPANY from time to time, which as of the date of this Agreement will include an occurrence and aggregate limit of at least $1,000,000.  Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

(iv)  Workers compensation coverage for any and all employees of DISTRIBUTOR in compliance with all requirements and laws of the state or states in which DISTRIBUTOR operates.

## Option 2:

(i)   Automobile liability insurance, including hired auto and non-owned auto, on all vehicles used in the business, in such amounts as may reasonably be established by COMPANY from time to time, which as of the date of this Agreement will include combined single limit coverage of at least $2,000,000; and collision and comprehensive loss coverage for the actual cash or replacement cost value of any and all delivery vehicles operated by DISTRIBUTOR that are financed or leased, with no more than a $500 deductible.  Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

(ii)  Comprehensive general liability coverage, in such amounts as may reasonably be established by COMPANY from time to time, which as of the date of this Agreement will include an occurrence and aggregate limit coverage of at least $2,000,000.  Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

(iii) Workers compensation coverage for any and all employees of DISTRIBUTOR in compliance with all requirements and laws of the state or states in which DISTRIBUTOR operates.

## EXHIBIT "I" DISTRIBUTOR CHOICE OF DELIVERY LOCATION

As set forth in Section 11.1, COMPANY will deliver Products and Authorized Products to DISTRIBUTOR at the location selected below by DISTRIBUTOR.

Please select choice below by initialing the appropriate selection:

_____          1. Location #1 Bridgeport

_NB_               2. Location #2 Waterbury

_____          3. Location #3 Windsor

## EXHIBIT "J" DISTRIBUTOR CHOICE OF COMPANY FEE FOR SERVICE

As set forth in Section 14.2, if COMPANY services DISTRIBUTOR's Territory, DISTRIBUTOR agrees to pay a daily fee to COMPANY as selected below by DISTRIBUTOR.

Please select choice below by initialing the appropriate selection:

_____ Option 1: $350 per day.

_____ Option 2: 12% of average daily net sales.



## EXHIBIT "K" – ARBITRATION AGREEMENT

The parties agree that any claim, dispute, and/or controversy except as specifically excluded herein, that either DISTRIBUTOR (including its owner or owners) may have against COMPANY (and/or its affiliated companies and its and/or their directors, officers, managers, employees, and agents and their successors and assigns) or that COMPANY may have against DISTRIBUTOR (or its owners, directors, officers, managers, employees, and agents), arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between DISTRIBUTOR and COMPANY ("Agreement"), including the termination of the Agreement, services provided to COMPANY by DISTRIBUTOR, or any other association that DISTRIBUTOR may have with COMPANY ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.) ("FAA") in conformity with the Commercial Arbitration Rules of the American Arbitration Association ("AAA" or "AAA Rules"), or any successor rules, except as otherwise agreed to by the parties and/or specified herein. Such arbitration shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing. Copies of AAA's Rules are available on AAA's website (www.adr.org).

COMPANY shall pay for all arbitration filing fees and costs that are customarily associated with AAA arbitration, subject to the Arbitrator's authority to award fees and costs to COMPANY as the prevailing party. Each party may be represented by legal counsel of their own choosing. Each party shall pay its own attorneys' fees, provided that an Arbitrator may award attorney's fees and costs to the prevailing party under any applicable statute or written agreement to the same extent that attorney's fees and costs could be awarded in court. The arbitration shall be subject to the same burdens of proof and statutes of limitations as if the Covered Claims were being heard in court. The Arbitrator shall issue a written decision within forty-five (45) days of the later of: (1) the arbitration hearing; or (2) submission of the parties' post-arbitration briefs. The Arbitrator's written decision shall include findings of fact and conclusions of law. The Arbitrator shall have the authority to award the same damages and other relief that would have been available in court pursuant to applicable law had the Covered Claim been brought on an individual basis in such forum, including attorneys' fees and costs. Subject to the parties' right to appeal, the decision of the arbitrator will be final and binding. The Arbitrator shall not have the authority to add to, amend, or modify, existing law. No arbitration award or decision will have any preclusive effect as to any issues or claims in any dispute, arbitration, or court proceeding where any party was not a named party in the arbitration.

All Covered Claims against COMPANY must be brought by DISTRIBUTOR on an individual basis only and not as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. DISTRIBUTOR further agrees that if it is within any such class, collective, representative, or multi-plaintiff action, it will take all steps necessary to opt-out of the action or refrain from opting in or joining, as the case may be, and DISTRIBUTOR expressly waives any right to recover any relief from any such class, collective, representative, or multi-plaintiff action. Similarly, all Covered Claims by COMPANY against DISTRIBUTOR may not be brought as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. The parties understand that there is no right or authority for any Covered Claim to be heard or arbitrated on a multi-plaintiff, collective, or class action basis, as a private attorney general, or any other representative basis. The parties understand that there are no bench or jury trials and no class, collective, representative, or multi-plaintiff actions are permitted under this Arbitration Agreement. The Arbitrator shall not consolidate claims of different distributors into one proceeding, nor shall the Arbitrator have the power or authority to hear arbitration as a class, collective, representative, or multi-plaintiff action. The Arbitrator may award damages on an individual basis only.

**TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICITY WAIVE ANY RIGHT TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION; (2) SERVE OR PARTICIPATE AS A REPRESENTATIVE OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; (3) SERVE OR PARTICIPATE AS A MEMBER OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; OR (4) RECOVER ANY RELIEF FROM ANY SUCH CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF ACTION.**

Any dispute concerning the validity or enforceability of this prohibition against class, collective, representative, or multi-plaintiff action arbitration shall be decided by a court of competent jurisdiction, and no arbitrator shall have any authority to consider or decide any issue concerning the validity or enforceability of such

prohibition. Any issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement (except for those concerning the validity or enforceability of the prohibition against class, collective, representative, or multi-plaintiff action arbitration and/or applicability of the FAA) shall be resolved by the arbitrator, not a court.

The Arbitrator shall have the authority to consider and rule on dispositive motions, such as motions to dismiss, or motions for summary judgment, in accordance with the standards and burdens generally applicable to such motions in federal district court, except that the Arbitrator may establish appropriate and less formal procedures for such motions at the Arbitrator's discretion consistent with the expedited nature of arbitration proceedings. The Arbitrator will allow the parties to conduct adequate discovery including, but not limited to, issuing subpoenas to compel the attendance of witnesses at the arbitration hearing; serving written discovery; conducting depositions; and compelling the production of documents during discovery.

Covered Claims covered under this Arbitration Agreement include, but are not limited to: breach of contract, any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor, tort claims, discrimination claims, retaliation claims, and claims for alleged unpaid compensation, civil penalties, or statutory penalties under either federal or state law.

This Arbitration Agreement does not cover claims relating to whistleblowers and/or unlawful retaliation arising under the Sarbanes-Oxley Act or disputes involving any ERISA-based benefit plans that provide for arbitration. This Arbitration Agreement also does not preclude either DISTRIBUTOR or COMPANY from seeking provisional remedies such as temporary restraining orders or preliminary injunctions in accordance with applicable law. A party's seeking or obtaining such provisional remedies shall not be considered a waiver of that party's right to arbitration under this Arbitration Agreement.

Nothing in this Arbitration Agreement is intended to affect or limit DISTRIBUTOR's right to file an administrative charge or otherwise seek relief from any administrative or federal or state government agencies (although if DISTRIBUTOR chooses to pursue a claim following the exhaustion of such administrative remedies, that claim would be subject to the provisions of this Arbitration Agreement).

The parties agree that arbitration proceedings are to be treated as confidential, and that the parties will act to protect the confidentiality of the proceedings. The parties agree that neither they nor their counsel will reveal or disclose the substance of the arbitration proceedings, or the result, except as required by subpoena, court order, or other legal process. If disclosure is compelled of one party by subpoena, court order or other legal process, or as otherwise required by law, the party agrees to notify the other party as soon as notice of such process is received and before disclosure takes place. The parties may, however, disclose such information to their legal representatives, accountants or tax advisors as necessary so long as they agree to maintain such information in strict confidence. COMPANY may also disclose such information to individuals in affiliated companies for legal reporting purposes and other legitimate business reasons.

Any request for arbitration must be in writing and provided to the other party and to AAA by certified or registered mail, return receipt requested, within the time period provided for by the statute(s) of limitations applicable to the claim(s) asserted. The request must set forth a statement of the nature of the dispute, including the alleged act or omission at issue; the names of all persons involved in the dispute; the amount in controversy, if any; and the remedy sought.

**DISTRIBUTOR acknowledges that this is an important document that affects its legal rights and that the DISTRIBUTOR has been given the opportunity to discuss this Arbitration Agreement with private legal counsel.** If any provision of AAA's Rules or of this Arbitration Agreement are determined to be unlawful, invalid, or unenforceable, such provisions shall be enforced to the greatest extent permissible under the law, or, if necessary, severed, and all remaining terms and provisions shall continue in full force and effect. This Arbitration Agreement may be modified or terminated by COMPANY after thirty (30) days written notice to DISTRIBUTOR. Any modifications or terminations shall be prospective only and shall not apply to any claims or disputes that are

JA0118

pending in arbitration or that have been initiated by either party pursuant to the AAA Rules. The parties also agree that nothing herein is intended to, or does, affect or otherwise change the independent contractor relationship between them and that adequate and sufficient consideration has been provided for in this Arbitration Agreement, including but not limited to the additional monetary consideration and various other amendments to the Distributor Agreement as set forth in the Amendment executed concurrently herewith, and each party's promise to resolve their claims by arbitration. Finally, this Arbitration Agreement is the complete agreement of the parties on the subject of arbitration of disputes and supersedes any prior or contemporaneous oral or written agreement or understanding on the subject. Any agreement contrary to the foregoing must be in writing signed by the President of COMPANY.

This Arbitration Agreement shall be governed by the FAA and <u>Connecticut</u> law to the extent <u>Connecticut</u> law is not inconsistent with the FAA.

**DISTRIBUTOR acknowledges that it has received and read and specifically agrees to be bound by this Arbitration Agreement. DISTRIBUTOR understands that this Arbitration Agreement requires that disputes that involve matters subject to the Agreement be submitted to arbitration pursuant to the Arbitration Agreement rather than to a judge or jury in court and that such disputes must be brought on an individual basis only.**

Date: _____6/7/17_____
(Accepted)

DISTRIBUTOR

By: _Deal Bissonette_

Its: _President_

COMPANY

By: _Mike Brock_

Its: _Vice President_

OWNER

_____
Signature

_Deal Bissonette_

Print Owner's Name

ATTEST:

WITNESS: _____

JA0119

**EXHIBIT N**

## Receipt

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If CK Sales Co., LLC offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

If CK Sales Co., LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC 20580 and the state agency listed on Exhibit A.

The franchisor is **CK Sales Co., LLC**, located at 11 Adamian Drive, Auburn, Maine 04210. Its telephone number is (207) 783-9161.

Issuance date: **April 1, 2017**

The franchise sellers for this offering are Brian Devlin, Judd Price, Mike Brock and Jake Linthicum, 11 Adamian Drive, Auburn, Maine 04210.

CK Sales Co., LLC authorizes the respective state agencies identified in Exhibit A to receive service of process for it in the particular state.

I received a disclosure document dated **April 1, 2017** that included the following Exhibits:

    Exhibit A – State Regulators; Agents for Service
    Exhibit B – Affiliated Companies
    Exhibit C – Distributor Agreement. The Distributor Agreement contains eleven (11) Exhibits:
        (i)        Territory
        (ii)      Products
        (iii)     Authorized Products
        (iv)     Bill of Sale
        (v)      Owner
        (vi)     Personal Guaranty
        (vii)    Settlement Statement Authorization
        (viii)   Distributor Choice of Insurance Coverages
        (ix)     Distributor Choice of Delivery Location
        (x)      Distributor Choice of Fee for Service
        (xi)     Arbitration Agreement
    Exhibit D – Territory Pro Forma
    Exhibit E – Financing Documents
        (i)   Secured Promissory Note and Personal Guaranty
        (ii)  UCC-1
    Exhibit F – Form of Purchase Agreement and General Release
    Exhibit G – Form of Company Approval of Assignment and General Release
    Exhibit H – Form of Assignment/Assumption Agreement and Bill of Sale
    Exhibit I – Current Independent Distributors
    Exhibit J – Independent Distributor Terminations
    Exhibit K – Previous Owner Information
    Exhibit L – Financial Statements
    Exhibit M – Form of Guarantee
    Exhibit N – Receipts

Date: 5/24/19      Print Name: Neal Bissonnette      Signature:
(Do not leave blank)

You may return the signed receipt either by signing, dating, and mailing it to CK Sales Co., LLC at 11 Adamian Drive, Auburn, Maine 04210, or by faxing a copy of the signed and dated receipt to Brian Devlin or Jake Linthicum at (207) 784-4634.

JA0120

# ATTACHMENT 2

 **DISTRIBUTOR AGREEMENT** 
**TABLE OF CONTENTS**

| ARTICLE | | PAGE |
|---|---|---|
| I. | Warranty | 1 |
| II. | Definitions | 2 |
| III. | Relationship | 4 |
| IV. | Sale of Products | 5 |
| V. | Best Efforts/Distributor | 5 |
| VI. | Best Efforts/Company | 6 |
| VII. | Accounts/Trademarks Exempt From Agreement | 7 |
| VIII. | Payment for Products | 7 |
| IX. | Equipment and Insurance | 9 |
| X. | Proprietary Services | 9 |
| XI. | Product Delivery | 11 |
| XII. | Product Code | 11 |
| XIII. | Advertising and Promotions | 12 |
| XIV. | Service Requirements | 12 |
| XV. | Transfer or Sale of Rights | 12 |
| XVI. | Independent Business | 14 |
| XVII. | Termination by Company | 15 |
| XVIII. | Dispute Resolution | 16 |
| XIX. | Trademarks, Tradenames and Proprietary Materials | 18 |
| XX. | Miscellaneous | 20 |
| Exhibit A | Territory | 24 |
| Exhibit B | Products | 25 |
| Exhibit C | Authorized Products | 26 |
| Exhibit D | Bill of Sale | 27 |
| Exhibit E | Owner | 28 |
| Exhibit F | Personal Guaranty | 29 |
| Exhibit G | Settlement Statement Authorization | 30 |
| Exhibit H | Distributor Choice of Insurance Coverages | 32 |
| Exhibit I | Distributor Choice of Delivery Location | 33 |
| Exhibit J | Distributor Choice of Fee for Service | 34 |
| Exhibit K | Arbitration Agreement | 35 |
| Maryland Addendum (if applicable) | | 38 |
| Indiana Addendum (if applicable) | | 39 |

**DISTRIBUTOR AGREEMENT**

JA0122

 

This Distributor Agreement ("Agreement") is made effective the **7th** day of **May, 2018**, by and between **CK SALES CO., LLC**, with its office and principal place of business at 11 Adamian Drive Auburn, ME 04210 ("COMPANY"), and **Blue Star Distributors Inc**, a Connecticut corporation, with its principal place of business at **78 Andrews Street Bristol, CT 06010** ("DISTRIBUTOR").

**W I T N E S S E T H:**

COMPANY has developed or acquired a license or franchise for the use of formulae, recipes, trademarks and trade names through which it manufactures and/or markets bread, rolls, and other fresh-baked products, as defined herein; and

Whereas, COMPANY, through the expenditure of time and effort and through its continuing research and marketing programs, has over the years developed a reputation for excellence in quality, value, and superior service which has created strong consumer recognition, approval, and demand for its products; and

Whereas, COMPANY has determined that the divestiture and division of its market area into distribution territories, and the sale of its products to independent franchise distributors for distribution and ultimate retail sale in said territories, will result in a superior distribution system; and

Whereas, DISTRIBUTOR is an independent contractor with the resources, expertise and capability to act as a franchise distributor of COMPANY's products in the Territory; and

Whereas, the parties desire to create a right in DISTRIBUTOR, under which DISTRIBUTOR will be authorized to sell certain defined products within a territory or territories and otherwise operate the distributorship business hereunder.

Now, therefore, in consideration of these premises, and of the covenants and conditions contained in this Agreement, and for other good and valuable consideration given and received, the receipt and the sufficiency of which are hereby specifically agreed to and acknowledged, the parties mutually agree as follows:

**I. WARRANTY**

1.1     The foregoing preambles are incorporated herein by reference and shall constitute warranties, representations, agreements and undertakings by the parties.

**II. DEFINITIONS**

2.1     **Outlets**: Shall mean all retail stores (except thrift stores) selling food to the general public and all restaurant, fast food, military and institutional accounts, in each case which allow direct store delivery (DSD) of Products and/or Authorized Products, except those exempt from this

Agreement as set forth in Article VII, below.

**2.2** **Products**: Shall mean fresh baked goods, as specifically described in **Exhibit B**, attached hereto and made a part hereof, which are currently produced and/or distributed by COMPANY, provided, however, that the Distribution Rights granted herein shall survive only so long as COMPANY and/or its affiliate(s) has/have the legal right to produce and sell such goods, whether by ownership, license, franchise, or otherwise, and COMPANY produces and/or sells such goods.   Products shall not include products other than those specifically described in **Exhibit B** nor products intended to be sold as frozen or refrigerated.

**2.3** **Authorized Products**: Shall mean fresh baked goods, as specifically described in **Exhibit C**, attached hereto and made a part hereof, provided, however, that DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive. COMPANY may cease selling such Authorized Products to DISTRIBUTOR upon notice, with or without cause.   COMPANY may also add Authorized Products to **Exhibit C** upon notice to DISTRIBUTOR.   Authorized Products may include products with logos and/or labels, or without.

**2.4** **Distribution Rights**: Except as expressly limited by this Agreement, Distribution Rights shall mean the right to sell and distribute Products to Outlets in the Territory, which right has been purchased by DISTRIBUTOR from COMPANY as evidenced by a Bill of Sale executed by the parties, which is attached hereto as **Exhibit D**, and made a part hereof.

**2.5** **Territory**: Shall mean that geographic area as more specifically described in **Exhibit A** within which DISTRIBUTOR owns the Distribution Rights.   By signing the Agreement, DISTRIBUTOR warrants and expressly represents that the Owner (as defined below) has personally driven the Territory description and confirms that the Territory description in Exhibit A is correct and reflects DISTRIBUTOR's understanding of the geographic scope of the Distribution Rights that DISTRIBUTOR is purchasing.   DISTRIBUTOR hereby agrees to defend, indemnify, and hold harmless COMPANY and its parent, affiliates, and subsidiaries, and their respective directors, managers, shareholders, officers, employees, agents, and representatives from and against any and all claims, damages, lawsuits, judgments, losses, liabilities, penalties, fines, costs, and expenses (including reasonable attorneys' fees) incurred as result of any claim and/or regulatory or legal proceeding in which it is alleged that the Territory description in Exhibit A contains a mistake or is otherwise incorrect.

**2.6** **Good Industry Practice**: Shall mean the standards that have developed and are generally accepted and followed in the baking industry, including, but not limited to, maintaining an

JA0124

adequate and fresh supply of Products and Authorized Products in all Outlets in the Territory requesting service, actively soliciting all Outlets in the  Territory not being serviced, properly rotating all Products and Authorized Products, promptly removing all stale Products and Authorized Products, maintaining proper service and delivery to all Outlets in the Territory requesting service in accordance with Outlet's requirements, maintaining all equipment in a sanitary condition and in good safe working order, and operating the distributorship business hereunder in compliance with all applicable federal, state and local laws, rules and regulations, including but not limited to,  all motor vehicle, Department of Transportation, food, drug, health, bioterrorism, security, and sanitary laws and regulations.  **DISTRIBUTOR specifically acknowledges and agrees that such standards do not reflect control by COMPANY as to the specific details or manner and means of DISTRIBUTOR's business, but reflect only COMPANY's interests in the results achieved by DISTRIBUTOR, protecting the reputation of the brands, and protecting the business reputation of both DISTRIBUTOR and COMPANY.**

2.7  **Stale**:  Shall mean Products and Authorized Products removed from the market on the appropriate color code or designated pick up date as designated by COMPANY

2.8  **Out of Code**:  Shall mean Products and Authorized Products left in the market beyond the appropriate color code or designated pick up date.

2.9  **Chain**:  Shall mean a person or business entity that operates more than one Outlet and/or which makes centralized decisions regarding the purchase of Products and/or Authorized Products for more than one Outlet.

2.10  **Owner**:  Shall mean the individual holding a majority ownership in the stock of DISTRIBUTOR and listed on **Exhibit E** hereto and who is empowered to make binding decisions on behalf of DISTRIBUTOR related to modifications to the terms of this Agreement. Such individual must personally guarantee the conditions and obligations herein by executing the Personal Guaranty, attached hereto as **Exhibit F** and made a part hereof.  As long as DISTRIBUTOR owns the Distribution Rights hereunder, Owner agrees to ensure DISTRIBUTOR is (i) properly established, organized and at all times in good standing with the appropriate state agency(s); (ii) in possession of all trading and other licenses, registrations, authorizations, consents, and permissions necessary or appropriate for the performance of DISTRIBUTOR's obligations as contemplated by this Agreement; and (iii) otherwise in compliance with appropriate state and federal law(s).   Upon request, DISTRIBUTOR shall provide DISTRIBUTOR documentation showing that its corporate registration is in good standing and in compliance with appropriate state law(s).



### III. RELATIONSHIP

**3.1** **Extent and Duration:** COMPANY hereby recognizes DISTRIBUTOR's ownership of the Distribution Rights, said ownership to continue until:

(a)     transferred, assigned or sold by DISTRIBUTOR or anyone acting on behalf of DISTRIBUTOR (this includes a sale by COMPANY for the account of DISTRIBUTOR in the event of a termination of this Agreement upon the terms defined below), or

(b)     COMPANY, for legitimate business reasons unrelated to Section 3.1(c) immediately below, ceases to use distributors to distribute Products in the Territory. In such event, COMPANY will repurchase the Distribution Rights from DISTRIBUTOR at ten (10) times the average weekly sales volume of Products (not Authorized Products) in the Territory calculated over the six (6) month period preceding the repurchase, or

(c)     either party exercises its right to terminate pursuant to Section 16.1. In such event, COMPANY will repurchase the Distribution Rights from DISTRIBUTOR at fair market value, which in no event shall exceed the purchase price paid by DISTRIBUTOR for the Distribution Rights.

**3.2** **Nature of Rights**: The parties agree that the Distribution Rights sold to DISTRIBUTOR pursuant to the Bill of Sale can be exercised only pursuant to the terms of this Agreement and that any termination of this Agreement other than in accordance with Section 3.1 (b) or (c) requires DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR (including a sale by COMPANY on behalf of DISTRIBUTOR as provided for in Section 17.4), to sell such Distribution Rights subject to the terms of this Agreement.

### IV. SALE OF PRODUCTS AND AUTHORIZED PRODUCTS

**4.1** Products and Authorized Products will be sold to DISTRIBUTOR at such terms and prices as established by COMPANY from time to time. Title and risk of loss shall pass to DISTRIBUTOR upon delivery to DISTRIBUTOR as set forth in Section 11.1 below.

### V. BEST EFFORTS/DISTRIBUTOR

**5.1** **Obligations of DISTRIBUTOR:** DISTRIBUTOR agrees and covenants to use DISTRIBUTOR's commercially reasonable best efforts to develop and maximize the sale of Products to Outlets within the Territory and service the Territory in accordance with Good Industry Practice as defined above, including servicing all Outlets in accordance with the Outlet's then-established service requirements. DISTRIBUTOR further agrees and covenants to use DISTRIBUTOR's

commercially reasonable best efforts to maximize the sale of Authorized Products to those Outlets in the Territory for which such Authorized Products have been produced and to distribute such Authorized Products to such Outlets in accordance with Good Industry Practice as defined above, including servicing all Outlets in accordance with the Outlet's then-established service requirements.   DISTRIBUTOR shall cooperate with COMPANY on its marketing and sales efforts and ensure its employee(s) maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with COMPANY, and customer requirements. DISTRIBUTOR may not sell products in the Territory which are competitive with the Products or Authorized Products.  DISTRIBUTOR may sell noncompetitive products, as long as this does not interfere with the sale of the Products or Authorized Products in the Territory. **DISTRIBUTOR specifically acknowledges and agrees that the obligations herein do not reflect control by COMPANY as to the specific details or manner and means of DISTRIBUTOR's business, but reflect only COMPANY's interests in the results achieved by DISTRIBUTOR, protecting the reputation of the brands, and protecting the business reputation of both DISTRIBUTOR and COMPANY.** As set forth in Section 2.10, DISTRIBUTOR must be properly established, organized and at all times in good standing with the appropriate state agency(s) and in compliance with appropriate state law(s).

5.2   **Alternate Distribution**:  Should DISTRIBUTOR believe a certain account or accounts is/are unprofitable to service, DISTRIBUTOR shall provide COMPANY written notice of such belief and the reasons therefor, including a detailed financial analysis. Within ten (10) business days thereafter, COMPANY representative(s) and DISTRIBUTOR shall meet to discuss DISTRIBUTOR's concerns. DISTRIBUTOR and COMPANY agree to work in good faith to explore opportunities to remedy the unprofitability of such account(s), and DISTRIBUTOR further agrees to give its best effort to remedy the unprofitability of such account(s), including the exercise of any recommendations made by COMPANY.  After exhausting all such efforts, if the COMPANY agrees with DISTRIBUTOR's position, DISTRIBUTOR shall be relieved of its contractual obligation to service such account(s) for a period of time determined by COMPANY. During such period, COMPANY may make alternate distribution arrangements for such account(s) and DISTRIBUTOR shall not receive any credit for sales associated with such alternate distribution. At the end of the period specified by COMPANY, COMPANY and DISTRIBUTOR shall meet again to determine future service of such account(s), including DISTRIBUTOR resuming service once such account(s) become profitable.

5.3   **Non-Compliance**: Failure to comply with Section 5.1 and/or any of the terms, conditions and

obligations elsewhere in this Agreement shall be considered a material breach of this Agreement and shall be governed by the provisions of this Agreement dealing with termination.

## VI. BEST EFFORTS/COMPANY

6.1 **Obligations of Company**: COMPANY shall use its commercially reasonable best efforts to manufacture and deliver to DISTRIBUTOR sufficient quantities of Products and Authorized Products to supply Outlets requesting service in the Territory, preserve and develop the quality and marketability of the Products, and cooperate with DISTRIBUTOR on DISTRIBUTOR's sales and marketing efforts. In order to assist DISTRIBUTOR with product sales to Chains, which may require COMPANY and/or its affiliate(s) involvement to obtain authorization to sell Products or Authorized Products, DISTRIBUTOR hereby designates COMPANY and/or its affiliate(s) and COMPANY and/or its affiliate(s) agree(s) to act as DISTRIBUTOR's limited agent to obtain such authorization. This limited agency designation is for the sole purpose of authorization discussions (including space, position and pricing) with regard to Chain accounts. Nothing herein shall obligate COMPANY and/or its affiliate(s) to seek authorization or otherwise pursue business opportunities with any specific Chain or other account. Additionally, nothing herein shall prevent DISTRIBUTOR from having the right to deal directly with Chain accounts with regard to such terms, although DISTRIBUTOR acknowledges that (i) Chains may decide not to deal with either COMPANY or DISTRIBUTOR, and (ii) employees of Chains at the store and regional level may not have the authority enter into any agreements with DISTRIBUTOR.

6.2 **Non-Compliance**: Failure to comply with Section 6.1 shall be considered a material breach of this Agreement and shall be governed by Section 20.2 below (Company Breach). Repeated breaches by COMPANY which threaten to do substantial harm to DISTRIBUTOR'S business shall entitle DISTRIBUTOR to terminate this Agreement.

## VII. ACCOUNTS AND/OR TRADEMARKS EXEMPT FROM DISTRIBUTORSHIP

7.1 **Accounts Exempt From Agreement**: COMPANY reserves the right to solicit and service drop delivery and other non-DSD accounts with Products and Authorized Products, in whole or in part, in DISTRIBUTOR's Territory, so long as it is done for legitimate business reasons and not for the purpose of undermining DISTRIBUTOR's business.

7.2 **Thrift Stores**: COMPANY reserves the right to continue to sell Products and Authorized Products through its retail thrift store operation, COMPANY-owned and/or independently owned.

**7.3**   **Other Trademarks**:   The parties hereto stipulate that COMPANY and COMPANY affiliates produce a variety of products marketed under a variety of trademarks distributed through multiple channels of distribution, including warehouse distribution. This Agreement does not restrict any other distribution of products by COMPANY and COMPANY affiliates marketed under trademarks not listed on **Exhibit B** via warehouse distribution or otherwise.

**VIII. PAYMENT FOR PRODUCTS**

**8.1**   **Settlement of Account**:   On or before Friday of each week, DISTRIBUTOR will remit to COMPANY a full settlement of all Products and Authorized Products sold to DISTRIBUTOR in the preceding week, in accordance with terms established by COMPANY from time to time. DISTRIBUTOR authorizes COMPANY to make credits and charges to its weekly settlement as set forth on the Settlement Statement Authorization, a sample of which is attached hereto as **Exhibit G**.

**8.2**   **Cash Sales**:   DISTRIBUTOR is solely responsible for the collection of all cash sales in the Territory.

**8.3**   **Non-Cash Sales**: In cases where Products and/or Authorized Products are sold and distributed to Outlets which have been approved by COMPANY for credit and in its sole discretion, COMPANY will accept electronic data with corresponding proof of delivery, charge slips, Outlet-generated authorizations or other forms of payment authorizations as may be required by the Outlet or COMPANY (including but not limited to, authorizations signed by the Outlet's authorized representative, such as the store manager, or its designee) in lieu of cash, and credit DISTRIBUTOR's account for such sales, provided DISTRIBUTOR fully complies with COMPANY's credit policies as established from time to time. In the event DISTRIBUTOR fails to comply with COMPANY's credit policy, fails to provide complete documentation as required by the Outlet or COMPANY, or falsifies any documentation or credit information, COMPANY shall be entitled to charge DISTRIBUTOR's account for any credit extended to DISTRIBUTOR resulting therefrom without limiting any other remedies available to COMPANY. DISTRIBUTOR is wholly responsible for collection of accounts receivable not authorized by COMPANY. COMPANY is obligated to credit DISTRIBUTOR only for such payments made by the Outlet.

**8.4**   **Chain Accounts**:   COMPANY and/or its affiliate(s) reserves the right to continue carrying the accounts receivable for all Chain and other major accounts and to promptly credit DISTRIBUTOR for DISTRIBUTOR's sales to all such accounts.

**8.5**   **Scan Based Trading**:   In the event a Chain account implements Scanned Based Trading (SBT),

Pay By Scan (PBS) or other accounting methodologies and/or technology, DISTRIBUTOR agrees to comply with policies and procedures as may be necessary to comply with such Chain accounting and/or technology requirements, including the provisions of Section 8.3 herein. In the event DISTRIBUTOR receives credit for products that are not accounted for by the Outlet's scanner data or an inventory of products in the Outlet ("Shrink"), COMPANY shall be entitled to charge DISTRIBUTOR's account to recovery any such credit that was wrongfully extended to DISTRIBUTOR.

8.6 **Security Interest**: To secure the prompt payment and timely performance of all indebtedness, obligations and liabilities of DISTRIBUTOR to COMPANY under this Agreement, whether now existing or hereafter arising, DISTRIBUTOR hereby grants and conveys to COMPANY a presently existing and continuing security interest in the Distribution Rights, in this Agreement, in all Products and/or Authorized Products now or hereafter in DISTRIBUTOR's possession, in all accounts now or hereafter arising out of the sale by DISTRIBUTOR of Products and/or Authorized Products, and in all proceeds thereof. DISTRIBUTOR agrees that this security interest attaches immediately upon execution of this Agreement by DISTRIBUTOR and that COMPANY has all of the rights of a secured party under the applicable Uniform Commercial Code, as amended from time to time. DISTRIBUTOR expressly authorizes COMPANY to file and refile all appropriate Uniform Commercial Code financing statements necessary to perfect the security interests granted hereunder.

8.7 **Default:** Nothing herein shall be deemed to require COMPANY to fill an order of DISTRIBUTOR during the time when DISTRIBUTOR has failed to make any payment due to COMPANY in a timely fashion.

## IX. EQUIPMENT AND INSURANCE

9.1 **Delivery Vehicle(s):** DISTRIBUTOR is responsible for obtaining DISTRIBUTOR's own delivery vehicle(s) and purchasing adequate insurance thereon, as described in Section 9.2 below. Consistent with good industry practice, DISTRIBUTOR agrees to keep the delivery vehicle(s) clean at all times and in a manner consistent with the professional image customers and the public associates with COMPANY, and to maintain the delivery vehicle(s) in such condition as to provide safe, prompt, and regular service to all customers. If legally required, DISTRIBUTOR agrees to have painted in a conspicuous manner on any delivery vehicle owned or leased by it to carry out the terms hereof: "Owned and Operated by (DISTRIBUTOR's name), An Independent Contractor", along with any other identifying information or registration number required by any state or federal motor carrier regulatory agency.

**9.2**   **Insurance**: DISTRIBUTOR shall maintain at all times throughout the duration of this Agreement insurance policies from insurance companies that maintain a financial strength rating of A- or better and are licensed to do business in the state(s) in which the Territory is located, and naming COMPANY as an additional insured party on all such insurance policies. DISTRIBUTOR may select either option as set forth in **Exhibit H** attached hereto and made a part hereof. DISTRIBUTOR agrees to provide COMPANY with written evidence of insurance and endorsement within three (3) days upon request by COMPANY.   COMPANY reserves the right to change the insurance coverage requirements by providing DISTRIBUTOR with thirty (30) calendar days notice.

**9.3**   **Other Insurance:** In addition to the insurance coverage required under this Agreement, it is DISTRIBUTOR'S responsibility to carry and maintain any other insurance coverage DISTRIBUTOR may desire.

## X. PROPRIETARY SERVICES

**10.1**   **Services Provided**:   COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist DISTRIBUTOR in the conduct of DISTRIBUTOR's business for the following purposes: (i) collection of sales data; (ii) preparation of sales tickets; (iii) accumulation of sales histories; (iv) preparation of daily and weekly settlements; (v) preparation of automated "adds" to and "cuts" from DISTRIBUTOR's daily order of  Products and Authorized Products; (vi) direct communication to COMPANY for the purpose of DISTRIBUTOR's ordering of product and receipt of daily load information; (vii) providing automated route book information; (viii) providing automatic product movement information; (ix) providing individual customer sales profiles; and (x) providing suggested orders for each customer. **DISTRIBUTOR specifically acknowledges and agrees that the use of such proprietary administrative services is a necessary component of transacting business with Outlets and maximizing sales and does not reflect control by COMPANY of the specific details or manner and means of DISTRIBUTOR's business**.

**10.2**   **Administrative Fee:**   COMPANY shall charge, and DISTRIBUTOR shall pay, a fair market, reasonable administrative fee for these services, which shall be established from time to time by COMPANY.  By signing below, DISTRIBUTOR specifically authorizes COMPANY to collect the Administrative Fee on a weekly basis via the weekly settlement statement process.

**10.3**   **Confidentiality:**   DISTRIBUTOR agrees to maintain and hold in confidence any and all information obtained from or derived about COMPANY's proprietary administrative services pursuant to the provisions of Section 20.7.

**10.4**   **No Proprietary Rights:** DISTRIBUTOR acknowledges that DISTRIBUTOR cannot and shall not

acquire any proprietary rights in COMPANY's proprietary administrative services and no rights shall accrue to DISTRIBUTOR by virtue of the use of the proprietary administrative services. The right to use these proprietary administrative services shall not be assigned by DISTRIBUTOR without the express written consent of COMPANY.

10.5 **Termination or Amendment of Services:** This provision shall remain in effect for as long as this Agreement is in effect. However, in the event this Agreement is terminated for any reason, so shall DISTRIBUTOR's right to use the proprietary administrative services. COMPANY may, in its sole discretion, alter, amend or terminate the proprietary administrative services herein made available by the giving of fourteen (14) calendar days' notice to DISTRIBUTOR.

10.6 **Accurate and Truthful Reporting:** DISTRIBUTOR shall at all times utilize the proprietary services in an honest and ethical manner. This specifically includes accurate and truthful reporting of transactions and related information so as to allow COMPANY to comply with applicable legal disclosure and reporting requirements. COMPANY reserves the right to audit DISTRIBUTOR's transactional records and inventory to ensure accurate and truthful reporting and COMPANY's compliance with applicable legal requirements.

## XI. PRODUCT DELIVERY

11.1 COMPANY shall deliver Products and Authorized Products to DISTRIBUTOR at the location chosen by DISTRIBUTOR, as reflected on **Exhibit I** attached hereto and made a part hereof. DISTRIBUTOR will be charged a fee for warehouse use. DISTRIBUTOR may request to change the location upon thirty (30) days' notice to COMPANY, provided COMPANY is able to accommodate the requested change, such decision being COMPANY's sole discretion. If COMPANY is not able to accommodate the requested change, it may provide DISTRIBUTOR with other location options. By signing below, DISTRIBUTOR specifically authorizes COMPANY to collect the warehouse fee on a weekly basis via the weekly settlement statement process.

## XII. PRODUCT CODE

12.1 Maintaining a fresh market is a fundamental tenet of the baking industry. Accordingly, Out of Code Products or Authorized Products left in the market is a material breach of this Agreement. Repeated violations will be grounds for termination of this Agreement. **DISTRIBUTOR specifically acknowledges and agrees that removing Stale Products and Authorized Products from the market on the appropriate color code or designated pick up date is necessary to maintain the reputation of the brands and to protect the business reputation of both DISTRIBUTOR and COMPANY.**

**12.2** DISTRIBUTOR is not obligated to sell its Stale Products and Authorized Products back to COMPANY. However, to assist DISTRIBUTOR in maintaining a fresh market, COMPANY will repurchase a certain percentage of DISTRIBUTOR's Stale Products or Authorized Products, in accordance with COMPANY's Stale allowance policy as established by COMPANY from time to time.

**12.3** DISTRIBUTOR may not sell any Out of Code Products or Authorized Products, or those not in a saleable condition for distribution to the general public, but may otherwise sell such products to purchasers for non-human consumption. DISTRIBUTOR may also choose to donate such products to a charity that will not resell the products, so long as such products are in a saleable condition.

## XIII. ADVERTISING AND PROMOTIONS

**13.1** COMPANY will provide all COMPANY initiated advertising material at no cost to DISTRIBUTOR, including, but not limited to, point of sale material and COMPANY scheduled media advertising. Subject to COMPANY's prior approval, which approval will not be unreasonably withheld, DISTRIBUTOR may use other advertising materials.

**13.2** DISTRIBUTOR will adhere to all promotions and feature pricing with respect to the major and Chain accounts in the Territory. Such promotions and feature pricing are optional with respect to local accounts. When DISTRIBUTOR follows promotions or feature pricing, DISTRIBUTOR will receive a reduction in the purchase price accounting for such promotion or feature pricing, such that DISTRIBUTOR and COMPANY share the price allowance. With respect to local accounts, DISTRIBUTOR shall be required to provide COMPANY with sufficient proof that the promotion or feature pricing was extended to the local accounts(s) in order to obtain a pricing adjustment for such sales. Upon agreement of the COMPANY, DISTRIBUTOR and COMPANY will each share in any resulting pricing allowance(s).

## XIV. SERVICE REQUIREMENTS

**14.1** DISTRIBUTOR is responsible for providing proper service of the Territory at all times.

**14.2** If DISTRIBUTOR does not service the Territory, for any reason, COMPANY reserves the right to service the Territory, and DISTRIBUTOR agrees to pay a daily fee as indicated on **Exhibit J**, plus any operating expenses COMPANY incurs, including but not limited to fuel, truck rental and travel costs. COMPANY reserves the right to change its daily fee. Such temporary service by COMPANY does not relieve DISTRIBUTOR of the obligation imposed on it by the AGREEMENT nor act to cure any breach by DISTRIBUTOR.

 **XV. TRANSFER OR SALE OF RIGHTS**

**15.1** **Conditions:** The Distribution Rights are owned by the DISTRIBUTOR and may be sold or transferred in whole or in part by DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, subject to the prior written approval of COMPANY, which approval shall not be unreasonably withheld. Any sale or transfer of the Distribution Rights must be bona fide, for legitimate business purposes, and compliant with all applicable laws. Additionally, the prospective purchaser or transferee must be fully qualified to meet all of the obligations under this Agreement, including but not limited to, conducting the business as a corporation pursuant to the conditions set forth in Section 2.10. COMPANY's right of approval in this Section shall expire if not exercised within thirty (30) days after the later of (a) receipt by COMPANY of written notice from DISTRIBUTOR of its intent to sell or transfer to a named bona fide purchaser or transferee on terms and conditions fully set forth in such notice, and (b) an evaluation by COMPANY of the proposed purchaser or transferee. The transfer, whether in one or a series of transactions, of a majority of the ownership or voting interests in the stock of DISTRIBUTOR, whether by operation of law or otherwise, shall constitute a sale, subject to the prior written approval of COMPANY for purposes of this Article. DISTRIBUTOR shall execute and deliver to COMPANY and its affiliates a release of all its interests and claims to and in such Distribution Rights and all of its interests under or arising out of this Agreement, together with a general release of claims against COMPANY and its affiliates, in the event of any transfer or sale of the Distribution Rights. COMPANY will concurrently execute a general release of claims as to DISTRIBUTOR, except for any claim for monies due and owing COMPANY. Except as specifically set forth in Article III hereof, COMPANY has no obligation to repurchase the Distribution Rights.

**15.2** **Settlement of Account:** No transfer or sale of DISTRIBUTOR's rights under this Agreement is to be made unless and until DISTRIBUTOR has settled with COMPANY all outstanding accounts and settled all other outstanding liens and debts related to the distributorship; provided, however, that COMPANY may waive this requirement depending on the circumstances of the particular transaction, including if it is satisfied that under the terms of the sale, the purchaser assumes all such liabilities and is financially capable of such assumption.

**15.3** **Transfer Fee:** In the event of a sale by DISTRIBUTOR, or by anyone other than COMPANY acting on behalf of DISTRIBUTOR of DISTRIBUTOR's Distribution Rights to a third party, DISTRIBUTOR shall be solely responsible for ensuring the purchaser is fully qualified to operate the business hereunder, and shall pay a transfer fee to COMPANY in an amount equal to two percent (2%) of such gross sales price, but not less than $2,000, in consideration of the administrative

activities undertaken by COMPANY in connection with such sale. In the event of a sale of the Distribution Rights to COMPANY, or by COMPANY on behalf of DISTRIBUTOR, DISTRIBUTOR shall pay a transfer fee to COMPANY in an amount equal to five percent (5%) of such gross sales price, but not less than $3,000, in consideration of the administrative activities undertaken by COMPANY in connection with such sale.

**15.4**     **Taxes and Reporting Requirements:** DISTRIBUTOR shall be solely responsible for all taxes and transactional reporting requirements, including but not limited to the nature of the conveyance, related to the transfer or sale of the Distribution Rights.

**XVI. INDEPENDENT BUSINESS**

**16.1**     **Essential Term:** The status of DISTRIBUTOR pursuant to this Agreement is that of independent contractor for all purposes and the parties hereby signify their express intention to this effect. DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner and means of DISTRIBUTOR's business, it being understood that the interests of COMPANY are the results achieved by DISTRIBUTOR, protecting the reputation of the brands, and protecting the business reputation of both DISTRIBUTOR and COMPANY. DISTRIBUTOR's business is separate and apart from that of COMPANY and it is of the essence of this Agreement that DISTRIBUTOR is an independent business. Any final determination that DISTRIBUTOR is not an independent contractor shall entitle either party to cancel this Agreement, such determination being contrary to the parties' express intention herein to create an independent contractor relationship. Neither DISTRIBUTOR nor any of DISTRIBUTOR's employees, agents, or servants shall be considered or deemed in any way to be employees, agents or servants of COMPANY and neither party has the right or power, express or implied, to do any act or thing that would bind the other, except as herein specifically provided. DISTRIBUTOR shall not represent or do anything to suggest to its employees, agents, servants that they are employed by or work for COMPANY. The parties do not intend to act as joint employers, parent/subsidiary, joint venturers, or any other legal capacity other than separate and distinct businesses acting pursuant to the terms of this Agreement. There is no fiduciary relationship between the parties. Furthermore, none of the benefits provided by COMPANY to its employees are available from COMPANY to DISTRIBUTOR or to DISTRIBUTOR's employees, agents, or servants. In the event DISTRIBUTOR and/or DISTRIBUTOR's employees, agents or servants hereafter become eligible to participate in any such benefits, DISTRIBUTOR, on behalf of DISTRIBUTOR and DISTRIBUTOR's employees, agents and servants, hereby waives any right to participate in

JA0135

such benefits. Such waiver is not dependent upon DISTRIBUTOR's status as an independent contractor. DISTRIBUTOR will be solely and entirely responsible for DISTRIBUTOR's acts and for the acts of DISTRIBUTOR's employees, agents, and servants during the performance of this Agreement, and will save and hold COMPANY harmless from any and all damages which may arise therefrom, including attorneys' fees.

16.2 **Non-Personal Service**:  This Agreement does not require that DISTRIBUTOR's obligations hereunder be conducted personally by Owner or by any specific individual in DISTRIBUTOR's organization.   DISTRIBUTOR shall be free to engage such persons as DISTRIBUTOR deems appropriate to assist in discharging DISTRIBUTOR's responsibilities hereunder. Any breach of this Agreement by any person engaged by DISTRIBUTOR shall be deemed to be a breach by DISTRIBUTOR.

16.3 **Professional Services**:  DISTRIBUTOR may engage any legal and/or accounting professional services it deems necessary for purposes of legal compliance, meeting its obligations under this Agreement, and otherwise.

**XVII. TERMINATION BY COMPANY**

17.1 **Performance**:  Except as set forth in Sections 3.1 (b) and (c) and 16.1 above, or this Article, COMPANY shall not terminate or cancel this Agreement, provided DISTRIBUTOR faithfully carries out the terms hereof.  In the event DISTRIBUTOR fails to perform DISTRIBUTOR's obligations under this Agreement, COMPANY may terminate this Agreement as set forth below.

17.2 **Non-Curable Breach**:  COMPANY may terminate upon twenty-four (24) hours' written notice and DISTRIBUTOR shall have no right to cure if: (i) DISTRIBUTOR's failure of performance involves criminal activity, threatens public or private health or safety, involves violent activity or violations of law, or threatens to do substantial harm to COMPANY's business, trademarks or reputation, including, but not limited to, any action or inaction on DISTRIBUTOR's part that results in DISTRIBUTOR's inability to service any Chain account; (ii) DISTRIBUTOR fails to maintain the insurance coverage requirements as set forth in Section 9.2 above and **Exhibit H**; or (iii), DISTRIBUTOR dissolves its corporate status or Owner fails to maintain a majority ownership in the stock of DISTRIBUTOR;

17.3 **Curable Breach**:  In any event of any other failure of performance by DISTRIBUTOR not described in Section 17.2, COMPANY must give DISTRIBUTOR ten (10) business days written notice within which DISTRIBUTOR may cure DISTRIBUTOR's failure of performance.    If

DISTRIBUTOR does not cure such failure of performance within this ten (10) day period, COMPANY may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure. Furthermore, the parties agree that repeated violations, even if cured, constitute a chronic failure of performance and threaten substantial harm to COMPANY's business, trademarks or reputation, and in such event COMPANY shall be entitled to terminate this Agreement immediately and DISTRIBUTOR shall have no further right to cure.

17.4    **Actions Following Termination:**  If this Agreement is terminated under either Section 17.2 or 17.3, COMPANY, within the limits of its ability to do so, will operate the business for the account of DISTRIBUTOR, deducting its reasonable expenses in connection with the operation thereof, and sell DISTRIBUTOR's Distribution Rights to a qualified purchaser(s) at the best price which can reasonably be obtained after proper notice and advertisement. Such sale shall be for the account of the terminated DISTRIBUTOR, and the proceeds of such sale, after deducting therefrom any monies owed by DISTRIBUTOR to COMPANY, the amount of any outstanding liens, any other known liabilities of the distributorship and the reasonable costs incurred in effecting the sale, shall be turned over to DISTRIBUTOR in exchange for the release of DISTRIBUTOR's Distribution Rights and interests under this Agreement, together with a general release of claims as to COMPANY and its affiliates. COMPANY will concurrently execute a general release of claims as to DISTRIBUTOR, except for any claim for monies due and owing COMPANY.

**XVIII. DISPUTE RESOLUTION**

18.1    **Negotiation:**  DISTRIBUTOR and COMPANY shall attempt in good faith and employ their best efforts to resolve and terminate any controversy, claim or dispute arising out of or relating to this Agreement promptly by negotiations. Such negotiations shall take place between representatives of COMPANY and DISTRIBUTOR who have the authority to settle and resolve the dispute. Such negotiations shall begin upon written notice from one party to the other describing any dispute or claim which has not been resolved in the ordinary course of business and suggesting a location for a meeting between the parties to conduct such negotiations within ten (10) business days after delivery of such notice. Representatives of DISTRIBUTOR and COMPANY shall meet at a mutually acceptable time and place within ten (10) calendar days after delivery of such notice and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute. Any such meeting may be attended by one or more representatives of each party. No such meeting shall be attended by an attorney representing either party unless such party shall have first given the

other party at least three (3) calendar days' notice that it will be accompanied by an attorney at the next scheduled meeting, and at such meeting the other party may also be accompanied by an attorney.

**18.2** **Mediation**: If the dispute has not been resolved within thirty (30) calendar days of the initial notice, or if the party receiving such notice has failed to meet within fifteen (15) calendar days, either party may initiate mediation by a request therefore in writing to the other party. Upon receipt of such notice, DISTRIBUTOR or COMPANY shall be obligated to engage in mediation. If the parties fail to agree within fifteen (15) calendar days of the date of such request for mediation on the selection of a mediator, then the Center for Public Resources shall appoint a mediator in accordance with its Mediation Procedure and the parties shall continue efforts through mediation to resolve the controversy and dispute between them until mediation is terminated by the occurrence of any of the following events:

    (i)   A written resolution in settlement of the dispute is reached, or

    (ii)  The mediator informs the parties in writing that further efforts would not be productive or useful, or

    (iii) The parties agree in writing that further efforts would not be productive, or

    (iv) Sixty (60) calendar days elapse from the commencement of the mediation without resolution.

Neither COMPANY nor DISTRIBUTOR may withdraw from mediation before such a termination of the process.

**18.3** **Mandatory and Binding Arbitration**: In addition to and/or instead of utilizing the negotiation and mediation procedures described in this Article, either DISTRIBUTOR or COMPANY may request binding arbitration to resolve any dispute between them. Both DISTRIBUTOR and COMPANY agree that all claims, disputes, and controversies arising out of or in any manner relating to: (i) this Agreement or any other agreement executed in connection with this Agreement; (ii) the performance, interpretation, application or enforcement hereof, including, but not limited to breach hereof and/or termination hereof, (iii) the services provided to COMPANY by DISTRIBUTOR or by DISTRIBUTOR to COMPANY, or (iv) any other dealings between DISTRIBUTOR and COMPANY, which has not been resolved pursuant to the negotiation and mediation provisions herein shall be submitted to binding arbitration in accordance with the terms and conditions set forth in the Arbitration Agreement attached hereto as **Exhibit K**, excepting only such claims, disputes, and controversies as specifically excluded therein.

**18.4**  **Confidentiality:** All negotiations and mediations pursuant to this Article of the Agreement are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and any similar state rules of evidence.

**18.5**  **Tolling:** All applicable statutes of limitation and defenses based upon the passage of time shall be tolled during the negotiation and mediation procedures specified in this Article. All deadlines specified in such procedures may be extended by mutual agreement of the parties.

**XIX. TRADEMARKS, TRADE NAMES, AND PROPRIETARY MATERIALS**

**19.1**  **Permission for Use:** Subject to the terms and conditions of this Article and to the Distribution Rights granted herein, for the Duration of this Agreement, COMPANY authorizes DISTRIBUTOR to use, on a non-exclusive basis, the trade names and trademarks (collectively, "Trademarks"), trade dress, package designs, logos, artwork, advertising materials and other works protected by copyright, and other intellectual property of or associated with the Products (collectively, including the Trademarks, the "Proprietary Materials") solely in connection with DISTRIBUTOR's advertising, promoting, marketing, sale, and distribution of Products in the Territory. DISTRIBUTOR may not assign or transfer this authorization except in the context of a sale or transfer of all or a portion of the Distribution Rights as provided in this Agreement. DISTRIBUTOR will not use any of the Proprietary Materials in any manner different from how they are used generally by COMPANY.

**19.2**  **Conditions of Use:** DISTRIBUTOR shall make no use of the Trademarks or Proprietary Materials, nor engage in any program or activity which makes use of or contains any reference to COMPANY, its products, Trademarks or Proprietary Materials, other than as specifically provided herein, except with the prior written consent of COMPANY. Should DISTRIBUTOR advertise other services or products on its delivery vehicle, such advertising shall not dilute or negatively affect the reputation and goodwill of COMPANY, the Trademarks or the Proprietary Materials. DISTRIBUTOR will not (i) do anything that would or might be inconsistent with, impair, or conflict with ownership of the Proprietary Materials by COMPANY or, if licensed, franchised, or otherwise, the owner thereof; (ii) use any of the Proprietary Materials in any manner likely to (a) deceive or mislead the public, (b) endanger the validity or enforceability of any of the Proprietary Materials, or (c) damage or impair the reputation or value of COMPANY, any of the Proprietary Materials, or any Product; (iii) attack, contest, oppose, or interfere with the right, title, or interest in or to any Proprietary Materials of COMPANY or the owner thereof in any jurisdiction; or (iv) adopt or use any work confusingly or substantially similar to any of

the Proprietary Materials. DISTRIBUTOR will not use any of the Trademarks or Proprietary Materials in either its legal or fictitious trade name without the prior written consent of COMPANY. DISTRIBUTOR will not use any of the Trademarks, Proprietary Materials, or any variation thereof as a business and/or corporate name or d/b/a of DISTRIBUTOR, an Internet domain name or a mnemonic, cipher, or "vanity" telephone number without COMPANY's prior written approval.

**19.3** **Monitoring and Cooperation:** To insure the uniform quality of the goods in connection with which the Proprietary Materials are used, COMPANY will have the right to require DISTRIBUTOR to immediately discontinue any non-approved use of any Proprietary Materials or any other activity that COMPANY in its sole judgment considers likely to impair the value or validity of the Proprietary Materials. DISTRIBUTOR will immediately observe and require that other persons under its control observe any and all instructions of the COMPANY limiting or halting the use of the Proprietary Materials. DISTRIBUTOR will notify COMPANY, in writing, as soon as DISTRIBUTOR becomes aware of any infringement, imitation, impairment, counterfeiting, or other unlawful or improper use of any of the Proprietary Materials or any of the Products. DISTRIBUTOR will cooperate with and provide testimony and other evidence to COMPANY in and in connection with any application for, registration and protection of, or enforcement of the Proprietary Materials in the Territory as and when requested by COMPANY.

**19.4** **Acknowledgment:** DISTRIBUTOR acknowledges and agrees that (i) all the rights concerning the Proprietary Materials are owned by COMPANY or the owner thereof, (ii) DISTRIBUTOR does not have, and will not as a result of this Agreement or performance hereunder acquire, any ownership or legal rights in any of the Proprietary Materials used in connection with the Products, and (iii) DISTRIBUTOR's sole rights with respect to the Proprietary Materials are set forth in this Article.

**19.5** **Return Upon Termination:** Upon termination of this Agreement, DISTRIBUTOR shall cease use of COMPANY's Proprietary Materials and shall deliver to COMPANY any advertising, promotional or merchandising material.

## XX. MISCELLANEOUS

**20.1** **Notice:** Any notice required or permitted under this Agreement shall be deemed properly given and received on the date received if hand delivered; on the next business day after deposit with a

nationally recognized overnight courier service for overnight delivery; or three (3) days after deposited in the mails, return receipt requested, registered or certified mail postage pre-paid, addressed to the parties at the addresses first referenced above, or at such other address as either party may designate by written notice given pursuant to this section.

**20.2** **Company Breach**: If DISTRIBUTOR maintains that COMPANY is in breach of this Agreement, DISTRIBUTOR should notify COMPANY in writing, by certified mail, return receipt requested. Such written notice must include the specific section of this Agreement DISTRIBUTOR maintains has been breached and sufficient facts to provide reasonable notice to COMPANY of the action or failure to act which DISTRIBUTOR maintains is a breach of this Agreement. Upon receipt of the DISTRIBUTOR's notice of breach, COMPANY shall have a reasonable period of time to investigate and cure any breach. Any failure to comply with this provision shall not affect DISTRIBUTOR's right to submit a claim to mandatory and binding arbitration.

**20.3** **Survival**: This agreement shall be binding upon the heirs, personal representatives, successors or assigns of the parties to this Agreement. Notwithstanding any termination of this Agreement, all provisions hereof that, by their terms or reasonable interpretation thereof, set forth obligations that extend beyond the termination of this Agreement, shall survive and remain in full force and effect.

**20.4** **Incorporation of Bill of Sale**: This Agreement is subject to and affected by a Bill of Sale simultaneously executed by the parties, such Bill of Sale being fully incorporated in this Agreement by reference.

**20.5** **Entire Agreement**: This Agreement, together with all Exhibits incorporated herein by reference, as amended from time to time in accordance with the Agreement, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter. Unless set forth in this Agreement, no party shall be liable for any representation made to any other. Except as otherwise expressly authorized herein, this Agreement may be amended or modified only by a writing signed by all parties.

**20.6** **Indemnification**: DISTRIBUTOR agrees to indemnify and hold harmless COMPANY from and against any and all claims, actions, liabilities, expenses, losses or demands, including reasonable attorneys' fees, growing out of or based upon this Agreement or any acts or omissions of DISTRIBUTOR arising in the normal course of the conduct of business by DISTRIBUTOR pursuant to this Agreement. DISTRIBUTOR shall also indemnify COMPANY against all liability and loss in connection with, and shall assume full responsibility for, payment

of all federal, state and local taxes and/or contributions imposed or required under unemployment insurance, workers' compensation insurance, and income tax laws with respect to DISTRIBUTOR or DISTRIBUTOR's employees engaged in performance of this Agreement.

**20.7** **Trade Secrets/Confidential Business Information**: DISTRIBUTOR recognizes and acknowledges that COMPANY and its affiliated entities have, through the expenditure of substantial time, effort and money, developed and acquired certain trade secrets and confidential business information ("Confidential Information") which are of great value to COMPANY. DISTRIBUTOR further acknowledges and understands that through the distributor relationship with COMPANY, DISTRIBUTOR will have access to Confidential Information of COMPANY and its affiliated entities. Accordingly, except as and to the extent required by law, DISTRIBUTOR covenants that DISTRIBUTOR will make no disclosure, or any use, in any manner whatsoever, of any of the Confidential Information of COMPANY and/or any of its affiliated entities while this Agreement is in effect and thereafter, except as specifically authorized by COMPANY. Upon termination of this Agreement, DISTRIBUTOR shall return to COMPANY all embodiments of such Confidential Information that are in DISTRIBUTOR's possession, custody or control. As used herein the term Confidential Information includes (a) sales data, financial statements and information, marketing arrangements and plans, trade secrets, pricing information and strategies, business development plans, and any other business methods, processes and techniques of COMPANY and/or its related entities to the extent all of which are not generally known to the trade or industry and/or (b) confidential or proprietary information or trade secrets of third parties, including retail customers, with which COMPANY and/or its related entities conducts business and which is supplied to DISTRIBUTOR for purposes of this Agreement. Notwithstanding the foregoing, Confidential Information shall not include information that: (i) is or becomes generally known to the public not as a result of a disclosure by DISTRIBUTOR; (ii) is received by DISTRIBUTOR in good faith and without restriction from a third party having the right to make such disclosure; and/or (iii) is known to DISTRIBUTOR at the time of COMPANY's disclosure thereof to DISTRIBUTOR or DISTRIBUTOR's becoming aware thereof in the course of and as a result of DISTRIBUTOR's business relationship with COMPANY. DISTRIBUTOR's obligations in this paragraph shall be in addition to, and not in lieu of, any and all obligations imposed upon DISTRIBUTOR by applicable law.

**20.8** **Injunctive Relief**: DISTRIBUTOR agrees and acknowledges that a violation of Section 20.7 will cause irreparable harm to COMPANY and that there will be no adequate remedy at law to redress the resulting harm that will be suffered by COMPANY. Therefore, DISTRIBUTOR further

agrees that in the event of any violation or threatened violation of this Section, COMPANY shall be entitled as a matter of course to an immediate injunction out of any court of competent jurisdiction restraining such violation or threatened violation by DISTRIBUTOR, such right to be cumulative and in addition to whatever other remedies, at law or in equity, that COMPANY may have.

20.9 **Savings Provision/Non-Waiver:**  Should any portion, word, clause, sentence or paragraph of this Agreement be declared void or unenforceable, including the Arbitration Agreement attached hereto, such portions shall be modified or deleted in such a manner as to make this Agreement as modified legal and enforceable to the fullest extent permitted under applicable law.  Except as expressly provided herein, no waiver by either party of any default in the performance of any part of this Agreement by the other party shall be deemed a waiver of any other default hereunder.

20.10 **Legal Counsel:**  DISTRIBUTOR acknowledges that it has been given a reasonable opportunity to discuss this Agreement with an attorney of its choosing; that it has carefully read and fully understands the provisions of this Agreement, and that it is entering into this Agreement knowingly, voluntarily, and with the intention of being legally bound by all of the terms of this Agreement.

20.11 **Governing Law:** This Agreement and the construction thereof shall be governed by the laws of the State of Connecticut, without regard to the conflict-of-law rules.

20.12 **Revocation:**  This Agreement, including the Arbitration Agreement attached hereto, may be revoked by DISTRIBUTOR within seven (7) calendar days after DISTRIBUTOR executes it ("Revocation Period") by sending written notice of revocation to **Peter Roy**, and the Agreement will not become effective or enforceable until this Revocation Period has expired, without revocation.

20.13 **Right to Opt-Out of Mandatory and Binding Arbitration:** DISTRIBUTOR may elect to opt-out of the arbitration procedures described in Article 18.3, above, and Exhibit K, attached hereto, within seven (7) calendar days after DISTRIBUTOR executes this Agreement ("Opt-Out Period") by sending written notice of such intent via hand delivery, email or fax to **Peter Roy**.  Neither Article 18.3 nor Exhibit K will become effective or enforceable until this Opt-Out Period has expired and DISTRIBUTOR has not elected to opt-out of the arbitration procedures described in Article 18.3, above, and Exhibit K, attached hereto.  Should DISTRIBUTOR choose to opt-out of the arbitration procedures described in Article 18.3, above, and Exhibit K, attached hereto, then neither Article 18.3 nor Exhibit K shall be part of this Agreement, neither DISTRIBUTOR

nor COMPANY shall be required to comply with any of their provisions, and neither DISTRIBUTOR nor COMPANY will be required to submit any claims, disputes, and controversies between them to binding arbitration.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR have executed this Agreement this <u>25th</u> day of <u>April, 2018</u>, and each signatory hereto represents that he or she has the authority to execute this Agreement and legally bind the respective party.

DISTRIBUTOR

By: Tyler Wojnarowski

Its: President

COMPANY

By: Judd E. Paice

Its: MARKET VP

WITNESSES:

ATTEST:

 **EXHIBIT "A" – TERRITORY** 

Territory begins at intersection of Mrytle Street and Corbin Ave. Go south on Corbin Ave to Route 372. Turn right on Route 372 to Route 10. Turn left on Route 10 to West Main Street. Turn right on West Main Street to West Street. Turn right on West Street to Spring Street. Turn right on Spring Street to Route 10 working both sides throughout.

Territory begins at intersection of West Main Street and Route 10. Go south on Route 10 to King Road working both sides throughout.

Territory begins at intersection of Meriden Ave and Route 322. Go west on Route 322 to Shelton Ave working both sides throughout.

**Acknowledged and Agreed:**

**DISTRIBUTOR**

**COMPANY**



**EXHIBIT "B" – PRODUCTS**

Except as expressly limited by the Distributor Agreement, DISTRIBUTOR shall have the exclusive right to sell and distribute the following Products in the Territory specifically described in **Exhibit A**.

1. Nature's Own
2. Country Kitchen
3. Barowsky's
4. TastyKake
5. Wonder Bread
6. Home Pride
7. Cobblestone Bread Company
8. Old Fashion Hearth



## EXHIBIT "C" – AUTHORIZED PRODUCTS

Except as expressly limited by the Distributor Agreement, DISTRIBUTOR is authorized to distribute the following products. Authorized Products may include products with logos and/or labels, or without. DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive, and COMPANY may cease selling such Authorized Products to DISTRIBUTOR upon notice. COMPANY may also add Authorized Products to this Exhibit upon notice to DISTRIBUTOR.

1. Best Yet
2. C & S
3. Clear Bag
4. HANNAFORD
5. Middle East
6. Shurfine
7. Sunbeam
8. SuperBuy
9. Great Value
10. Dave's Killer Bread Products

## EXHIBIT "D" – BILL OF SALE

**CK SALES CO., LLC** , ("COMPANY"), subject to the consideration set forth below, effective the **7th** day of **May, 2018**, hereby conveys, sells, transfers and delivers to **Blue Star Distributors Inc**, ("DISTRIBUTOR"), the Distribution Rights specifically described in the Distributor Agreement executed simultaneously with this Bill of Sale.  Both the Distributor Agreement and all appendices (Exhibits) thereto are specifically incorporated into and made a part of this Bill of Sale.

The terms of this sale are as follows:

Purchase price shall be **$61,980.00**.  DISTRIBUTOR shall own all Distribution Rights in the Territory consistent with the terms and conditions contained in the Distributor Agreement.

COMPANY has lawful title to the Distribution Rights in the Territory free from all encumbrances.  COMPANY warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR execute this Bill of Sale this **25th** day of **April, 2018**.

DISTRIBUTOR

By: Tyler Wojnarowski

Its: President

COMPANY

By: JUDD E. PRICE

Its: MARKET VP

WITNESSES:

Emiline Doughty

ATTEST:

JA0148

 **EXHIBIT "E" – OWNER**

**Owner's Name:**   Tyler J. Wojnarowski

**Address:**   78 Andrews Street

**City, State, ZIP**   Bristol, CT 06010

**TELEPHONE:**   860.985.5989

**Email Address:**   twojo65@sbcglobal.net

## EXHIBIT "F" – PERSONAL GUARANTY

In consideration of the foregoing premises, covenants and conditions, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged,    Tyler    J. Wojnarowski , an individual ("GUARANTOR"), does hereby irrevocably and unconditionally guarantee to COMPANY, and become surety to COMPANY, for the performance and compliance with the terms, conditions and obligations of this Distributor Agreement entered into by and between **Blue Star Distributors Inc** (Corporation Name), a **Connecticut** corporation ("DISTRIBUTOR"), and COMPANY. If any term, condition or obligation of the Distributor Agreement is not complied with, performed, or paid by DISTRIBUTOR as required therein, including any terms, conditions or obligations due following termination thereof, GUARANTOR will, upon COMPANY's demand, immediately ensure the timely and complete performance of DISTRIBUTOR of each and every obligation and duty imposed on it by the Distributor Agreement, and/or pay any amounts due and owing due to DISTRIBUTOR's breach of the Distributor Agreement or as required by the terms and conditions thereof. GUARANTOR shall also pay to COMPANY upon demand all costs and expenses, including but not limited to reasonable attorney fees, which may be incurred by COMPANY in the enforcement and/or collection of monies due hereunder. GUARANTOR is fully responsible for ensuring DISTRIBUTOR is properly established, organized and at all times in good standing with the appropriate state agency(s), and in compliance with appropriate state law(s) in accordance with Section 2.10 of the Distributor Agreement. GUARANTOR agrees and acknowledges he/she is subject to the Arbitration Agreement attached hereto as **Exhibit K**.

4-25-18

GUARANTOR Signature                     Date

Tyler Wojnarowski

GUARANTOR Name (Print)

WITNESSES:

## **EXHIBIT "G" – SETTLEMENT STATEMENT AUTHORIZATION**

I understand that on a weekly basis I will receive a settlement statement from COMPANY (in the format of the sample shown below). I also understand that this statement reflects an ongoing accounting between COMPANY and me (and the business entity pursuant to which my distributorship is operated), for product purchases, adjustment to product purchases, various credits, and business expenses.

I (personally and on behalf of my business entity) hereby authorize COMPANY to make the adjustments noted on the settlement statement, both charges and credits, on a weekly basis. I understand that my portion of customer price allowances is included in the standard discount.

I (personally and on behalf of my business entity) also authorize COMPANY to collect from me (and/or the business entity pursuant to which my distributorship is operated), via the weekly settlement statement, business expenses such as shown on the below sample, on a weekly basis. I understand that the amount for certain business expenses DISTRIBUTOR may incur, as applicable, including, for example, territory payment, truck lease, health/disability, life insurance, truck/business insurance, administrative fee and warehouse fee (as applicable) will remain the same each week and authorize COMPANY to deduct charges for these expenses from my settlement each week in exact amount show below.

I also understand that certain other business expenses, such as stale adjustment, truck rental, truck repair, truck tax, tag and license fees, sales and use tax, open route expense, supplies/equipment, apparel, temporary services fees, SBT shrink charges and miscellaneous expense listed below may vary weekly. By signing below, I (personally and on behalf of my business entity) also authorize deduction of any of these expenses, as applicable, each week.

Finally, I (personally and on behalf of my business entity) understand and agree that should I dispute any of the credits or charges on a weekly statement that I must bring such dispute to COMPANY's attention in writing within ten (10) calendar days of receipt of the statement with the disputed credit or charge. If I do not, I understand that my failure to do so indicates my agreement that all charges and credits on the statement are proper.

DISTRIBUTOR

WITNESS

| Name: | ████████████ | Master Distrib Name: | ████████ |
| Distributor Number: | ████████ | Master Distrib Number: | ████████ |
| Route: | ████████ | Master Route: | |
| Warehouse: | ████████ | VP of Sales: | ████████ |
| Date: | Week # 08 | ( 02/18/2018 to 02/24/2018 ) | Director RSM: | ████████ |
| Company Code: | | Branch: | ████████ |

| | | | |
|---|---|---|---|
| Beginning Balance Owed | | | 10,764.29 |
| Prior Weeks' Balances Transferred | | 0.00 | 0.00 |
| Funds Paid To Distributor | | | 192.38 |
| Funds Received From Distributor | | | 0.00 |

| | Accountability | Margin / Discounts | |
|---|---|---|---|
| Total Product Charged | , 10,231.50 | | |
| Relay Adjustment | 0.00 | | |
| Load Adjustment | 3.46- | | |
| Damaged | 0.00 | | |
| Short Code | 0.00 | | |
| Product Transfers | 212.48 | | |
| Cust Price Allwnce/Overrides | 1,279.12- | | |
| Stales | 1,387.38- | | |
| Standard Discount | | 1,374.76- | |
| Additional Discount | | 0.00 | |
| Contest Earnings | | 0.00 | |
| Other Earnings | | 0.00 | |
| Authorized Charges | 2,523.08- | | |
| AR Ticket Chargebacks | 0.00 | | |
| | | | |
| Scan Based Trading Adj. ( 02/11/2018 to 02/17/2018 ): | | | |
| Point of Sale Data | 5,090.72- | | |
| Revaluation Variance | 107.23- | | |
| Shrink | 226.91- | | |
| | | | |
| New Distributor Balance | 173.89- | 1,374.76- | 1,548.65- |

| Business Expenses: | | | |
|---|---|---|---|
| Stale Adjustment | 0.00 | Administrative Fee | 26.00 |
| Territory Payment | 226.51 | Warehouse Fee | 36.00 |
| Truck Purchase | 0.00 | FICA Tax-Current Wk | 105.18 |
| Truck Lease | 169.33 | FICA Tax-Adjustment | 0.00 |
| Truck Rental | 0.00 | Sales and Use Tax | 0.00 |
| Truck Repair | 0.00 | Open Route Expense | 0.00 |
| Truck Tax,Tag,License,Fees | 0.00 | Supplies / Equipment | 0.00 |
| Truck/Bus Insurance | 0.00 | Apparel | 0.00 |
| Health Insurance | 0.00 | Temp Svcs Fee | 0.00 |
| Disability Insurance | 0.00 | SBT Shrink Charges | 0.00 |
| Health License | 0.00 | Miscellaneous Expense | 0.00 |
| Life Insurance | 0.00 | | |
| | | | |
| Total Business Expense | | | 363.02 |

| | |
|---|---|
| Total Distributor Balance | 9,970.94 |
| Scan Based Trading Credits | |
| Less Prior Week Scan Based Trading Inventory ( 02/17/2018 ): | 5,531.71- |
| Less Current Week SBT Delivery Tickets ( 02/18/2018 to 02/24/2018 ): | 4,576.12- |
| | |
| Weekly Distributor Balance | 136.89- |
| | To be paid via Direct Deposit to bank account on record this Friday |

JA0152

**EXHIBIT "H" – DISTRIBUTOR CHOICE OF INSURANCE COVERAGES**

### Option 1:

(i)     Automobile liability insurance, including hired auto and non-owned auto, on all vehicles used in the business, in such amounts as may reasonably be established by COMPANY from time to time, which as of the date of this Agreement will include combined single limit coverage of at least $1,000,000; and collision and comprehensive loss coverage for the actual cash or replacement cost value of any and all delivery vehicles operated by DISTRIBUTOR that are financed or leased, with no more than a $500 deductible.  Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

(ii)    Comprehensive general liability coverage, in such amounts as may reasonably be established by COMPANY from time to time, which as of the date of this Agreement will include an occurrence and aggregate limit of at least $1,000,000.  Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

(iii)   Umbrella or excess liability coverage, in such amounts as may reasonably be established by COMPANY from time to time, which as of the date of this Agreement will include an occurrence and aggregate limit of at least $1,000,000.  Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

(iv)   Workers compensation coverage for any and all employees of DISTRIBUTOR in compliance with all requirements and laws of the state or states in which DISTRIBUTOR operates.

### Option 2:

(i)     Automobile liability insurance, including hired auto and non-owned auto, on all vehicles used in the business, in such amounts as may reasonably be established by COMPANY from time to time, which as of the date of this Agreement will include combined single limit coverage of at least $2,000,000; and collision and comprehensive loss coverage for the actual cash or replacement cost value of any and all delivery vehicles operated by DISTRIBUTOR that are financed or leased, with no more than a $500 deductible.  Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

(ii)    Comprehensive general liability coverage, in such amounts as may reasonably be established by COMPANY from time to time, which as of the date of this Agreement will include an occurrence and aggregate limit coverage of at least $2,000,000.  Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

(iii)   Workers compensation coverage for any and all employees of DISTRIBUTOR in compliance with all requirements and laws of the state or states in which DISTRIBUTOR operates.

## EXHIBIT "I" - DISTRIBUTOR CHOICE OF DELIVERY LOCATION

As set forth in Section 11.1, COMPANY will deliver Products and Authorized Products to DISTRIBUTOR at the location selected below by DISTRIBUTOR.

Please select choice below by initialing the appropriate selection:

_TW_        1. Location #1 <u>Waterbury, CT</u>

_____        2. Location #2 <u>Bridgeport, CT</u>

_____        3. Location #3 <u>Windsor, CT</u>

JA0154

## EXHIBIT "J" - DISTRIBUTOR CHOICE OF COMPANY FEE FOR SERVICE

As set forth in Section 14.2, if COMPANY services DISTRIBUTOR's Territory, DISTRIBUTOR agrees to pay a daily fee to COMPANY as selected below by DISTRIBUTOR. By signing the Distributor Agreement, DISTRIBUTOR specifically authorizes COMPANY to collect the fee for service via the weekly settlement statement process.

Please select choice below by initialing the appropriate selection:

Option 1: $350 per day.

Option 2: 12% of average daily net sales.

## EXHIBIT "K" – ARBITRATION AGREEMENT

The parties agree that any claim, dispute, and/or controversy except as specifically excluded herein, that either DISTRIBUTOR (including its owner or owners) may have against COMPANY (and/or its affiliated companies and its and/or their directors, officers, managers, employees, and agents and their successors and assigns) or that COMPANY may have against DISTRIBUTOR (or its owners, directors, officers, managers, employees, and agents), arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between DISTRIBUTOR and COMPANY ("Agreement"), including the termination of the Agreement, services provided to COMPANY by DISTRIBUTOR, or any other association that DISTRIBUTOR may have with COMPANY ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.) ("FAA") in conformity with the Commercial Arbitration Rules of the American Arbitration Association ("AAA" or "AAA Rules"), or any successor rules, except as otherwise agreed to by the parties and/or specified herein. Such arbitration shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing. Copies of AAA's Rules are available on AAA's website (www.adr.org).

COMPANY shall pay for all arbitration filing fees and costs that are customarily associated with AAA arbitration, subject to the Arbitrator's authority to award fees and costs to COMPANY as the prevailing party. Each party may be represented by legal counsel of their own choosing. Each party shall pay its own attorneys' fees, provided that an Arbitrator may award attorney's fees and costs to the prevailing party under any applicable statute or written agreement to the same extent that attorney's fees and costs could be awarded in court. The arbitration shall be subject to the same burdens of proof and statutes of limitations as if the Covered Claims were being heard in court. The Arbitrator shall issue a written decision within forty-five (45) days of the later of: (1) the arbitration hearing; or (2) submission of the parties' post-arbitration briefs. The Arbitrator's written decision shall include findings of fact and conclusions of law. The Arbitrator shall have the authority to award the same damages and other relief that would have been available in court pursuant to applicable law had the Covered Claim been brought on an individual basis in such forum, including attorneys' fees and costs. Subject to the parties' right to appeal, the decision of the arbitrator will be final and binding. The Arbitrator shall not have the authority to add to, amend, or modify, existing law. No arbitration award or decision will have any preclusive effect as to any issues or claims in any dispute, arbitration, or court proceeding where any party was not a named party in the arbitration.

All Covered Claims against COMPANY must be brought by DISTRIBUTOR on an individual basis only and not as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. DISTRIBUTOR further agrees that if it is within any such class, collective, representative, or multi-plaintiff action, it will take all steps necessary to opt-out of the action or refrain from opting in or joining, as the case may be, and DISTRIBUTOR expressly waives any right to recover any relief from any such class, collective, representative, or multi-plaintiff action. Similarly, all Covered Claims by COMPANY against DISTRIBUTOR may not be brought as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action.  The parties understand that there is no right or authority for any Covered Claim to be heard or arbitrated on a multi-plaintiff, collective, or class action basis, as a private attorney general, or any other representative basis. The parties understand that there are no bench or jury trials and no class, collective, representative, or multi-plaintiff actions are permitted under this Arbitration Agreement. The Arbitrator shall not consolidate claims of different distributors into one proceeding, nor shall the Arbitrator have the power or authority to hear arbitration as a class, collective, representative, or multi-plaintiff action. The Arbitrator may award damages on an individual basis only.

**TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICITY WAIVE ANY RIGHT TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION; (2) SERVE OR PARTICIPATE AS A REPRESENTATIVE OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; (3) SERVE OR PARTICIPATE AS A MEMBER OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; OR (4) RECOVER ANY RELIEF FROM ANY SUCH CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF ACTION.**

Any dispute concerning the validity or enforceability of this prohibition against class, collective, representative, or multi-plaintiff action arbitration shall be decided by a court of competent jurisdiction, and no

arbitrator shall have any authority to consider or decide any issue concerning the validity or enforceability of such prohibition. Any issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement (except for those concerning the validity or enforceability of the prohibition against class, collective, representative, or multi-plaintiff action arbitration and/or applicability of the FAA) shall be resolved by the arbitrator, not a court.

The Arbitrator shall have the authority to consider and rule on dispositive motions, such as motions to dismiss, or motions for summary judgment, in accordance with the standards and burdens generally applicable to such motions in federal district court, except that the Arbitrator may establish appropriate and less formal procedures for such motions at the Arbitrator's discretion consistent with the expedited nature of arbitration proceedings. The Arbitrator will allow the parties to conduct adequate discovery including, but not limited to, issuing subpoenas to compel the attendance of witnesses at the arbitration hearing; serving written discovery; conducting depositions; and compelling the production of documents during discovery.

Covered Claims covered under this Arbitration Agreement include, but are not limited to: breach of contract, any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor, tort claims, discrimination claims, retaliation claims, and claims for alleged unpaid compensation, civil penalties, or statutory penalties under either federal or state law.

This Arbitration Agreement does not cover claims relating to whistleblowers and/or unlawful retaliation arising under the Sarbanes-Oxley Act or disputes involving any ERISA-based benefit plans that provide for arbitration. This Arbitration Agreement also does not preclude either DISTRIBUTOR or COMPANY from seeking provisional remedies such as temporary restraining orders or preliminary injunctions in accordance with applicable law. A party's seeking or obtaining such provisional remedies shall not be considered a waiver of that party's right to arbitration under this Arbitration Agreement.

Nothing in this Arbitration Agreement is intended to affect or limit DISTRIBUTOR's right to file an administrative charge or otherwise seek relief from any administrative or federal or state government agencies (although if DISTRIBUTOR chooses to pursue a claim following the exhaustion of such administrative remedies, that claim would be subject to the provisions of this Arbitration Agreement).

The parties agree that arbitration proceedings are to be treated as confidential, and that the parties will act to protect the confidentiality of the proceedings. The parties agree that neither they nor their counsel will reveal or disclose the substance of the arbitration proceedings, or the result, except as required by subpoena, court order, other legal process, or as otherwise required by law. If disclosure is compelled of one party by subpoena, court order or other legal process, or as otherwise required by law, the party agrees to notify the other party as soon as notice of such process is received and before disclosure takes place. The parties may, however, disclose such information to their legal representatives, accountants or tax advisors as necessary so long as they agree to maintain such information in strict confidence. COMPANY may also disclose such information to individuals in affiliated companies for legal reporting purposes and other legitimate business reasons.

Any request for arbitration must be in writing and provided to the other party and to AAA by certified or registered mail, return receipt requested, within the time period provided for by the statute(s) of limitations applicable to the claim(s) asserted. The request must set forth a statement of the nature of the dispute, including the alleged act or omission at issue; the names of all persons involved in the dispute; the amount in controversy, if any; and the remedy sought.

**DISTRIBUTOR acknowledges that this is an important document that affects its legal rights and that the DISTRIBUTOR has been given the opportunity to discuss this Arbitration Agreement with private legal counsel.** If any provision of AAA's Rules or of this Arbitration Agreement are determined to be unlawful, invalid, or unenforceable, such provisions shall be enforced to the greatest extent permissible under the law, or, if necessary, severed, and all remaining terms and provisions shall continue in full force and effect. This Arbitration Agreement may be modified or terminated by COMPANY after thirty (30) days written notice to DISTRIBUTOR. Any

modifications or terminations shall be prospective only and shall not apply to any claims or disputes that are pending in arbitration or that have been initiated by either party pursuant to the AAA Rules. The parties also agree that nothing herein is intended to, or does, affect or otherwise change the independent contractor relationship between them and that adequate and sufficient consideration has been provided for this Arbitration Agreement, including but not limited to, each party's promise to resolve their claims by arbitration. Finally, this Arbitration Agreement is the complete agreement of the parties on the subject of arbitration of disputes and supersedes any prior or contemporaneous oral or written agreement or understanding on the subject. Any agreement contrary to the foregoing must be in writing signed by the President of COMPANY.

This Arbitration Agreement shall be governed by the FAA and Connecticut law to the extent Connecticut law is not inconsistent with the FAA.

**DISTRIBUTOR acknowledges that it has received and read and specifically agrees to be bound by this Arbitration Agreement. DISTRIBUTOR understands that this Arbitration Agreement requires that disputes that involve matters subject to the Agreement be submitted to arbitration pursuant to the Arbitration Agreement rather than to a judge or jury in court and that such disputes must be brought on an individual basis only.**

Date: _4-25-18_
   (Accepted)

DISTRIBUTOR

By: _Tyler Wojnarowski_

Its: _President_

OWNER

Signature

_Tyler Wojnarowski_
Print Owner's Name

WITNESS: _____

COMPANY

By: _JUDD E. PRICE_

Its: _MARKET VP_

ATTEST: _____

JA0158



**EXHIBIT N**

### Receipt

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If CK Sales Co., LLC offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

If CK Sales Co., LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC 20580 and the state agency listed on Exhibit A.

The franchisor is **CK Sales Co., LLC**, located at 11 Adamian Drive, Auburn, Maine 04210. Its telephone number is (207) 783-9161.

Issuance date:  **April 1, 2018**

The franchise seller for this offering is Jake Linthicum, 11 Adamian Drive, Auburn, Maine 04210.

CK Sales Co., LLC authorizes the respective state agencies identified in Exhibit A to receive service of process for it in the particular state.

I received a disclosure document dated **April 1, 2018** that included the following Exhibits:

 Exhibit A – State Regulators; Agents for Service
 Exhibit B – Affiliated Companies
 Exhibit C – Distributor Agreement. The Distributor Agreement contains eleven (11) Exhibits:
  (i)  Territory
  (ii)  Products
  (iii)  Authorized Products
  (iv)  Bill of Sale
  (v)  Owner
  (vi)  Personal Guaranty
  (vii)  Settlement Statement Authorization
  (viii)  Distributor Choice of Insurance Coverages
  (ix)  Distributor Choice of Delivery Location
  (x)  Distributor Choice of Fee for Service
  (xi)  Arbitration Agreement
 Exhibit D – Territory Pro Forma
 Exhibit E – Financing Documents
  (i)  Secured Promissory Note and Personal Guaranty
  (ii)  UCC-1
 Exhibit F – Form of Purchase Agreement and General Release
 Exhibit G – Form of Company Approval of Assignment and General Release
 Exhibit H – Form of Assignment/Assumption Agreement and Bill of Sale
 Exhibit I – Current Independent Distributors
 Exhibit J – Independent Distributor Terminations
 Exhibit K – Previous Owner Information
 Exhibit L – Financial Statements
 Exhibit M – Form of Guarantee
 Exhibit N – Receipts

Date: _4-10-2018_   _Tyler Wojnarowski_   _[signature]_
(Do not leave blank)    Print Name     Signature

You may return the signed receipt either by signing, dating, and mailing it to CK Sales Co., LLC at 11 Adamian Drive, Auburn, Maine 04210, or by faxing a copy of the signed and dated receipt to Jake Linthicum at (207) 784-4634.

JA0159

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNNECTICUT

_____
                                )

NEAL BISSONNETTE               )       CIVIL ACTION NO: 3:19-CV-00965
and TYLER WOJNAROWSKI    )
on behalf of themselves and all     )
others similarly situated,        )
                                )
       Plaintiffs,                )
                                )
       v.                      )       OCTOBER 9, 2019
                                )
LEPAGE BAKERIES PARK ST., LLC,  )
C.K. SALES CO., LLC, and FLOWERS  )
FOODS, INC.                  )
                                )
       Defendants.            )
_____)

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION

## INTRODUCTION

Defendants in this Action have moved to compel Plaintiffs' claims to arbitration. In doing so, they virtually ignore the Supreme Court's recent landmark decision in New Prime Inc. v. Oliveira, 139 S. Ct. 532 (2019) holding that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, exempts delivery drivers (even those labelled as independent contractors) from being compelled to arbitration. Moreover, Defendants gloss over the fact that the two Plaintiffs in this case were not part of a prior settlement, but were actually required to sign their contracts with their forced arbitration provisions as a condition of obtaining their jobs. In their motion,

1

JA0160

Defendants rely upon arguments that have been thoroughly disavowed by the vast majority of courts considering the issue.

The facts relevant to this motion are straightforward.  Plaintiffs Neil Bissonnette and Tyler Wojnarowski ("Plaintiffs") work exclusively for Defendants on a full-time basis, delivering Defendants' products from a central warehouse to retail stores and institutions across Connecticut.  *See* Amended Compl. (Dkt. 24) at ¶¶ 18, 30.  They are undoubtedly "transportation workers" under Section 1 of the FAA and therefore may not be compelled to arbitrate their claims under federal law, because workers engaged in interstate commerce are exempt from the FAA under 9 U.S.C. § 1.  The Supreme Court has made clear that workers like Plaintiffs qualify for the exemption where, as here, they deliver *goods that are "within the flow of interstate commerce.*" Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 118 (2001) (citing Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195 (1974)) (emphasis added)**;** *see also* New Prime Inc. v. Oliveira, 139 S. Ct. 532, 537, 202 L. Ed. 2d 536 (2019) (holding that the exemption applies to workers classified as independent contractors who are transportation workers "engaged in…interstate commerce.").  As set forth further *infra*, Plaintiffs are precisely the type of transportation workers contemplated by the exemption – those working at the heart of our nation's interstate commerce system by ensuring that national (interstate) products such as Wonder Bread and Country Kitchen (*see* Dkt. 24 at ¶ 12) make it onto the shelves of grocery stores and other retailers in Connecticut.[1]

---

[1]     While Plaintiffs may only make deliveries to Connecticut stores, they fall plainly within the "class of worker" engaged in interstate commerce within the meaning of the § 1 exemption. *See* United States Postal Serv., 859 F.2d 402, 405 (6th Cir. 1988) (finding that the concern is "not whether the individual worker actual engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce").

JA0161

Defendants also cannot compel Plaintiffs' claims to arbitration through the application of state law for two distinct reasons.  First, as Defendants' recognize, the arbitration agreement provides: "This Arbitration Agreement shall be governed by the FAA and <u>Connecticut</u> law to the extent <u>Connecticut</u> law is not inconsistent with the FAA."  *See* Dkt. 31-1 at 81 (Exhibit "K" to Agreement) (emphasis in the original).  To the extent Connecticut law would require the claims of transportation workers to be compelled to arbitration, Connecticut law is plainly inconsistent with the FAA, and therefore cannot apply according to the Agreement (which only permits application of Connecticut law when "consistent" with the terms of the FAA).  Second, even if one were to disregard the plain language of the Agreement, the FAA preempts Connecticut law to the extent that the state law would require transportation workers to be compelled to arbitration, because Congress adopted the Section 1 exemption to avoid that result.  *See* <u>New Prime Inc.</u>, 139 S. Ct. at 537.

Finally, Defendants focus much of their attention on a settlement from several years ago in another lawsuit, <u>Bokanoski v. Lepage Bakeries Park St., LLC</u>, No. 15-00021 (D. Conn.). However, neither the named Plaintiffs nor most of the putative class members in this case had even begun working for Defendants at the time that the prior case was litigated and ultimately resolved.  Though not relevant to any issues before this Court, Defendants purport to rely on statements made by Plaintiffs' counsel in <u>Bokanoski</u> that long predated the <u>New Prime</u> decision. In any event, such statements have been taken out of context and were just opinions provided within the setting of the then existing legal environment relating to arbitration, opinions that were dispelled by <u>New Prime</u>.  Those statements have nothing to do with the two named Plaintiffs or putative class in this action.  For the reasons set forth further herein, this Court should deny Defendants' Motion and should allow Plaintiffs to proceed to reach the merits of

their state and federal wage claims and unjust enrichment claim.

## BACKGROUND

Plaintiffs initiated this action on June 20, 2019, alleging violations of state and federal wage and hour laws and a claim of unjust enrichment on behalf of themselves and all others similarly situated.  Dkt.  1.  As reflected in Plaintiffs' Amended Complaint (Dkt. 24), since 2017 and 2018, respectively, Plaintiffs have been delivering brand name baked goods on behalf of Defendants (to stores and supermarkets) while being classified as independent contractors.  *See* Dkt. 24 at ¶¶ 2-3.  However, Plaintiffs have not always been classified as independent contractors of Defendants.  Indeed, "[p]rior to 2017, Plaintiff Bissonnette performed the same delivery work as an <u>employee</u> of Defendants."  (emphasis added).  Plaintiffs use a commercial truck to "pick-up products at the Lepage warehouse that have been delivered there from one of Defendants' out of state commercial bakery locations."  Dkt. 24 at ¶ 18.  Plaintiffs "then transport th[e]se goods within the flow of interstate commerce by delivering them to various stores and retail locations."  <u>Id</u>.  Further, Plaintiffs and other Distributors are classified as independent contractors and are required to follow numerous company "policies and procedures, including the time, place, and manner of pick-ups and deliveries."  <u>Id</u>. at ¶ 24.  Plaintiffs work exclusively for Defendants and are required to work at least 40 hour per week.  <u>Id</u>. at ¶¶ 32-33.  However, despite the employment nature of the relationship between Distributors and Defendants, Defendants deduct significant amounts from the pay of Distributors (e.g., Distributors are forced to pay hundreds of dollars each week to lease Defendants trucks and to pay so-called "distribution rights.").  <u>Id</u>. at ¶ 36.

Years prior to the initiation of this lawsuit, Distributors working for Defendants classified as independent contractors initiated, and ultimately settled, an action against Defendants.  *See*

JA0163

<u>Bokanoski et al. v. Lepage Bakeries Park St., LLC et al</u>., Civil Action No. 3:15-cv-00021-JCH.

As part of that settlement, that *specific class of Distributors* signed updated Distribution

Agreements that contained arbitration provisions.   *See* Dkt. 31-02 at ¶ 18.  Defendants

acknowledge that Plaintiffs Bissonnette and Wojnarowski fall within a substantial class of

Distributors who either "[b]ecame a Distributor [a]fter [the] <u>Bokanoski</u> Settlement," or are

subject to arbitration provisions that new Distributors were mandated to sign, separate and apart

from the <u>Bokanoski</u> case.   <u>Id</u>. at ¶ 14.  **In short, the named Plaintiffs and the vast majority of**

**Defendants' current Distributors working in Connecticut (nearly 75%) have absolutely no**

**connection to the <u>Bokanoski</u> matter and received no consideration as part of that**

**settlement.[2] <u>Id</u>.**

Notwithstanding that Plaintiffs' claims, and the claims of the vast majority of putative

class members, have absolutely no relationship to the <u>Bokanoski</u> matter, Defendants have

attempted to place the prior litigation at issue in its Motion.  Accordingly, some background

regarding the context of the <u>Bokanoski</u> settlement is warranted here.  That action was filed in

in January 2015.  *See* <u>Bokanoski,</u> Dkt. 1.  Those plaintiffs were represented by the undersigned

counsel.  The <u>Bokanoski</u> Plaintiffs performed deliveries for Defendants and alleged that they

were misclassified as independent contractors.  After substantial litigation, in March 2017, the

---

[2]      Indeed, Plaintiff Bissonnette has expressly alleged that prior to 2017 he was classified as
an employee of Defendants, thus, despite previously performing distribution work for
Defendants, he could not have possibly fallen within the <u>Bokanoski</u> class.  The gravamen of
Plaintiffs' complaint is that they have been misclassified as independent contractors.  Indeed,
"Defendants required employee distributors like Plaintiffs to enter into Distributor Agreements
under which they are designated as independent contractors, even though Defendants maintain
substantial control over the Distributors' work and the Distributors perform the core function of
Defendants' baked goods delivery business, making distributors employees under nearly any
applicable test, particularly Connecticut's strict 'ABC' employment test."  Dkt. 24 at ¶ 37.

JA0164

<u>Bokanoski</u> Plaintiffs reached a settlement with Defendants that provided $1.25 million to a class of thirty-six "Distributors," and the settlement was approved by this Court (Judge Hall).  *See* <u>Bokanoski</u>, Dkt.'s 125, 132.  As part of the Settlement, Distributors who wished to continue working for Defendants had the option to execute an arbitration agreement with Defendants in order to receive additional consideration available under the Settlement.  *See* <u>Bokanoski</u>, Dkt. 125.  Based on discussions with dozens of class members in <u>Bokanoski</u>, the undersigned counsel believed that class members in that action who continued to work for Defendants had a number of non-wage related disputes over certain charges, fees, damaged products, and other day-to-day concerns.  Thus, the arbitration provision provided them with a quick and efficient avenue to challenge these "low-value," individualized disputes.  The undersigned counsel never represented in <u>Bokanoski</u> that arbitration would be the preferred avenue to resolving future misclassification and wage deductions claims under the Connecticut wage laws.  However, given that concerns of their clients in that matter were related to other aspects of the ongoing relationship, class counsel believed that this arbitration provision (under which Defendants would pay the full costs related to any arbitration proceeding) gave a substantial (previously unavailable) benefit to the class members in that case.  *See* <u>Bokanoski</u>, supra, Dkt. 125 at 11 (referring to the fact that prior to the new dispute resolution procedures distributors had no meaningful avenue to "resolve many of the 'low value,' day-to-day disputes that concern class members the most.").  Plaintiffs Bissonnette and Wojnarowski had nothing to do with the <u>Bokanoski</u> case and these representations did not pertain to them.[3]  They did not even work for

---

[3]     Defendants' efforts to prejudice Plaintiffs in this matter, by bringing up statements made by different parties in <u>Bokanoski</u> are also irrelevant because the doctrine of judicial estoppel applies where the party (not counsel) making an assertion took a contrary position in a prior action.  *See* <u>Barton v. City of Norwalk</u>, 163 Conn. App. 190, 202–03, 135 A.3d 711, 718 (2016), <u>aff'd,</u> 326 Conn. 139, 161 A.3d 1264 (2017).  Here, not only are Plaintiffs completely

JA0165

Defendants in their current capacities when the <u>Bokanoski</u> settlement was approved.

Between 2017 (when the <u>Bokanoski</u> settlement was negotiated) and the present, circumstances have changed. First and foremost, new Distributors have come forward (including Plaintiffs Bissonnette and Wojnarowski) who were required to sign the arbitration agreement as a condition of working for Defendants. The Agreement was presented to them on a take-it-or-leave-it basis, *not* as part of a negotiated settlement under which they received financial consideration. These new Distributors wish to pursue claims for unpaid wages in Court, on behalf of themselves and all others similarly situated, and have done so by filing the instant Action.

The legal landscape has also changed dramatically over the past two years. On January 15, 2019, the Supreme Court issued a landmark decision holding that workers classified as independent contractors (such as Plaintiffs in <u>Bokanoski</u> and in this Action) could not be compelled to arbitration if they fit within the transportation worker exemption of the FAA. *See* <u>New Prime Inc.</u>, 139 S. Ct. 532. Though Defendants now profess to have had a crystal ball that easily foretold the <u>New Prime</u> decision, the undersigned counsel did not. It is of course true that the transportation worker exemption had existed in statutory text for many years. However, prior to <u>New Prime</u> it was anticipated that the Supreme Court, *especially given the Court's exceedingly favorable view of enforcement of arbitration agreements under the FAA[4]*, would ***not*** apply the transportation worker exemption to workers classified as independent contractors

_____

distinct parties (and thus cannot be found to have taken a contrary position), but the prior statements made by Plaintiffs' counsel are not actually contrary to any statements made herein.

[4]     *See,* e.g., <u>Epic Sys. Corp. v. Lewis</u>, 138 S. Ct. 1612 (2018); <u>Circuit City Stores, Inc. v. Adams</u>, 532 U.S. 105 (2001).

JA0166

(similarly, given prior Supreme Court precedents, lawyers on both sides of the "V" had become accustom to lower courts compelling arbitration under *prior* FAA precedent).  Indeed, as of the Bokanoski settlement, the First Circuit had yet to even decide Oliveira v. New Prime, Inc., 857 F.3d 7, 14 (1st Cir. 2017), the decision that was affirmed by the Supreme Court earlier this year.

Ultimately, if the arbitration clause signed by workers falls outside the FAA and is unenforceable, then it is unenforceable.  Plaintiffs (who were not members of the Bokanoski class) stand in the same position as any other individual in a misclassification suit who was required to sign an arbitration agreement.  **The question of whether an individual who was a class member in Bokanoski and signed an arbitration agreement as part of the Bokanoski settlement (for enhanced consideration) should be compelled to arbitration is not the question before the court.**  This motion has absolutely nothing to do with the Bokanoski case or the class members in that action, notwithstanding Defendants' efforts to prejudice these Plaintiffs by casting aspersions on the undersigned counsel for statements made on behalf of different clients, in a different case more than two years ago, prior to a substantial change in the governing law that could not have been foreseen.

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE EXEMPT FROM THE FAA AND THEREFORE THERE IS NO BASIS UNDER FEDERAL LAW TO COMPEL THEIR CLAIMS TO ARBITRATION

The FAA requires that written provisions of commercial contracts that require resolution of controversies in arbitration proceedings shall be "valid, irrevocable, and enforceable…."  9 U.S.C. § 2.  However, Section 1 of the FAA exempts from the Act's coverage all "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. To qualify for the Section 1 exemption from the FAA, an individual (1) must work for a business pursuant to a "contract of employment," (2) be a

JA0167

"transportation worker," and (3) be "engaged in interstate commerce." See Harden v. Roadway Package Sys., Inc., 249 F.3d 1137, 1140 (9th Cir. 2001) (citing Circuit City Stores, Inc., 532 U.S. at 118).  Plaintiffs satisfy all three criteria.

Here, the first criterion cannot seriously be in dispute because the Supreme Court recently held that even workers classified as "independent contractors" perform work pursuant to "contracts of employment" as that term was understood under Section 1. See New Prime, supra, at 543-44 ("When Congress enacted the Arbitration Act in 1925, the term 'contracts of employment' referred to agreements to perform work. No less than those who came before him, [Plaintiffs are] entitled to the benefit of that same understanding today", regardless of his classification.).  With respect to the second two factors, Defendants insists that Plaintiffs are not transportation workers nor do they engage in interstate commerce.  See Dkt. 31-1 at 16.[5]  This is incorrect.

Defendants' contention that full-time delivery drivers like Plaintiffs who drive trucks full of baked goods that have travelled in interstate commerce are not transportation workers, or are somehow not engaged in interstate commerce, simply does not hold up to scrutiny.  Plaintiffs are members of *precisely* the class of "transportation worker" that numerous courts have found fall within the exemption, as they operate trucks delivering commercial products within the flow of

---

[5]      At the same time, Defendants acknowledge that the products delivered by Plaintiffs **"do originate from other states**…."   *See* Dkt. 31-1 at 18, n. 10 (emphasis added). While the question of whether Plaintiffs' are exempt from FLSA overtime protections is not yet before this court, the fact that Defendants believe such an exemption applies is a concession that they are transportation workers allegedly subject to certain Department of Transportation ("DOT") regulations.  In fact, one of the definitions of interstate commerce used by the DOT is "trade, traffic, or transportation" "[b]etween two places **in a State** as part of a trade, traffic, or transportation originating or terminating outside the State or the United States."  See 49 CFR 390.5T.  (emphasis added).

JA0168

interstate commerce.  *See* <u>Nieto v. Fresno Beverage Co., Inc.</u>, No. F074704, 2019 WL 1305459,

at *6 (Cal. Ct. App. Mar. 7, 2019); *see also* <u>Waithaka v. Amazon.com, Inc.</u>, 2019 WL 3938053,

at *2 (D. Mass. Aug. 20, 2019) (noting that there is a consensus in the caselaw that the Section 1

exemption applies to "truck drivers", and collecting cases).  Second, Plaintiffs are unmistakably

engaged in interstate commerce and Defendants' position that workers like Plaintiffs must

literally carry goods across state lines in order to work in interstate commerce has been routinely

rejected.   Indeed, as discussed below, numerous courts have found that transportation workers

making *intra*state deliveries are still "engaged in foreign or interstate commerce" within the

meaning of the Section 1 exemption because their deliveries are "within the flow of interstate

commerce." <u>Circuit City Stores, Inc. v. Adams</u>, 532 U.S. 105, 118 (2001) (citing <u>Gulf Oil Corp.</u>

<u>v. Copp Paving Co.</u>, 419 U.S. 186, 195 (1974)) (emphasis added); *see also* <u>Waithaka v.</u>

<u>Amazon.com, Inc.</u>, 2019 WL 3938053, at *4 (D. Mass. Aug. 20, 2019) (holding that Amazon

delivery driver "clearly works in the transportation industry" and applying Section 1 exemption);

<u>Ward v. Express Messenger Sys. Inc. d/b/a Ontrac</u>, No. 1:17 -cv-02005 (D. Colo. Jan. 28, 2019),

Dkt. 118 at *8 (attached hereto as Ex. A) (holding that last-mile delivery drivers qualified for the

Section 1 transportation worker exemption even though their deliveries all occurred within the

State of Colorado).  Here, the Court should hold the same and should find that Plaintiffs and

other delivery drivers working for Defendants are transportation workers "engaged in interstate

commerce."

      A.     <u>**Plaintiffs are "Transportation Workers"**</u>

     In this case, Plaintiffs make the "last mile" delivery of a wide variety of baked goods and

snack products.  These products are manufactured at various bakery facilities outside of

Connecticut.  *See* Dkt. 31-1 at 18, n. 10.  They are then shipped to a centralized warehouse in

Waterbury, Connecticut.  Plaintiffs then pick up those products, load them onto delivery trucks, and proceed to drive them to grocery stores and other retailers.  *See* Amended Compl. (Dkt. 24) at ¶ 18.  There is no question that delivery drivers like Plaintiffs work in the transportation industry, as the very essence of their jobs as distributors is to transport baked goods from Defendants' warehouse to the retailers who contract with Defendants to purchase products.  Defendants even refer to them as "Distributors," and requires them to sign a "Distribution Agreement."  Dkt. 31.02 at page 10.  It is difficult to conceive of a job that is more quintessentially in the transportation industry.

Defendants argue that because they describe themselves as "manufacturers" of "bread and bakery products," and they do not consider themselves to be a traditional trucking company, then their delivery drivers cannot be "transportation workers" exempt from the FAA.  This borders on the absurd.  Of course, many companies, such as Amazon, would describe themselves as a retailers or manufacturers, as opposed to trucking companies, but drivers who actually perform Amazon deliveries have been held to perform their work in the "transportation industry."  *See* Waithaka v. Amazon.com, Inc., 2019 WL 3938053, at *4 (D. Mass. Aug. 20, 2019) (holding that Amazon delivery driver "clearly works in the transportation industry"); Rittmann v. Amazon.com, Inc., 383 F. Supp. 3d 1196, 1201 (W.D. Wash. 2019).  Indeed, in one case relied upon by Defendants in their motion, a federal district court summarized the relevant case law and held that "[p]laintiffs who are personally responsible for transporting goods, no matter what industry they are in, are 'transportation workers' under the FAA exemption."  *See* Veliz v. Cintas Corp., 2004 WL 2452851, at *6 (N.D. Cal. Apr. 5, 2004), modified on

JA0170

reconsideration, 2005 WL 1048699 (N.D. Cal. May 4, 2005).[6]  Thus, no matter what business

Defendants may think or claim they are in, because Plaintiffs are personally responsible for

transporting goods, the Section 1 exemption applies.[7]

    The cases relied upon by Defendants on this issue are inapposite, as they involve

instances in which courts sought to determine whether employees *who did not personally*

*transport products* might still be exempt under Section 1 of the FAA if their work was closely

related to interstate transportation generally.  *See* Erving v. Virginia Squires Basketball Club,

468 F.2d 1064, 1066 (2d Cir. 1972) (holding that Julius Erving, the professional basketball

player, did not satisfy the transportation worker exemption); Hill v. Rent-A-Center., Inc., 398

F.3d 1286, 1288 (11th Cir. 2005) (involving an account manager for a furniture and appliance

rental business); Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations, 107 F.3d 979,

980 (2d Cir. 1997) (dispute related to "employees of a cleaning contractor" was not subject to

transportation worker exemption); Topf v. Warnaco, Inc., 942 F. Supp. 762, 764 (D. Conn. 1996)

(determining whether "Vice President of Operations" of an apparel manufacturer, who

---

    [6] In Veliz, the Court engaged in a summary judgment-like analysis, considering countless
Declarations, and held that the plaintiffs were more akin to customer service professionals than
delivery drivers because, among other reasons, their duties did not "entail delivery of product in
the same manner that a truck driver does."  Veliz, 2004 WL 2452851, at *10.  The same is not
true in this case, where Plaintiffs quite literally load a truck with products and then drive the
truck to deliver the products to numerous locations.  To the extent Defendants now attempt to
create a factual dispute regarding the nature of Plaintiffs' delivery work, at the motion to dismiss
stage the factual assertions in the Complaint must be taken as true.  *See* Dkt. 24 at ¶ 18 (asserting
that Plaintiffs' job duties entail picking up products at a warehouse, transporting the goods
within the flow of interstate commerce by delivering them to various stores).

    [7]    *See also* Lenz v. Yellow Transp., Inc., 431 F.3d 348, 351 (8th Cir. 2005) (stating that
individuals who drive delivery trucks for a company in the transportation industry are
"indisputably ...transportation worker[s]"); Seven-Up/RC Bottling Co. of S. Cal. v.
Amalgamated Indus. Workers Union, Local 61, NFIU/LIUNA, 183 F. App'x 643, 643-44 (9th
Cir. 2006) (unpublished) ("Semi-Drivers, Pre-Sales Delivery Drivers, Fountain/Vending
Delivery Drivers, and a Utility Driver ... are transportation workers.").

JA0171

performed no deliveries, was a transportation worker); <u>Tran v. Texan Lincoln Mercury, Inc.</u>, 2007 WL 2471616, at *1 (S.D. Tex. Aug. 29, 2007) (holding that "Finance Manager" of car dealership who performed no delivery of merchandise was not a transportation worker); <u>Kowalewski v. Samandarov</u>, 590 F. Supp. 2d 477, 484 (S.D.N.Y. 2008) (holding that taxi drivers who performed no transportation of goods were not transportation workers under the FAA), *but see* <u>Singh v. Uber Techs. Inc.</u>, -- F.3d --, 2019 WL 4282185, at *12 (3d Cir. Sept. 11, 2019) (observing that "the FAA may operate to exclude from FAA coverage the contracts of employment of all classes of transportation workers," including Uber drivers who perform interstate trips). The cases relied on by Defendants are not applicable here, where the Plaintiffs actually transport and deliver interstate goods as their central job function.

In fact, all of the relevant caselaw holds that when an individual performs the work of transporting products, he or she is a transportation worker working in the transportation industry regardless of whether his or her employer considers itself a trucking company. *See* <u>Veliz v. Cintas Corp.</u>, 2004 WL 2452851, at *6 ("Plaintiffs who are personally responsible for transporting goods, no matter what industry they are in, are 'transportation workers' under the FAA exemption."). For example, the Section 1 exemption has been have found to apply in <u>Nieto v. Fresno Beverage Co., Inc.</u>, 2019 WL 1305459 (where the plaintiff distributors worked for a beverage company and their job was to deliver beverages to retailers). *See* <u>id.</u> at *6. And as discussed above, Amazon delivery drivers have been found to be transportation workers, even though Amazon does not itself operate as a traditional trucking company. *See* <u>Waithaka v. Amazon.com, Inc.</u>, 2019 WL 3938053, at *4 (holding that Amazon delivery driver "clearly works in the transportation industry"); <u>Rittmann v. Amazon.com, Inc.</u>, 383 F. Supp. 3d 1196, 1201 (W.D. Wash. 2019).

JA0172

In sum, because Plaintiffs quite clearly perform deliveries of goods and products as the central function of their jobs, there is no conceivable way that they are not "transportation workers," regardless of how Defendants would prefer to characterize their business, and the cases cited by Defendants do not distract from this obvious conclusion.

### B.  Plaintiffs Perform Their Work in Interstate Commerce

The Supreme Court has made clear that workers like Plaintiffs qualify for the Section 1 exemption where they deliver goods that are "within the flow of interstate commerce." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 118 (2001) (citing Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195 (1974)).  Defendants nevertheless argue that Plaintiffs do not qualify for the exemption because their deliveries are "intrastate."  Dkt. 31-1 at 22-25.  However, this is wrong and ignores nearly all of the relevant caselaw holding that the Section 1 exemption is *not* limited to drivers who physically move across state lines: "if Congress intended the residual clause of the exemption to cover only those workers who physically transported goods across state lines, it would have phrased the FAA's language accordingly." Palcko v. Airborne Express, Inc., 372 F.3d 588, 593–94 (3d Cir. 2004); *see also* Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC, 702 F.3d 954, 957 (7th Cir. 2012) (holding that a party primarily engaged in local trucking who occasionally engages in interstate transport is a transportation worker under section 1 of the FAA); Bacashihua v. U.S. Postal Serv., 859 F.2d at 405 (postal worker, who made only intrastate deliveries, was engaged in interstate commerce); Christie v. Loomis Armored US, Inc., 2011 WL 6152979, at *3 (D. Colo. Dec. 9, 2011) (an armored vehicle driver whose job was "to transport currency, a good that is undisputedly in the stream of interstate commerce," was a member of "a class of workers engaged in interstate commerce and is therefore exempt from the FAA pursuant to Section 1," even though the plaintiff herself did not

JA0173

cross state lines to make the deliveries); Austin v. Doordash, Inc., 2019 WL 4804781, at *4 (D.

Mass. Sept. 30, 2019) (noting that "a worker or even a class of workers does not need to drive

across state lines in order to be engaged in interstate commerce"); Nieto v. Fresno Beverage Co.,

Inc., No. F074704, 2019 WL 1305459, at *4 (Cal. Ct. App. Mar. 7, 2019), reh'g denied (Mar. 27,

2019) (intrastate delivery driver found to be exempt under Section 1).[8]

A federal court recently reached this conclusion in Ward v. Express Messenger Sys. Inc.

d/b/a Ontrac, No. 1:17 -cv-02005 (D. Colo. Jan. 28, 2019), Dkt. 118 at *8 (attached hereto as Ex.

A) where the court held that last-mile delivery drivers qualified for the Section 1 transportation

worker exemption even though their deliveries all occurred within the state of Colorado. The

Ward court described the arguments as follows:

> Defendants contend that the [] Plaintiffs, ... are not transportation workers because
> they did not move goods in interstate commerce; they instead made only intrastate
> deliveries in Colorado .... Plaintiffs counter that they are all transportation
> workers because they are all drivers in the transportation industry, and though
> they may not have transported goods across state lines, they directly engaged in
> the movement of goods in interstate commerce ...

See Ex. A at *9.  The court ultimately agreed with Plaintiffs' view.  See id.

Even more recently, two federal courts have rejected the argument advanced by

Defendants in regard to Amazon delivery drivers.  See Waithaka v. Amazon.com, Inc., 2019 WL

3938053, at *4; Rittmann v. Amazon.com, Inc., 383 F. Supp. 3d at 1200.  In Waithaka and

Rittmann, even though the Amazon delivery drivers in those cases may not have traveled across

state lines to make final destination deliveries, the courts found that the transportation worker

---

[8]      Moreover, it is not even necessary that all goods that the workers are delivering are in the
flow of interstate commerce. See, e.g., Siller v. L & F Distributors, Ltd., 109 F.3d 765 (5th Cir.
1997) (finding interstate commerce where only "approximately 39% of the truckloads …
contained some out-of-state products," noting that "even if the hauls contain only slight amounts
of goods traveling in interstate commerce, they will be deemed interstate commerce in its
entirety.").

exemption applied because Amazon was "in the business of shipping goods across state lines" and plaintiffs performed the last leg of the delivery  Rittmann, 383 F. Supp. 3d at 1200. Similarly, here, Defendants admit that "[t]he goods ordered, sold, and delivered by Plaintiffs do originate from other states." Dkt. 31-1 at 18, n. 10.  Thus, but for Plaintiffs and other Distributors, the baked goods such as Wonder Bread that thousands of people enjoy in the State of Connecticut would be stranded in a small handful of Defendants' centralized warehouses and would not make it to the store shelves, causing "a ripple effect in interstate commerce because goods travelling interstate would still not make it to their final destination." Id. 1201-02.  For this reason, workers like Plaintiffs who transport interstate goods "even if it is the last leg of the journey…fal[l] within the transportation worker exemption." Id. at 1201.[9]

## II.   WHERE THE FAA DOES NOT APPLY, ARBITRATION ALSO MAY NOT BE COMPELLED UNDER CONNECTICUT LAW

Given that Plaintiffs are transportation workers exempt from the FAA, Defendants must turn to state law if they wish to enforce the arbitration clauses at issue.  Defendants cannot meet their burden of compelling arbitration three distinct reasons: (1) the plain terms of the Agreement

---

[9]      Defendants rely upon a number of cases related to food delivery drivers in the "gig economy."  Here, Plaintiffs are plainly more like the delivery drivers in Ward, Nieto, and Christie than the takeout food delivery drivers in Levin v. Caviar, Inc., 146 F. Supp. 3d 1146 (N.D. Cal. 2015), Magana v. DoorDash, Inc., 343 F. Supp. 3d 891 (N.D. Cal. 2018), Lee v. Postmates Inc., 2018 WL 6605659 (N.D. Cal. Dec. 17, 2018), Wallace v. Grubhub Holdings Inc., 2019 WL 1399986 (N.D. Ill. Mar. 28, 2019).  In those cases, the plaintiff drivers were akin to pizza delivery drivers, not traditional truck drivers bringing products to stores intended for resale.  And while the holdings of these cases are not binding on this Court and are contrary to the growing weight of authority across jurisdictions, the finding that those "gig economy" workers deliveries of locally prepared food did not fall within Section 1 is distinct from a worker driving a delivery truck full of packaged baked goods and snack products for Defendants from their warehouses, which are within the flow of  interstate delivery supply chain. See also, Nieto supra at FN 3, distinguishing Lee.  In the recent Doordash decision from the District of Massachusetts, the court even noted that an on demand delivery driver who "delivers groceries for a store that buys goods in interstate commerce" may be exempt under Section 1, but where the meals are prepared locally, it would not be the case.  See Austin v. Doordash, Inc., 2019 WL 4804781, at *4 (D. Mass. Sept. 30, 2019).  Here, Plaintiffs are quite clearly delivering goods that are travelling in interstate commerce and have meals that have been locally prepared.

JA0175

provide that Connecticut law (which contains no similar "exemption for transportation workers)

cannot apply when it is inconsistent with the FAA; (2) to the extent that Connecticut law might

require transportation workers like Plaintiffs to pursue their claims in arbitration, Connecticut

law is preempted by the FAA; and (3); though it remains an open question that has not been

decided by the Connecticut Supreme Court, many state court have held that similar class action

waivers in employment contracts are against public policy and are unenforceable.

### A.  The Plain Language of the Agreement Does Not Permit Application of Connecticut Law because it would be "Inconsistent" with the FAA

As explained above, Plaintiffs are transportation workers engaged in interstate commerce

and are therefore exempt from the FAA under the transportation worker exemption, 9 U.S.C. § 1.

Thus, under the plain language of the governing law provision of the Arbitration Agreement,

Plaintiffs cannot be compelled to arbitration under Connecticut law because doing so would be

"inconsistent with the FAA."

Here, the governing law provision of the Arbitration Agreement at issue provides as

follows: "This Arbitration Agreement shall be governed by the FAA and Connecticut law to the

extent Connecticut law is not inconsistent with the FAA."  *See* Dkt. 31-1 at 81 (Exhibit "K" to

Agreement)

In interpreting a contract Connecticut courts "accord the language employed in the

contract a rational construction based on its common, natural and ordinary meaning and usage as

applied to the subject matter of the contract... where the language is unambiguous, we must give

the contract effect according to its terms."  Ramirez v. Health Net of Ne., Inc., 285 Conn. 1, 13–

14, 938 A.2d 576, 586 (2008).  In contrast to ambiguous contract language, where an agreement

contains "definitive contract language, [however] the determination of what the parties intended

17

by their contractual commitments is a question of law." <u>Gold v. Rowland</u>, 325 Conn. 146, 157,

156 A.3d 477, 484 (2017).   Connecticut courts are to "accord the language employed in

the contract a rational construction based on its common, natural and ordinary meaning and

usage as applied to the subject matter of the contract." <u>Harbour Pointe, LLC v. Harbour Landing</u>

<u>Condo. Ass'n, Inc.</u>, 300 Conn. 254, 260, 14 A.3d 284, 288 (2011) (citation omitted).

    The only reasonable interpretation of this governing law provision is to preclude

application of Connecticut law when it is inconsistent with the FAA.  As explained above, the

FAA expressly exempts transportation workers like Plaintiffs from its coverage and therefore

would not require Plaintiffs to proceed in arbitration.  To the extent Connecticut law would lead

to an inconsistent result, i.e., require transportation workers transportation workers engaged in

interstate commerce to bring their claims in arbitration, it cannot be enforced.[10]  Black's Law

Dictionary defines "inconsistent" as "[l]acking agreement among parts; not compatible with

another fact or claim." Black's Law Dictionary (11th ed. 2019).  In short, if the FAA and

Connecticut law could be incompatible – such as where the FAA is inapplicable and would not

compel arbitration, while the state statute would require the opposite result – then under the plain

language of the governing law provision, the Court cannot apply Connecticut law and cannot

compel arbitration.

    This "governing law" language in this case is similar to the contractual provision at issue

in <u>Rittman v. Amazon.com, Inc.</u>, 383 F.Supp.3d 1196.  There, the "governing law" provision in

the plaintiff's contract stated that Washington law could not apply to the arbitration provision of

---

[10]     That said, the Court need not decide the precise question of whether Connecticut law
would independently compel arbitration under the facts of this case because the plain language
sufficiently establishes that Connecticut law cannot apply where it is inconsistent with the FAA,
and thus it is sufficient to conclude that Connecticut law cannot serve as a basis to compel
arbitration here.

the contract, which was only governed by the FAA and federal law.  *See* id. at 1202.  The

Rittman court observed that the intent of the Agreement was that only the FAA would apply to

the arbitration provision and state law would not apply to enforcement of that provision.  Id.  The

Court held that "if the parties intended Washington law to apply if the FAA was found to be

inapplicable, they would have said so," but instead "they did the opposite" and it appeared that

"it is precisely *against* the parties' intent to apply Washington law to the Arbitration Provision."

Id. at 1203.  The same is true here.  If the parties had intended Connecticut law to apply if the

FAA was found to be inapplicable, they would have said so.[11]  Instead, they said the opposite –

that only the FAA would apply and that Connecticut law could not apply if it was inconsistent

with the FAA.  It clearly would be inconsistent where it would compel the opposite outcome

than the FAA in this particulate case.

**B.   To the Extent Connecticut Law May be Applied and Would Require that the Claims be Compelled to Arbitration, the FAA Preempts such an Application of Connecticut Law**

Here, forcing transportation workers into "whatever arbitration procedures the parties'

private contracts might happen to contemplate" would frustrate the purpose and objective of the

Section 1 exemption to free transportation workers from such burdens.  quoting New Prime Inc.

v. Oliveira, 139 S. Ct. at 537.  *See also* Marentette v. Abbott Labs., Inc., 886 F.3d 112, 117 (2d

Cir. 2018) ( Under obstacle preemption principles, state law is preempted "where the state law at

issue 'stands as an obstacle to the accomplishment and execution of the full purposes and

---

[11]     For example, the contract could have been written to provide: "in the event that this provision is exempt from the FAA, arbitration shall be required to the extent permitted by Connecticut law."

JA0178

objectives of Congress.'" (citations omitted).[12]  Thus, to the extent that Connecticut law *might*

require Plaintiffs (transportation workers) to be compelled to arbitration, the FAA should be

found to preempt Connecticut law.

The Supremacy Clause of the United States Constitution "invalidates state laws that

interfere with, or are contrary to federal law." Air Transport Ass'n of Am., Inc. v. Cuomo, 520

F.3d 218, 220 (2d Cir. 2008) (citations and internal quotation marks omitted); *See* U.S. Const.,

Art. VI, cl. 2.  State law may be preempted expressly, impliedly (conflict preemption), or where

Congress occupies the entire field of regulation.  *See* N.Y. SMS A Ltd. P'ship v. Town of

Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010)

There are two subsets of conflict preemption: (1) impossibility and, (2) obstacle

preemption. English v. Gen. Elec. Co., 496 U.S. 72, 79, 110 S. Ct. 2270, 2275, 110 L. Ed. 2d 65

(U.S. 1990). To prove the demanding standard for impossibility preemption a party must

"demonstrate that it was impossible to comply with both federal and state requirements." Wyeth

v. Levine, 555 U.S. at 573. Obstacle preemption occurs when state law is an obstacle to the

"accomplishment and execution of the full purposes and objectives of Congress". Pac. Capital

---

[12]     The case for finding of obstacle preemption is especially compelling here where
Congress has taken a unique federal interest in the transportation industry regulatory framework.
*See*, e.g., Barrett v. Adams Fruit Co., 867 F.2d 1305, 1309 (11th Cir. 1989), aff'd, 494 U.S. 638,
110 S. Ct. 1384, 108 L. Ed. 2d 585 (1990) (applying obstacle preemption principles to preempt
Florida law that conflicted with the transportation worker regulations in the Migrant and
Seasonal Agricultural Worker Protection Act); Geier v. Am. Honda Motor Co., 529 U.S. 861,
863, 120 S. Ct. 1913, 1916, 146 L. Ed. 2d 914 (2000) (state tort law would stand as an obstacle
to DOT regulations); United States v. Locke, 529 U.S. 89, 94, 120 S. Ct. 1135, 1140, 1143 146
L. Ed. 2d 69 (2000) (preempting state regulation of "the maritime oil transport industry" and
explaining that "[t]he State of Washington has enacted legislation in an area where the federal
interest has been manifest since the beginning of our Republic and is now well established).

Bank, N.A. v. Connecticut, 542 F.3d 341, 351 (2d Cir. 2008), quoting United States v. Locke, 529 U. "To determine whether a state law conflicts with Congress' purposes and objectives, we must first ascertain the nature of the federal interest."  Hillman v. Maretta, 569 U.S. 483, 491, 133 S. Ct. 1943, 1950, 186 L. Ed. 2d 43 (2013), citing Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372–73, 120 S. Ct. 2288, 2294, 147 L. Ed. 2d 352 (2000).  Generally speaking, "[t]he mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." Madeira v. Affordable Hous. Found., Inc., 469 F.3d 219, 241 (2d Cir. 2006). Rather, obstacle preemption precludes only those state laws that create an "actual conflict" with an overriding federal purpose and objective. See Mary Jo C. v. N.Y. State & Local Ret. Sys., 707 F.3d 144, 162 (2d Cir. 2013). What constitutes a "sufficient obstacle" is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Ibid. (internal quotation marks omitted).

However, cases involving uniquely federal areas of regulation are more likely to lead to a finding of preemption.  See, e.g., Crosby, 530 U.S. at 373-74 (Massachusetts law undermined Congress's intended "delegation of effective discretion to the President to control economic sanctions against Burma... [and] developing a comprehensive, multilateral strategy toward Burma."); See also Chamber of Commerce of U.S. v. Whiting, 563 U.S. at 604 (noting that the challenging party relied on cases "involving] uniquely federal areas of interest ... Regulating in-state businesses through licensing laws is not such an area." (internal citations omitted)).  See also Hillman, 569 U.S. at 491 ("But family law [within the historic powers of the state] is not entirely insulated from conflict pre-emption principles, and so we have recognized that state laws

JA0180

" governing the economic aspects of domestic relations ... must give way to clearly conflicting federal enactments." Ridgway v. Ridgway, 454 U.S. 46, 55, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981).

In recent years, the U.S. Supreme Court has clarified the application of the FAA's Transportation Worker Exemption and Congress' purpose in adopting this statutory language. Indeed, the Supreme Court has recognized "**Congress' demonstrated concern with transportation workers and their necessary role in the free flow of goods explains the linkage to the two specific**" and that "[i]t would be rational for Congress to ensure that workers in general would be covered by the provisions of the FAA, while reserving for itself more specific legislation for those engaged in transportation" Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 121, 121 S. Ct. 1302, 1312, 149 L. Ed. 2d 234 (2001) (emphasis added).  Generally, "**§§ 3 and 4 of the [FAA] often require a court to stay litigation and compel arbitration "accord[ing] to] the terms" of the parties' agreement.**" New Prime Inc. v. Oliveira, 139 S. Ct. at 537.  However, "this authority doesn't extend to all private contracts, **no matter how emphatically they may express preference for arbitration**." Id.  (emphasis added). Specifically, "§ 1 warns that 'nothing' in the Act 'shall apply' to 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.'" Id.  Indeed, the Supreme Court explained Congress adopted this statutory language because it had already started to regulate "alternative employment dispute resolution regimes for many transportation workers…[a]nd it seems Congress 'did not wish to unsettle' those arrangements in favor of whatever arbitration procedures the parties' private contracts might happen to contemplate." Id., quoting Circuit City Stores, Inc. v. Adams, 532 U.S. at 121. Further, as Defendants recognize in their brief (See Dkt. 31-1 at 21), courts have found that Congress was concerned with workers such as Plaintiffs who transport goods in the flow of

22

interstate commerce because those workers could burden interstate commerce and the national

economy if there was a strike or work stoppage.  *See* Vargas v Delivery Outsourcing, LLC, No.

15-03408, 2016 WL 946112, *3 (N.D. Ca. Mar. 14, 2016) (The "exemption was intended to

reach workers who would, by virtue of a strike, interrupt the free flow of goods to third parties in

the same way that a seamen's strike or railroad employee's strike would." (citation omitted).[13]

As already explained, a work stoppage by baked good distributors "would cause a ripple effect in

interstate commerce because goods travelling interstate would still not make it to their final

destination."  Rittman, 383 F. Supp. 3d at 1201-02.

As it pertains to the transportation worker exemption, Congress expressly decided to

exclude transportation workers from the broad scope of the FAA because it had concerns that

subjecting transportation workers to arbitration might result in labor strife that could burden

interstate commerce and the free flow of goods.  Thus, Congress' chief purpose in adopting the

Section 1 exemption was to guard against arbitration provisions that could be used to oppress

workers, creating an environment for potential labor strife.  Therefore, if a worker is exempt

from the FAA under the transportation worker exemption, state laws that would subject those

workers to arbitration should be preempted because those laws conflict with Congress' chief

purpose of not burdening workers engaged in interstate commerce in this regard and not forcing

---

[13]     As it pertains to the transportation worker exemption, Congress expressly decided to
exclude transportation workers from the broad scope of the FAA because it had concerns that
subjecting transportation workers to arbitration might result in labor strife that could burden
interstate commerce and the free flow of goods.  Thus, Congress' chief purpose in adopting the
Section 1 exemption was to guard against arbitration provisions that could be used to oppress
workers, creating an environment for potential labor strife.  Therefore, if a worker is exempt
from the FAA under the transportation worker exemption, state laws that would subject those
workers to arbitration should be preempted because those laws conflict with Congress' chief
purpose of not burdening workers engaged in interstate commerce in this regard.

JA0182

this group of workers (of unique federal interest) into "whatever arbitration procedures the parties' private contracts might happen to contemplate."  New Prime, 139 S. Ct. at 537.

Finally, Plaintiffs concede that the Third Circuit in Palco v. Airborne Express, Inc., 372 F.3d 588, 595 (3d Cir. 2004) reversed a lower court finding that the FAA transportation worker exemption preempts state law that might require transportation workers to arbitrate.  However, Plaintiffs contend that over the past 15 years, various courts and the U.S. Supreme Court have clarified the purpose of the Section 1 exemption, making the rationale articulated by the Third Circuit no longer tenable.  Moreover, a party asserting preemption has the burden of proof and that this Court has discretion to credit arguments made herein by Plaintiff regarding the preemptive effect of Section 1 that were not considered by the Third Circuit.[14]  Indeed, a review of the Palcko court's preemption analysis leaves much to be desired.  For example, the Court relies on an inapposite case where the FAA required arbitration to be compelled in the face of conflicting laws and the general liberal policy in favor of arbitration under the FAA.  Id. at 595.  But it is nonsensical to use the liberal policy in favor of arbitration under the FAA to find that federal law would permit arbitration *that it expressly excluded from this otherwise liberal scope*.  Further, the court claimed that "[i]t is telling that the arbitration agreement itself envisioned the

---

[14]     Plaintiffs are aware of a handful of other cases rejecting the argument that the Section 1 exemption allegedly preempts state law.  See, e.g., Merrill v. Pathway Leasing LLC, No. 16-CV-02242-KLM, 2019 WL 1915597, at *5 (D. Colo. Apr. 29, 2019); Michel v. Parts Auth., Inc., No. 15CV5730ARRMDG, 2016 WL 5372797, at *3 (E.D.N.Y. Sept. 26, 2016).  However, Plaintiff maintains that the rationale articulated by the Courts in these decisions do not reflect the forceful arguments and showing made herein by Plaintiffs that demonstrate why preemption should be found.  They do not consider the particular obstacle preemption arguments asserted by Plaintiffs here.  In any event, this question is ripe for consideration after the Supreme Court's decision in New Prime.  Indeed, the Supreme Court "decline[d] to tangle with" questions regarding whether arbitration could be compelled on alternative grounds based on New Prime's invitation for the Court to do so.  See New Prime, 139 S. Ct. at 543.

possibility that Palcko's employment contract would be deemed exempt from the FAA's

coverage under section 1 of the Act." But this fact is irrelevant to the preemption analysis which

is rooted in the Supremacy Clause of the constitution, not contractual law.[15] In sum, Plaintiffs

assert that it has met its burden of proving obstacle preemption in this case and other Plaintiffs

who have raised this question may have simply failed to make the necessary showing. More to

the point, the Second Circuit and the District of Connecticut have never decided whether the

transportation worker exemption preempts state laws that would require transportation workers'

claims to be compelled to arbitration.   Here, Plaintiffs have fully explained why preemption

should be found.

## C. The Arbitration Agreement Is Contrary to Connecticut Public Policy

Putting aside the precise issue of whether transportation workers can be compelled to

arbitration under Connecticut law, this particular agreement is contrary to Connecticut public

policy in that it requires Plaintiffs:

> **TO THE MAXIMUM EXTENT PERMITTED BY LAW…WAIVE ANY RIGHT
> TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS,
> COLLECTIVE, REPRESENTATIVE, OR MULT-PLAINTIFF BASIS EITHER IN
> COURT OR ARBITRATION…**

---

[15]   That said, unlike in this case, the Palcko arbitration agreement plainly said that: "To the extent the Federal Arbitration Act is inapplicable, Washington law pertaining to agreements to arbitrate shall apply." Id. at 596. While Plaintiffs believes that this contract language does not impact the appropriate preemption analysis, it is noteworthy that in the case at bar the Arbitration Agreement contains no such pronouncement. To the contrary, it contains that Connecticut law only applies where it is not inconsistent with the FAA. Therefore, Palcko in many respects underscores the unique contractual language here that cannot serve as a basis to compel arbitration under the facts of this case.

JA0184

The agreement further purports to restrict Plaintiffs from participating or recovering in any such action.  *See* Dkt. 31-1 at 80 (Exhibit "K" to Agreement).  As explained, below this agreement should be found unenforceable under Connecticut law.[16]

Under Connecticut law, "[i]t is well established that 'contracts that violate public policy are unenforceable.'" Brown v. Soh, 280 Conn. 494, 501, 909 A.2d 43, 48 (2006), quoting Solomon v. Gilmore, 248 Conn. 769, 774, 731 A.2d 280 (1999).  The Connecticut Supreme Court has found that the Connecticut General Assembly, "in promulgating both civil and criminal penalties [under Connecticut wage laws], recognized the **important public policy of ensuring that employees receive wages due them**." Butler v. Hartford Tech. Inst., Inc., 243 Conn. 454, 463, 704 A.2d 222, 227 (1997) (emphasis added).  Equally important here, whether a contract is contrary to public policy turns on "the totality of the circumstances of any given case against the backdrop of current societal expectations." Brown v. Soh, 280 Conn. 494, 501 (2006).  Under Connecticut law, a court will not enforce a contract that "negate[s] laws enacted for the common good [,]" State v. Lynch, 287 Conn. 464, 477 (2008).; *See also* Jefferson Radiology, P.C. v. Baldwin, No. HHDCV166070917S, 2017 WL 3000714, at *2 (Conn. Super. Ct. June 8, 2017) ("if the contract contemplates acts against public policy, or forbidden by statute, it is inoperative." quoting Smith v. Delaney, 64 Conn. 264, 276, 29 A. 496 (1894).[17]

---

[16]    Indeed, the plain terms of the agreement contemplate that the waiver is subject to challenge: "[a]ny dispute concerning the validity or enforceability of this prohibition against class, collective, representative, or multi-plaintiff action arbitration shall be decided by a court of competent jurisdiction, and no arbitrator shall have any authority to consider or decide any issues concerning the validity or enforceability of such prohibition." *See* Dkt. 31-1 at 80-81.  This language is an indication that there is a question regarding the enforceability of such waivers.

[17]    Moreover, under Connecticut law, "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements ... [I]n evaluating whether the parties have entered into a valid arbitration agreement, the court must look to state law principles." Mack v. Brownstone Expl. & Discovery Park, LLC, No. HHDCV156062570S, 2017 WL 961041, at *2 (Conn. Super. Ct. Jan. 25, 2017), quoting Hottle

JA0185

Plaintiffs contend that in view of the societal impact of these modern-day class action waiver, the case for finding class action waivers in employment agreement unenforceable under Connecticut law has become clear.[18]  Indeed, it has become increasingly evident that these waivers are designed to escape liability and thwart statutory protections.

In fact, a finding that class action waivers in employment agreements are unenforceable under Connecticut law would be consistent with the findings of numerous state courts applying similar legal principles.[19]   *See*, e.g., Waithaka v. Amazon.com, Inc., No. CV 18-40150-TSH, 2019 WL 3938053, at *8 (D. Mass. Aug. 20, 2019) (where the Court applied Massachusetts Supreme Judicial Court precedent and found that the arbitration agreement was unenforceable under Massachusetts law on public policy grounds); Feeney v. Dell Inc., 454 Mass. 192, 908 N.E.2d 753, 761 (2009) (Feeney I) (finding class action waivers in consumer agreements to be contrary to public policy); Machado v. System4 LLC, 465 Mass. 508, 514 (2013); (concluding that Feeney I's logic with respect "to consumer claims under G.L. c. 93A…appl[ies] equally well to claims by employees under the Wage Act.", in a case where workers challenged their misclassification as independent contractors)*; See also,*  Kinkel v. Cingular Wireless LLC, 223

---

v. BDO Seidman, LLP, 268 Conn. 694, 704, 846 A.2d 862 (2004).

[18]    While it is true that where the FAA would compel, the U.S. Supreme Court has upheld class action waivers, here where the FAA would clearly not compel arbitration in view of New Prime, supra, Connecticut legal principles should lead to the finding that the agreement is unconscionable.

[19]    In D'Antuono v. Serv. Rd. Corp., 789 F. Supp. 2d 308, 330 (D. Conn. 2011), the District Court stated that "the Connecticut Supreme Court has never considered the issue" of unconscionable of arbitration agreements in employment contracts.  That statement remains true today.  Plaintiffs assert that the question is ripe for consideration and that for the reasons articulated herein, the class-action waiver in this agreement should be held unconscionable and/or contrary to public policy.

JA0186

Ill. 2d 1, 22-45 (2006); <u>Gentry v. Superior Court</u>, 165 P.3d 556, 560-69 (Cal. 2007); <u>McKenzie Check Advance of Florida, LLC v. Betts</u>, 112 So. 3d 1176 (Fla. 2013); <u>Picardi v. Eighth Judicial Dist. Court of State, ex rel. County of Clark</u>, 127 Nev. 106, 111-14 (2011); <u>Herron v. Century BMW</u>, 387 S.C. 525, 536 (2010); <u>Fiser v. Dell Computer Corp.</u>, 144 N.M. 464, 467-71 (2008); <u>Tillman v. Commercial Credit Loans, Inc.</u>, 362 N.C. 93, 108 (2008); <u>Scott v. Cingular Wireless</u>, 160 Wash. 2d 843, 853-60 (2007); <u>Muhammad v. County Bank of Rehoboth Beach, Delaware</u>, 189 N.J. 1, 22 (2006); <u>Wisconsin Auto Title Loans, Inc. v. Jones</u>, 290 Wis. 2d 514, 553-54 (2006); <u>Leonard v. Terminix Intern. Co., L.P.</u>, 854 So. 2d 529, 539 (Ala. 2002); <u>State ex rel. Dunlap v. Berger</u>, 211 W. Va. 549, 561-64 (2002); <u>Vasquez-Lopez v. Beneficial Oregon, Inc.</u>, 210 Or. App. 553, 569-572 (Or. App. Ct. 2007); <u>Schwartz v. Alltel Corp.</u>, 2006 WL 2243649, *4-5 (Ohio Ct. App. June 29, 2006); <u>Thibodeau v. Comcast Corp.</u>, 912 A.2d 874, 879-86 (Pa. Super. Ct. 2006); <u>Whitney v. Alltel Commc'ns, Inc.</u>, 173 S.W.3d 30, 309-140 (Mo. App. 2005).

Finally, the case for finding that class action waivers in employment agreements are unenforceable under Connecticut law is further supported by the Connecticut Supreme Court's finding "that class actions serve a unique function in vindicating plaintiffs' rights." <u>Rivera v. Veterans Mem'l Med. Ctr.</u>, 262 Conn. 730, 735, 818 A.2d 731, 735 (2003). Indeed, the Connecticut Supreme Court has explained that "[c]lass action procedures…increase efficiencies in civil litigation by encouraging multiple plaintiffs to join in one lawsuit." <u>Id</u>. In fact, Connecticut's class action procedures…are designed to prevent the proliferation of lawsuits, and duplicative efforts and expenses." <u>Id.</u>; <u>See also</u> <u>Grimes v. Hous. Auth. of the City of New Haven</u>, 242 Conn. 236, 244, 698 A.2d 302, 306 (1997) ("Connecticut's class action procedures in

28

Practice Book § 86 et seq…are designed to increase efficiencies in civil litigation by encouraging multiple plaintiffs to join in one lawsuit.").[20]

Accordingly, Plaintiffs assert that the agreement should be found contrary to Connecticut public policy and unenforceable.[21]

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' Motion and permit Plaintiffs' claims to proceed before this Court.

---

[20]   Id. at 306-307. ("Class action suits: (1) promote judicial economy and efficiency; (2) protect defendants from inconsistent obligations; (3) protect the interests of absentee parties; and (4) provide access to judicial relief for small claimants. H. Newberg, Class Actions (3d Ed.1992) § 1.06, p. 1–20.").

[21]   If Defendants' motion is not denied on the basis of Plaintiffs' arguments supra, Plaintiff hereby respectfully requests leave to certify a question to the Supreme Court regarding whether class action waivers in employment agreements are unenforceable as contrary to public policy.

JA0188

Respectfully submitted,

NEAL BISSONNETTE
and TYLER WOJNAROWSKI,
on behalf of themselves and all
others similarly situated,

By their Attorneys,


*/s/ Zachary L. Rubin*

Harold L. Lichten, *pro hac vice*
Matthew W. Thomson, *pro hac vice*
Zachary L. Rubin, (ct30192)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA  02116
(617) 994-5800
hlichten@llrlaw.com
mthomson@llrlaw.com
zrubin@llrlaw.com

DATED:  October 9, 2019


## CERTIFICATION OF SERVICE

I hereby certify that on October 9, 2019, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this document through the court's CM/ECF System.


*/s/ Zachary L. Rubin*

JA0189

Respectfully submitted,
NEAL BISSONNETTE
and TYLER WOJNAROWSKI,
on behalf of themselves and all
others similarly situated,

By their Attorneys,
/s/  *Harold L. Lichten*
Harold L. Lichten
Matthew W. Thomson
Zachary L. Rubin
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116
(617) 994-5800
hlichten@llrlaw.com
mthomson@llrlaw.com
zrubin@llrlaw.com

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 13, 2020, true and correct copies of the

foregoing Joint Appendix were served on counsel of record for each of the Defendant-

Appellees, via the CM/ECF system.

Dated: October 13, 2020                    /s/  *Harold L. Lichten*
                                            Harold L. Lichten